UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

UNITED STATES OF AMERICA, Plaintiff, v. KRISTY LYNN FELKINS, Defendant.

Case No. 2:20-CR-00175-TLN
Sacramento, California
July 20, 2023, 10:25 a.m.

Re: Sentencing Hearing

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE TROY L. NUNLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: U.S. DEPARTMENT OF JUSTICE by
MS. EMILY SAUVAGEAU,
ASSISTANT U.S. ATTORNEY
501 I Street, Suite 10-100
Sacramento, CA 95814

For the Defendant: FEDERAL PUBLIC DEFENDERS by
MS. LINDA C. HARTER
801 I Street, Third Floor
Sacramento, California 95814

MARYANN VALENOTI, RMR, CRR
Official Court Reporter
501 I Street, Suite 4-200
Sacramento, CA 95814
mvalenotiRMRCRR@gmail.com
(916)930-4275

Proceedings reported via mechanical steno - transcript produced via computer-aided transcription

SACRAMENTO, CALIFORNIA, THURSDAY, JULY 20, 2023

--oOo--

(In open court.)

THE CLERK: Calling case 20-CR-175, United States versus Kristy Lynn Felkins, on for judgment and sentencing, Your Honor.

THE COURT: Thank you. Counsel, state your appearances. Let's start first with the Assistant United States Attorney.

MS. SAUVAGEAU: Good morning, Your Honor. Emily Sauvageau standing in for Justin Lee on behalf of the United States.

THE COURT: Counsel for Ms. Felkins.

MS. HARTER: Good morning, Your Honor. Linda Harter from the Federal Defender's office. I'm here with Ms. Felkins. She is standing to my left out of custody.

THE COURT: Good morning, Ms. Harter. I haven't seen you in a while.

MS. HARTER: Good morning.

THE COURT: Good morning. Good morning, ma'am.

THE DEFENDANT: Good morning.

THE COURT: This is the time and place set for the pronouncement of judgment and sentence.

On March 17, 2022, the defendant appeared before this court with her attorney and entered an open plea to a one-count

indictment charging murder for hire in violation of 18 U.S.C. Section 1958. The matter was referred to the probation officer for preparation of a presentence evaluation and report. The Court has read and considered the presentence report dated May 16, 2023.

Ms. Harter, have you received a copy of the presentence report, and have you had an opportunity go over it with your client in detail?

MS. HARTER: Yes, Your Honor.

THE COURT: All right, thank you.

Ms. Felkins, have you received and read a copy of the presentence report?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And, ma'am, have you had an opportunity to go over it with your attorney in detail?

THE DEFENDANT: Yes.

THE COURT: All right, thank you.

The defendant filed formal objections to the PSR. Defendant argues the Court should disregard the guidelines as applied in this case as they are not based on empirical evidence and do not make good policy sense.

More specifically, defendant objects to the application of United States Sentencing Guidelines Section 2A1.5 and argues the correct guidelines for a violation of 18 U.S.C. Section 1958 is United States Sentencing Guidelines

Section 2E1.4.

Defendant takes issue with Probation applying United States Sentencing Guideline Section 2E1.4(a)(2) in equating the underlying unlawful conduct in this case with conduct that would violate 18 U.S.C. Section 373.

Defendant goes on to argue that there are three possible ways to violate 18 U.S.C. Section 1958(a) with increasing penalties for each.

Defendant takes the position that in a case where there is never any chance of physical harm such as here where the person contacted was a scam artist, the correct guideline, therefore, is United States Sentencing Guideline 2E1.4.

Defendant argues that if the guideline is read to apply the cross-reference for any case in which solicitation for murder using the Internet was done, Section 2E1.4 would never apply to a conviction for 18 U.S.C. Section 1958.

Defendant argues that the guidelines bear this out. As the guidelines, when using the cross-reference, would be well over the maximum possible penalty even in a case with no criminal history or aggravating factors which would advise the maximum penalty in every single case.

Defendant argues that such a result would eliminate the effect of accepting responsibility as the guideline would be the same whether a person admitted guilty or went to trial.

The defendant cites a case, *United States versus*

*Temkin*, T-E-M-K-I-N, 797 F.3d 682, Ninth Circuit case from 2015, to support the contention that the cross-reference does not make sense as written.

The defendant also notes 18 U.S.C. Section 373 has different elements of proof and affirmative defenses than Section 1958.

The defendant next argues that United States Sentencing Guideline Sections 2E1.4 and 2A1.5 are not entitled to deference as a policy and that the interplay of those subsections defies logic.

Counsel gives an example, and the example is where defendant describes how these guidelines were amended to become harsher over time and argues those changes were not based on empirical evidence.

The defendant also argues the four-level increase for pecuniary gain is duplicative of the offense level for cases that involved pecuniary gain, which is an element of Section 1958.

The defendant argues the Court should look at the history of the guidelines, the huge increases that were not based on empirical evidence in which you raise any proportionality between defendants and which raise the guideline range to the statutory maximum in every case, and as a policy matter, decline to follow the advice of subsequent amendments to the original guidelines.

The defendant next argues that the Sentencing Commission has already published new guidelines in the Federal Register that would take effect on November 1, 2023. One of the new guideline provisions will be 4C1.1, which will provide defendants like this defendant before this Court who have zero criminal history points with a two-level decrease and applicable offense level.

The defendant emphasizes that the reduction is a result of the Sentencing Commission study of recidivism which noted that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, as well as the fact that less than 40 percent of persons with zero criminal history point scores were receiving sentences within the guideline range.

The defendant also objects to the PSR statement that there are no grounds for departure. Defendant argues that there are two grounds for departure in this case: Diminished capacity under 5K2.13, and abhorrent behavior pursuant to 5K2.20.

The defendant argues there is no doubt at the time of this offense the defendant was suffering from postpartum depression.

The defendant also filed a report from Diana Barnes, a clinical psychologist, who reviewed defendant's medical records, her treatment records while on pretrial release,

information from the defendant's family and also examined the defendant.

Ms. Barnes concluded defendant was suffering from postpartum psychosis at the time of the offense which severely impaired defendant's normal thought and decision-making processes.

The defendant argues she also suffered from major depression and Post Traumatic Stress Disorder as a result of sexual abuse from her childhood, as well as abuse at the hands of her ex-husband.

The defendant argues this reduced mental capacity was not related to the use of drugs or alcohol.

The defendant also argues there was never a real threat of violence, and there was no need to protect the public as she has been receiving mental health treatment for three years and has no other criminal behavior.

The defendant makes many of the same arguments to support a departure based on abhorrent behavior.

The defendant argues she has no criminal history. She committed the offense during the brief time when she was suffering from untreated mental illness.

The offense only occurred on the Internet, and it was a marked deviation from her otherwise law-abiding life.

The defendant also emphasizes that no violence occurred, no drugs were involved, and no dangerous weapon was

involved.

Ms. Harter, did the Court accurately summarize the defendant's arguments?

MS. HARTER: Yes, Your Honor, and I appreciate the debrief that you gave the defense papers.

I would like to add just one note to your summary: The draft report came out, and I submitted an informal -- informal objections that pretty much mirror what you just summarized, and the response to those from Probation, they noted that -- the missing link here for the departures was an expert opinion, a diagnosis and a description of postpartum psychosis.

The final report came out before the expert report was submitted. So I just wanted to note that, that at the time probation wrote that final report, they did not have the benefit of the expert report by Ms. Barnes that was due. Your Honor, it's difficult to find an expert who's willing to work on these cases, and then it's difficult to get funding approved. That took some extra time, and by the time the report came, Ms. Barnes came on board, and the final report had already been submitted.

THE COURT: All right. I understand that. There actually is a national shortage right now of psychiatrists and/or psychologists, and it doesn't just impact this case, it impacts our system, as well as the mental health system, as

well as medical care throughout the United States. I do understand that.

Anything further you'd like to add?

MS. HARTER: About the guidelines, no, Your Honor.

THE COURT: Okay, all right. In response, the Government -- I should indicate the Government did file a response, and the Government argues that defendant's objections are really policy disagreements with the guidelines. As such, the Government argues the Court should overrule the objections and instead consider the policy objections as a request for a variance under 18 U.S.C. Section 3553(a).

The Government further argues that the presentence report correctly calculated the guideline range based on application of the United States Sentencing Guideline Section 2A1.5, and the Government also emphasizes that the Ninth Circuit in *Temkin* explicitly held that the applicable guideline range for Section 1958 conviction is United States Sentencing Guideline Section 2A1.5.

The Government next argues the Court should decline to apply a two-level reduction based on the prospective change to the sentencing guidelines as the Court is required to apply the version of the guidelines in effect at sentencing.

The Government requests that if the Court is inclined to apply the two-level reduction before it takes effect, the Court should calculate the guideline range under the current

version of the guidelines before varying downward.

The Government also requests that if the Court does vary downward, the Court clearly state that the variance is a result of the amendment so the defendant will not receive a further reduction if and when the amendment becomes retroactive.

I should note that the Government did not address defendant's request for a downward departure as related to diminished capacity or abhorrent behavior.

Did the Court accurately summarize the Government's arguments?

MS. SAUVAGEAU: Yes, Your Honor.

THE COURT: Does the Government wish to be heard any further?

MS. SAUVAGEAU: We would submit on the papers, including the recommendation of the probation office.

THE COURT: All right, thank you.

The Court agrees with the Government that the majority of defendant's objections or policy disagreements with the guidelines rather than proper formal objections; therefore, the Court will consider those arguments during the sentencing.

Further, the Court agrees with the Government and Probation that the PSR properly calculated the defendant's base offense level.

The calculation is based on and supported by the

*Temkin* case in which the Ninth Circuit held a defendant being sentenced for a Section 1958 conviction should have an offense level set by United States Sentencing Guideline section 2A1.5. That's explicitly stated in *Temkin*.

The Ninth Circuit did indicate that the District Court in that case had erred by not using the cross-referencing provision in United States Sentencing Guideline Section 2E1.4(a)(2), and for that proposition you could see *Temkin* and that's at Page 695.

As to the defendant's request to reduce -- for the Court to reduce her offense level based on a prospective change to the guidelines that is expected to take effect in November 2023, the Court declines to do that, declines to calculate the defendant's guideline range using a guideline provision that is not yet in effect.

Lastly, the Court denies defendant's request for a downward departure as Probation pointed out in its response to defendant's informal objection.

The defendant engaged in significant planning for this offense that precludes a downward departure for abhorrent behavior pursuant to 5K2.20.

As to diminished capacity, the Court finds the facts and circumstances of defendant's offense indicate a need to protect the public because the offense involved a serious threat of violence.

The defendant has not persuaded this Court that the threat of violence in this case was any less serious merely because she was talking to a scam artist rather than an actual hitman; therefore, the Court declines to grant a downward departure for diminished capacity pursuant to 5K2.13; however, however, I just want to make it clear that the Court will consider these arguments in determining whether to grant a downward variance during sentencing. For these reasons, the Court does overrule all of the defendant's objections subject to what I've just said.

Are there are any other objections to any statements of material facts, sentencing classifications, sentencing guideline ranges and/or policy statements filed that this Court is not aware of?

MS. SAUVAGEAU: No, Your Honor.

MS. HARTER: No, Your Honor.

THE COURT: All right. Thank you. There being no further objections to the findings in the presentence report, the Court adopts those findings and determines those findings to be true and correct.

The Court does find an advisory offense level of 34. This includes the following: On the base offense level of 33 pursuant to United States Sentencing Guideline Sections 2E1.4(a)2 and 2A1.5(a)., a four-level increase pursuant to United States Sentencing Guideline Section 2A1.5(b)(1) because

the defendant paid $5,000 to hire someone on the dark web to murder the Victim 1, G.S., and a three-level reduction for acceptance of responsibility pursuant to United States Sentencing Guideline Section 3E1.1(a) through (b).

The advisory criminal history is I, therefore, the guideline range is 151 to 188 months; however, the statutorily authorized maximum sentence of 10 years is less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 120 months pursuant to United States Sentencing Section 5G1.1(a).

Are there any reasons judgment and sentence should not proceed at this time?

MS. SAUVAGEAU: No, Your Honor. I don't know when the Court would wish to address this, the victim is present. I'm not sure whether he still wishes to address the Court.

THE COURT: Understood, understood. We will address that in a moment.

MS. SAUVAGEAU: Thank you.

THE COURT: Is there any reason judgment and sentence should not proceed at this time?

MS. HARTER: No, Your Honor.

THE COURT: All right, thank you.

The defendant did file a Sentencing Memorandum with the Court in which defendant requests the Court impose a five-year term of supervision with conditions, including

continued counseling and community service based upon factors under 18 U.S.C. Section 3553(a).

As to the defendant's history and characteristics, the defendant argues she has never committed a crime prior to this incident.

The defendant indicates that her two oldest children now live with her and have written letters explaining how much their mother does for them and how important she is to their family.

The defendant also talks about how she is a mother, a teacher and helps the family at home and ranch.

The defendant also states she is a vital member of her family, vital member of the community, and there is a long list of people who depend on her.

As to the nature and circumstances of the offense, the defendant states she committed the crime after the birth of her third child during a period of time where she was suffering from postpartum psychosis.

The defendant reiterates that no one was ever in real danger because the person that defendant found to assist her was a scam artist who has since been arrested.

The defendant also emphasizes she was not arrested for four years and five months after she stopped communicating with this scam artist, and when she was arrested, she immediately gave an honest and full account of her actions.

As to the need to protect the public, defendant argues the crime took place over seven years ago, and she has not posed any threat to the community or her ex-husband since.

The defendant also states that since her release from custody in 2020, she adds her ex-husband did not oppose that release.

She indicates that since then, she has been participating in counseling up through pretrial services.

The defendant indicates that neither her treating counselor nor the expert hired in this case to evaluate defendant believed she poses a threat, and they agree she was suffering from mental illness that she has been committed to overcoming, that she is extremely well and that she is not a danger.

As to the need to provide effective treatment, defendant argues that she has already established a successful relationship with a counselor in her community and sending her to prison would interrupt this treatment and would not be an effective way to treat her mental health issues.

As to the need to provide deterrent and to avoid unwarranted sentencing disparities, the defendant argues that for reasons already discussed, a prison sentence is not necessary to deter her from further criminal behavior.

As to general deterrence, the defendant argues that although this is a serious criminal action or criminal -- or

serious criminal behavior, it is not an imminent threat to the citizenry, and media is already doing a good job of publicizing the fact that sites like the one defendant used are usually frauds, and the people using them are often caught.

The defendant further indicates that there are no similar cases that would create an unwarranted sentencing disparity.

As to the need to provide restitution, defendant argues that restitution is not an issue in this case, but notes that community service hours would be appropriate to allow defendant to atone for her criminal behavior by giving back to her community.

Ms. Harter, did the Court accurately summarize the defendant's arguments?

MS. HARTER: Yes.

THE COURT: Is there anything you would like to add to those arguments?

MS. HARTER: I do have a few comments I'd like to make, if you are ready for those.

THE COURT: Sure. I'm ready.

MS. HARTER: Okay. So, Your Honor knows I've been doing this for a long time, and there are not many cases that cause me to lose sleep after 30 years, but this one has. I think your job here is difficult because you haven't had a chance to get to know Ms. Felkins and her family.

There is no doubt in my mind that she does not pose a danger and that a sentence here does not need to be imposed to deter her or to protect the public in any way. I'm confident of that, but I think she's also shown that because it's been seven years since this happened, and she's been in treatment, she's been fully compliant, and I think she's proven that we don't need to worry about her reoffending in any way.

To the victim who is present in the courtroom, I can't imagine what it would feel like to find out about this. I'm sure it was shocking. He expressed in the statement that it was shocking.

I don't know if anyone has told him, but he should be aware that there have been three clinicians now who have evaluated Ms. Felkins; two of them treating her and one hired, I'm talking about Diana Barnes. They all concluded that while she was suffering from this serious illness back at the end of 2015 and the beginning of 2016, that she's been treated and that she does not pose a danger to the future. That was their expert opinion. So hopefully he takes solace in that.

I do want to let Your Honor know that present in the courtroom today, besides the victim in this case and probably his family, are her family. Her husband is here. Her two children, the two oldest children, Jayden and Emerald are here. I know that they wanted to address the Court, but they know that's not usual, and they are aware that you have their

letters, and I assured them that you would have given that a careful read.

Her father and his wife is here. Matt, her husband, is here, his mother, his sister and his aunt are here showing support for her. Her mother is here, but at the hotel with the baby.

You received letters from all of these people, and I don't want to reiterate what's in them. What I do want to highlight, though, that in particular Matt's family, they did notice that something was wrong, and they expressed that in their letters, that something was wrong at the end of 2015, the beginning of 2016. I think that's significant.

It's also significant that we have a diagnosis from a clinician, her treating physician back at the end of 2015, after the birth of her son.

I know you know that the shortage in psychologists, psychiatrists, and that is a problem because what happened here was she was diagnosed with postpartum depression. She was given some antidepressants and told she should find additional treatment and then her insurance lapsed. Unfortunately, nobody warned her or her family that left untreated, that this could be an even more serious condition, and indeed that's what happened here.

From the first time that I met Ms. Felkins in this case, she expressed to me that it was hard for her to

understand what happened, that she felt like she was outside of herself or looking at somebody else's life when she thinks back about that time. She struggled to even put it into words when we were talking about it, and the more I got to know her and heard from people in her community, the more just unfathomable it was to me that this person could have gone on the web and sent the e-mails that she sent.

All I could say, Your Honor, is that postpartum psychosis is a terrible disease, and she was suffering from it untreated and that explains why this otherwise law-abiding person could do something as crazy as she did.

She does not wish any harm to her ex-husband. They did not have a friendly divorce. They did have a custody battle, but he is the father of her children, and she does not wish then or now, truly, any harm to come to him. He's the only father the kids have.

I don't think I have anything else to add to that, other than I just don't see any purpose to putting her in prison at this point. It would be a hole in the community, and it would be a hole in her family.

THE COURT: Thank you. Thank you. I'll allow her to allocute if she wishes to do so at the appropriate time.

All right. The Government also filed a Sentencing Memorandum in which the Government joins in the recommendation of probation officer, that the Court sentence the defendant to

87 months of imprisonment, 36 months of supervised release and a $100 special assessment.

The Government also notes the victim will be present at sentencing, at least insofar as the Sentencing Memorandum I initially received indicated that he did wish to be heard. Did the Court accurately summarize the Government's arguments?

MS. SAUVAGEAU: Yes, Your Honor.

THE COURT: Thank you. Is there anything further in support of those arguments, Counsel?

MS. SAUVAGEAU: Submitted.

THE COURT: In determining the sentence, the Court looks at the United States Supreme Court case *United States versus Booker*, as well as the advisory sentencing guidelines. The Court notes that the guidelines are not mandatory, but advisory and a starting point. The Court also looks to the statutory provisions of 18 U.S.C. Section 3553(a) to determine a sentence sufficient but not greater than necessary to comply with the purposes of sentencing.

You know, the Court has reviewed this case in detail, and I'll tell you this: It's not a simple case where I could just simply read it, put it down, and make a decision. It really isn't that kind of case.

The Court has reviewed the filings in this case, the character reference letters, criminal history, her level of involvement, the reports by experts in this case, the family

history, and before I proceed to pronounce judgment and sentence, I know there was an indication that the victim wished to be heard, and then I think there was an indication maybe he didn't want to be heard, but this is the kind of case where if the victim is present, I really need to hear from the victim in this case. And I really would like to hear from the victim. I don't need to, but I really would like to hear from the victim in this case. It would really help the Court in this instance to hear from the victim. So if the victim is present, I would like to hear from him.

MS. SAUVAGEAU: Thank you, Your Honor. The victim G.S. is present, and he is seated in the purple shirt in the back. I asked him right before we stated if he still wanted to speak, and he was unsure. So if we could ask him that now...

THE COURT: Mr. G.S., would you please come forward, sir. Just come up to the podium, please.

You've sat here -- and pull the microphone a little bit closer to you.

You've sat here and you heard everything we've been talking about for at least the last 30 minutes. Really, this is about you. Something the Government said is that you didn't know any of this was going on, and then when you found out, I imagine it was quite traumatic for you, but I want you to tell me how you felt about this, sir, please.

VICTIM G.S.: Um, I was very, very surprised at all of

the pieces of it.

I felt that the divorce was as amicable as you could expect. There was cooperation on both sides, and I think that looking at how things played out afterward really shows that that was the case when it comes to custody.

Even if I had custody -- I didn't use this case as a reason to legally pull the kids back. I thought it was still fair that they spend time with their mom. Just as she said, "He is their father," she is their mother, so I supported her as their mother at every step of this. So, the push for there being that much conflict I think is very inaccurate.

The biggest piece that stands out to me with this is that yes, she is a wonderful mother in many respects. She is vital to the family and community in a lot of ways, but in this situation there is also great advantage to portraying that image and character. While if you look historically at those who have been close, maintaining long-term friendships hasn't been something that she's been capable of.

Then looking at the children, one of the big parts of this that bothers me now is that the kids have been exposed to pieces of this that were absolutely unnecessary, and in doing that, it's taking -- it's harming them for her advantage. I don't think they're in a place to recognize that or the effect that it's going to have on them in the long-term, and of all of the pieces of this, that is the one that bothers me the most,

far more than any other aspect.

THE COURT: I just have a couple of questions, and this just helps give me some clarity and helps me base the decision that I have to make. It's a very important decision that's going to effect your ex-wife. It's going to effect your kids. It's going to effect her family. It's also going to effect you as well because you will always have that bond with your ex-wife because you do have kids.

Ms. Harter indicated earlier that there was a period of time where people around your wife -- and I don't know -- maybe you were in a better position to see it than other people -- noticed changes in her. Did you notice any changes?

VICTIM G.S.: During the 2015-2016 time period?

THE COURT: Yes.

VICTIM G.S.: It's really hard to say. Many of our communications at that point were around custody and division of property. At that point the pieces that I noticed were out of character seemed to be most likely things that I attributed to being from her lawyer trying to represent her and something that was more of a standard division of property.

THE COURT: When you say noticed things out of character, what are you referring to? Give me some examples.

VICTIM G.S.: Just being more combative on details on things when it came to dividing property, but that was really the basis of a lot of our communication at that point. When it

came to time with kids, there was nothing that stood out with that communication.

THE COURT: You indicated or at least the Government had indicated that you said that she had trouble making friends. I think you said that she had trouble making friends or maintaining relationships. Was that around the period of time when you were noticing that?

VICTIM G.S.: It's always been the case. I do agree with the professionals on that respect, in that there was, from a childhood trauma, a need to be in control of lots of situations. When it came to combative -- anything with friends where there was a bit of conflict on dominance, it became -- it ended poorly.

THE COURT: So then there is this conflict with the divorce, and it seems like that just manifested itself again. Am I reading too much into that?

VICTIM G.S.: No, I believe you are absolutely correct, and I think the custody was a bigger aspect of it. Having lack of control when it came to the kids, that had a tremendous effect on her, I could very much see that.

THE COURT: Okay. My final question, obviously this is going to have -- let me ask you this question, I'm going to be very blunt about it: Both the Government and Probation recommends that your ex-wife be sentenced to 87 months in prison, and I want to know how you feel about that.

VICTIM G.S.: That is a very difficult one to answer because I believe the sentence is less for my benefit and less for her benefit and more for the kids in ways that they don't recognize at this point.

There's been a lot over the recent past where it has been advantageous to have a particular narrative that they're exposed to, and they don't know better. They are not going to be able to unwind many of the things they're being told, and they believe those things, and they will for a very long time. I believe it is essential that they get sufficient time to be able to figure themselves out and work this out themselves. To me that is the biggest aspect of it and why I would push for something more substantial.

THE COURT: Well, obviously we allow victims to speak, and we call them Victim Impact Statements because truly if you look at the purpose of a Victim Impact Statement, I'm not here to protect the integrity of, you know, your kids' relationship with your wife, your kids' relationship with you.

What I'm here is to see if the Court should meet out some punishment to your wife based upon -- very simple, based upon her attempts to have you killed and have who is now your wife, your girlfriend at the time, to have her harmed in some way as well, that's why I'm here. So I wanted to just make it clear that while there's some issues that played out during the course and even playing out now with your kids and how they

view you, how they view your wife, that's not why I'm here. Understood?

VICTIM G.S.: Fair enough, sir. I'm just trying to be as honest and transparent.

THE COURT: Right. I think what I hear you saying is that you do think that she should -- she deserves some punishment for this; is that what I hear you saying?

VICTIM G.S.: The intent to end someone's life, especially someone who's working with you on so many levels, yes, I believe that should be as substantial as the law allows.

THE COURT: Okay. All right. Thank you very much. I appreciate it.

Any further Victim Impact Statements?

MS. SAUVAGEAU: No, Your Honor. His written statement was provided with the PSR, which I know the Court already indicated that it reviewed.

THE COURT: Absolutely. Does the Government wish to say anything further?

MS. SAUVAGEAU: Submitted.

THE COURT: All right. Ms. Harter, I did indicate that at some point I would give your client an opportunity to allocute if she wishes to do so. Does she wish to be heard?

MS. HARTER: She does, Your Honor. I just have a couple of things I would like to add.

THE COURT: Sure.

MS. HARTER: And I don't know if Mr. Scott's aware or not, but I think the Court is aware that the children that we're talking about, Jayden and Emerald, Emerald is actually a young adult now. They were taken by Ms. Felkins in for therapy where they could have a private relationship with the therapist because I think she recognized that all of this was hard on them, and by "all of this," I'm talking about her own actions. She did recognize that that was difficult for the children to process. She was arrested at home in front of her children. So she knows that they had issues to process. She took them to counseling so that they could help deal with that, and, in fact, Emerald is still in counseling to talk about those things.

So I don't think there's -- not only -- her presence does not interfere with them getting counseling and processing that. In fact, they have facilitated -- she has facilitated that they get help, professional help.

I think Mr. G.S. is probably frustrated by his lack of contact with the children in recent years, and, you know, it's a difficult situation because part of her pretrial release conditions has been no contact with Mr. G.S., but -- I mean, Ms. Felkins. Now, he wasn't subject to those conditions. But to the extent that prior to her arrest they were co-parenting and able to communicate and do that sort of thing, well, once she couldn't have contact at all with him anymore, you know,

that made things very difficult as he said in his statement, but a lot of that, I think, Your Honor, was beyond her control.

I don't think that you need to put her in prison so that the children and their father can have a better communication or a better contact. I think what has happened is just a function of that she couldn't communicate anymore, and she couldn't really co-parent with him anymore.

So those are the only -- and the last thing I would say is even Mr. G.S., Your Honor, tells you that she is a good mother and that she is a good member of her community, and that he doesn't feel like you need to put her in prison to protect him.

THE COURT: All right. Thank you. Does your client wish to be heard?

MS. HARTER: She does.

THE COURT: Yes, ma'am.

THE DEFENDANT: Your Honor, I'm so sorry for what I did. I lost my mind, and I worked extremely hard to improve my mental health, but that doesn't undo what I did. The pain and the stress that I have caused to G.S. and his family, my children and my family, I do thank God everyday that the person that I talked to was a scam artist because that could have been so much worse.

I'm very glad that no harm came to G.S., and I wish that I could undo it all.

THE COURT: All right. Thank you. Anything further for me to decide?

MS. SAUVAGEAU: No, Your Honor.

THE COURT: Anything further?

MS. HARTER: No, Your Honor.

THE COURT: All right, thank you. Let me say something, Ms. Harter, you are absolutely correct, there is nothing I could do here from the bench to alleviate any lingering issues, any pain that these kids endured during this whole ordeal; that's just not what we do, and you are absolutely correct about that.

I heard what the victim said in this matter, and I'm referring to him as "victim" because I don't want his name used, and that's what we do here. So I just don't want to make it so impersonal because it is personal, I did hear from him. You know, when he made the comments, for example, about the relationship that he had with the kids and that the kids have been exposed to things that are hurting them, I don't think there's any doubt about this, that there is any doubt. I think the kids are probably in need of counseling as much as anyone else in this case because they have to grow up with this for the rest of their lives, and they sort of had a bird's eye view to what was happening here. I really sincerely hope that they do get counseling and that they're able to, at some point, I think in a perfect world, have a relationship with both their

mother and their father.

So that really doesn't drive the Court. Of course I'm not here for family reconciliation, I'm not a family law court, so that's not what I do here, but what we do here is we try to meet out punishment for somebody who committed a crime.

I think it's already been stated, you know, that if the person, the so-called hitman was not a scam artist, we would be having a much different case here today. So there is a level of punishment that the Court needs to meet out in this case. So the Court is asking itself, What is that level of punishment? That's especially true here because there's so many different variables here and things that the Court can consider; for example, here you have a defendant before the Court who comes here who has been a victim of abuse as a child, and obviously as we all know, those of us in the system know, that abuse continues on for the rest of her life, and it spills over into relationships as well. I think her ex-husband spoke to some of it in how she has problems keeping and maintaining relationships, that is something that's common with victims of abuse.

Then you have a mental health component, and you have certain diagnosis, Post Traumatic Stress Disorder, postpartum psychosis, diminished capacity to abhorrent behavior, and you got all these things that play a part in who she is, and I have to take this person before me, and I have to try to meet out a

sentence that we would look at and say, "Well, that's justice." I don't think any sentence in this case could do anyone in this case justice.

On the one hand I have the victim here who's saying, "I want you to meet out some punishment."

I got the defendant here saying, "Well, you could meet out some punishment, but just don't make it imprisonment. I don't want to go to prison."

I have to consider all those things, and I do think that this is a case that does call for some imprisonment. The reality is this: There are going to be some people who are going to be harmed by that, not just this defendant, but these kids. I read all these letters. The people that she serves, so to speak, and people who love her and people who care for her and people who truly know her, who know what she's been through as a person, but I also agree with what Ms. Harter said earlier. For me not to take into consideration the diminished capacity and abhorrent behavior would simply be wrong on so many different levels. Because we generally -- when we deal with people who come before this Court who have criminal histories, those are the easy cases. Those are the easy cases. Those are the cases where we are talking about gradations of punishment. We know, we know, I don't want to say someone slots into a certain sentence, no, they don't, and we still listen, and you know how I do things. I listen to everything

everyone tells me, and I go over -- I sometimes go over it, and people ask me, "Why do you take so long," because I like to go over these cases, and I want to truly capture the person before me.

I think I know the person before me today. I think that this case is really sad. It's really sad because there was those things that interplay, the things that are working in her life, the mental health, and the person that she is, but also I have to look at the crime that was committed and that was serious. Although it was a scam artist, it was still very, very serious. Then the statement that if his girlfriend's with him, hurt her too. I have the deal with that.

I don't think -- I'll be honest with you, I'm going to grant a variance in this case because I don't think that 87 months in this case is appropriate.

I'm going to tell you, 87 months was not -- that was something that took all these factors into consideration. I'll tell you, they took some of the factors into consideration, I just don't think they took enough into consideration.

Therefore, it is the judgment and sentence of this Court, pursuant to the Sentencing Reform Act of 1984, that the defendant Kristin Lynn Felkins will be committed to the custody of Bureau of Prisons to be in prison for a term of 60 months.

The defendant will pay a special assessment of $100, payment to begin immediately.

The Court does find the defendant does not have the ability to pay a fine, so imposition of a fine is hereby waived.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 36 months.

Within 72 hours of release from the custody of Bureau of Prisons, the defendant shall report in person to the probation office in the district to which she is released.

While on supervised release, the defendant shall not commit another federal, state or local crime, and shall not illegally possess any controlled substance.

The defendant shall cooperate in the collection of dna as directed by the probation officer, and shall comply with the standards conditions which had been recommended by United States Sentencing Commission and adopted by this Court.

The mandatory drug testing condition is suspended based upon this Court's determination that the defendant poses a low risk of future substance abuse.

The Court also adopts the Special Conditions recommended by probation officer in the Sentencing Recommendation portion of the probation report and imposes all of those listed as Special Conditions.

The Court does find that this sentence is sufficiently long to punish the defendant, deter others from similar criminal conduct, but not be longer than necessary to achieve

those stated goals, and, therefore, meets the requirements of 18 U.S.C. Section 3553(a).

Ms. Felkins, you do have a right to appeal from your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other defect in the proceedings that was not waived by your plea.

You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the sentence is contrary to law.

With few exceptions, any Notice of Appeal must be filed within 14 days of judgment being entered in your case.

If you cannot afford the cost of an appeal, you will be permitted to proceed without the payment of cost.

If you cannot afford counsel, one will be appointed to represent you.

If you request, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf.

Ms. Harter, do you have a voluntary surrender date?

MS. HARTER: Your Honor, we're asking for a date at the end of September to give her time to arrange child care for the baby, and she'll need to enroll the other child in school.

THE COURT: All right. Thank you. We could do the 29th. September 29th, that's the last day of weekday in September. September 29.

MS. HARTER: Yes.

THE COURT: All right. It is further ordered, Ms. Felkins, that having been sentenced to the custody of Bureau of Prisons, you shall surrender to the institution designated by the Bureau of Prisons, or if no such institution has been designated, to the United States Marshal in Sacramento, California before 12:00. Have they changed it? Okay, before 12:00 p.m. on September 29, 2023.

Ma'am, I am also required to advise you that it is a criminal offense punishable by a consecutive term of imprisonment to fail to surrender for a service of sentence pursuant to the order of this Court.

All conditions of pretrial release shall remain in effect until the defendant surrenders in accordance with this order.

I'll recommend she be housed in an institution in Northern California.

MS. HARTER: Well, Your Honor, I think the closest place to Fallon for women would be either Victorville or Dublin.

THE COURT: I'll recommend she be housed either Victorville or Dublin, but this recommendation is subject to the security classification of the defendant and space availability as determined by the Bureau of Prisons.

Is there anything further?

MS. SAUVAGEAU: Your Honor, at the risk of beating a

dead horse, I know we talked about reasons for variances, but with the November 1 prospective amendments in mind, I just wanted to clarify if that is one of the Court's reasons for the variance.

THE COURT: No, that's not. Understood?

MS. SAUVAGEAU: Yes. Thank you.

THE COURT: Thank you, very much.

Good luck, ma'am. Thank you.

All right. Court stands in recess.

(Proceedings concluded at 11:18 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a true and correct transcript of proceedings in the above-entitled matter.

MARYANN VALENOTI, RMR, CRR
Official Court Reporter
CA CSR #11266

September 19, 2023
DATE