HEATHER E. WILLIAMS, Bar No. #122664
Federal Defender
CAROLYN M. WIGGIN, Bar No. #182732
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
Email: carolyn_wiggin@fd.org

Attorneys for Defendant-Movant
KRISTY LYNN FELKINS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | ) Case No: 2:20-cr-00175-TLN |
| Plaintiff, | ) |
| vs. | ) MOTION TO REDUCE SENTENCE |
| KRISTY LYNN FELKINS | ) PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) |
| Defendant. | ) (COMPASSIONATE RELEASE) |

## Table of Contents

Table of Authorities ......................................................................................................... ii

I.    Introduction ........................................................................................................... 1

II.   Relevant Facts and Procedural History ................................................................. 1

A.   Ms. Felkins Largely Positive Character and Behavior Aside from Abberant
Offense Behavior in the Midst of Post-Partum Psychosis. ........................................ 1

      1.    Ms. Felkins' Life Prior to Offense. ................................................... 1

      2.    Offense Conduct ................................................................................ 3

      3.    Ms. Felkins' Life After Offense ....................................................... 3

      4.    Arrest and Indictment ........................................................................ 3

      5.    Pretrial Supervision .......................................................................... 4

B.   Guilty Plea and Sentencing .................................................................................. 4

C.   Conditions at FCI Dublin During Ms. Felkins' Service of Her Sentence. ........... 5

D.   Closure of FCI Dublin and Ms. Felkins' Transfer to FCI Waseca ...................... 6

      1.    Overcrowding, Disrepair, and Lack of Programming at FCI Waseca ......... 6

      2.    Impact of Transfer to FCI Waseca on Ms. Felkins and Her Family ......... 7

E.   Caregiving Crisis for Ms. Felkins' Two Youngest Children ................................ 8

F.   Ms. Felkins' Conduct While Serving Her Prison Term ....................................... 9

G.   Ms. Felkins' Health Issues ................................................................................ 10

H.   Ms. Felkins' Release Plan ................................................................................. 11

III.   Argument ............................................................................................................ 13

A.   Statutory Framework for Sentence Reduction Authority Under 18 U.S.C.
§ 3582(c)(1)(A)(i) .................................................................................................... 13

B.   Ms. Felkins Has Exhausted Administrative Remedies ...................................... 14

C.   Extraordinary Circumstances Support a Grant of Compassionate Release. ....... 14

      1.    Under U.S.S.G. Section 1B1.13(b)(3) Ms. Felkins' Family Circumstances
Are and Extraordinary and Compelling Reason Warranting a Grant of
Compassionate Release. .......................................................................................... 14

      2.    Under U.S.S.G. Section 1B1.13(b)(5), Both the Harm Caused to Ms. Felkins
and Her Family By Her Placement in a Prison More Than 1600 Miles from Her
Family, and the Harsh Conditions of Her Prison Term, Are Grave Circumstances
that Warrant a Grant of Compassionate Release. .................................................... 17

      a.    Ms. Felkins' Transfer to FCI Waseca, a Prison More Than 1,600 Miles from Her
Family, Prevents Family Visits that Are Critical to Both Ms. Felkins and Her Family. ...... 18

      b.    Ms. Felkins Has Served an Exceedingly Difficult Prison Term ..................... 20

      3.    Ms. Felkins' Rehabilitation in Prison Supports Compassionate Release .............. 23

D.   The 18 U.S.C. Section 3553(a) Factors Support a Grant of Compassionate Release ........... 24

IV.   CONCLUSION .................................................................................................. 27

1

Table of Authorities

2

3    Federal Cases

4    *California Coalition for Women Prisoners et al v. United States of America*
5        *Federal Bureau of Prisons et al*, 4:23-cv-04155-YGR (N.D. Cal.) ............................... 5, 6, 18

6    *United States v. Blancas de Hernandez*, 2021 WL 2290778 (S.D. Cal. June 4, 2021) ............... 16

7    *United States v. Bowers*, No. 2023 WL 5017015 (D. Me. Aug. 7, 2023) ................................... 15

8    *United States v. Curl*, 2023 WL 6213049 (D. Nev. Sept. 22, 2023) ........................................ 16

9    *United States v. Elm*, 2024 WL 4026024 (S.D.N.Y. Sept. 3, 2024) ........................................ 15

10

11   *United States v. Henderson*, 2024 WL 881253 (E.D. Mo. Feb. 23, 2024) ................................. 23

12   *United States v. Keller*, 2 F.4th 1278 (9th Cir. 2021) .................................................... 14

13   *United States v. McCoy*, 2024 U.S. Dist. LEXIS 136812 (E.D. Cal. Aug. 1, 2024) ................... 22

14   *United States v. Morales*, 2024 WL 967658 (E.D. Cal. Mar. 6, 2024) ........................................ 22

15   *United States v. Morrison*, 501 F. Supp. 3d 957 (D. Nev. 2020) ............................................ 16

16
     *United States v. Muniz*, 2024 WL 3488485 (D. Utah July 19, 2024) ................................... 15, 22
17
     *United States v. Nunez*, 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024) ................................. 15, 23
18

19   *United States v. Ortega*, 2021 WL 5038791 (D. Kan. Oct. 29, 2021) ........................................ 16

20   *United States v. Resendiz*, 2023 WL 7309439 (S.D. Cal. Nov. 6, 2023) ................................... 15

21   *United States v. Russell*, 2024 WL 4851154 (D. Idaho Nov. 21, 2024) ................................... 22

22   *United States v. Smith*, 2023 WL 5487308 (E.D. Cal. Aug. 24, 2023) ........................................ 22

23   *United States v. Smith*, 2024 WL 4556521 (D. Nev. Oct. 22, 2024) ........................................ 15

24
     *United States v. Walker*, 2024 WL 580152 (D.N.J. Feb. 13, 2024) ............................................ 15
25

26   Federal Statutes

27   18 United States Code Section 3553 .............................................................. 13, 24, 25, 26

28   18 United States Code Section 3582 .............................................................. 1, 13, 14

18 United States Code Section 3621 ................................................................... 19

United States Sentencing Guidelines

United States Sentencing Guidelines Manual Section 1B1.13 ............................ *passim*

Other Authorities

*AP News, A Nevada woman who hired a hitman using bitcoin to kill her ex-husband gets five years in prison* (July 21, 2024), available at https://apnews.com/article/bitcoin-murder-for-hire-plot-982744db06845b532666db97660ed0b8 ................................ 25

Balsamo, Michael & Michael R. Sisak, *AP Investigation: Women's Prison Fostered Culture of Abuse, Associated Press* (Feb. 6, 2022, 9:40 AM),, available at https://apnews.com/article/coronavirus-pandemic-health-california-united-states-prisons-00a711766f5f3d2bd3fe6402af1e0ff8 .......................................................... 20

Dargis M, Mitchell-Somoza A., *Challenges Associated with Parenting While Incarcerated: A Review*. Int J Environ Res Public Health. 2021 Sep 21;18(18):9927. doi: 10.3390/ijerph18189927. PMID: 34574849; PMCID: PMC8469117...................................... 19

Federal Bureau of Prisons Population Statistics for FCI Waseca, available at https://www.bop.gov/about/statistics/population_statistics.jsp#:~:text=158%2C005%20 ........ 6

Fernandez, Lisa, *FCI Dublin cleared out; no women left in prison*, Fox 2 KTVU (May 1, 2024), available at https://www.ktvu.com/news/fci-dublin-cleared-out-no-women-left-in-prison ...................................................................................... 6

Fernandez, Lisa, *Feds Closed A Prison Notorious For Abuse. Things Only Got Worse.*, ROLLING STONE (June 5, 2024)................................................................................ 18

Fernandez, Lisa, *Prison officer nicknamed 'Dirty Dick' charged with more sex crimes*, KTVU FOX 2 (July 29, 2024), available at https://www.ktvu.com/news/prison-officer-nicknamed-dirty-dick-charged-more-sex-crimes.................................................... 21

Minnesota Department of Corrections, *The effects of Prison Visitation on Offender Recidivism*, (November, 2011), available at https://mn.gov/doc/assets/11-11MNPrisonVisitationStudy_tcm1089-272781.pdf ...................................................... 19

Mount Sinai, *Ask the Doc: Do I Need to Be Concerned About Endometriosis?* (April 2023), available at https://health.mountsinai.org/blog/do-i-need-to-be-concerned-about-endometriosis/ ...................................................................... 17

Poehlmann, J., *Incarcerated Mothers' Contact With Children, Perceived Family Relationships, and Depressive Symptoms. Journal of Family Psychology*, 19(3), 350–357 (2005). https://doi.org/10.1037/0893-3200.19.3.350................................ 19

iii

Popper, Nathaniel, *Can You Really Hire a Hitman on the Dark Web*?, INTERNATIONAL NEW YORK TIMES (March 6, 2020) ......................................................................... 24

PREA Facility Audit Report for FCI Waseca, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.bop.gov/locations/institutions/was/was_prea.pdf?v=1.0.2 ......................................................................... 6

Siennick, S. E., Mears, D. P., & Bales, W. D. (2013). *Here and gone: Anticipation and separation effects of prison visits on inmate infractions*. Journal of Research in Crime and Delinquency, 50(3), 417–444. https://doi.org/10.1177/0022427812449470 ................... 18

1

2

## I.    Introduction

3

4

Ms. Felkins asks that her prison sentence be reduced to time-served and that her three-year supervised release conditions be modified to include home confinement.  Ms. Felkins' children's primary caregiver is suffering from a painful medical condition for which she should, and may have to, get surgery now.  In addition, Ms. Felkins' service of her sentence has been particularly hard on her and her family.  Felkins' was initially detained in harsh, troubled conditions at FCI Dublin. She was then transferred to FCI Waseca, a women's prison in Minnesota with its own problems, including lack of available programming.  Ms. Felkins family cannot afford to travel to Minnesota to visit her.  The unusual hardships imprisonment incarceration has created for Ms. Felkins and for her family, particularly her young children, warrant a reduction in sentence that will include the severe restrictions entailed in three years of home confinement.

5

6

7

8

9

10

11

12

13

## II.    Relevant Facts and Procedural History.

14

15

### A.  Ms. Felkins Largely Positive Character and Behavior Aside from Aberrant Offense Behavior in the Midst of Post-Partum Psychosis.

16

17

18

### 1.  Ms. Felkins' Life Prior to Offense

19

For almost the entirety of Ms. Felkins' life, she has acted as a kind, responsible person.  She grew up in Humboldt County, California, where she worked hard on her family's farm and cared for her younger siblings.  PSR ¶ 49.  She faced strict discipline and some corporal punishment. PSR ¶¶ 49-50.  Tragically, she was molested by a relative for several years but was too afraid to tell anyone when it was happening.  PSR ¶ 51.  Despite these difficulties, she became involved in her community, playing basketball, taking dance lessons, and serving as an active member of Humboldt County 4H.  PSR ¶ 52.  She showed horses and swine, took part in community services, participated in parliamentary pro, was a junior leader for veterinary science, and held office of county treasurer and secretary. PSR ¶ 52.  She also worked and served as an AVID tutor for children in elementary school.  PSR ¶ 52.  Ms. Felkins' maternal grandmother had horses,

20

21

22

23

24

25

26

27

28

1

and through her exposure to those horses Ms. Felkins developed a passion for riding, showing, and caring for horses.  PSR ¶ 52.  See also Exh. D, p. 4.

Ms. Felkins married her first husband as a young woman and the couple had two children.  PSR ¶ 53.  The marriage was troubled and in November, 2014, Ms. Felkins and her first husband separated.  Ms. Felkins moved from their home in North Carolina to Oregon, and the two children stayed with their father in North Carolina.  In October of 2015, Ms. Felkins, who was living in Oregon with her new partner (and current husband), gave birth to her third child.  Within a month of that birth, medical staff reported Ms. Felkins was depressed and suffering from a "low mood."  PSR ¶ 62.  In November of 2015, Ms. Felkins' doctor prescribed anti-depressants, and he increased the prescriptions in December, 2015, because Ms. Felkins was still feeling depressed much of the time.  PSR ¶¶ 62-63.

In early 2016, Ms. Felkins, her partner, and their new baby moved from Oregon to California.  PSR ¶¶ 55-56, 64.  Ms. Felkins' insurance lapsed, so she did not see a doctor and get her prescriptions refilled.  PSR ¶ 64.  Ms. Felkins' post-partum mental health issues became worse.  Psychotherapist Diana Barnes, who has 30 years of experience in treating women with pregnancy and postpartum-related mood disorders, has concluded that in early 2016, Ms. Felkins began to suffer from "[a] more serious perinatal mood disorder [than postpartum depression], namely, a bipolar episode with psychotic features, commonly understood as postpartum psychosis." Docket No. 57, p. 2.  Dr. Barnes explained that:

> Postpartum psychosis is often described as a "cognitive disorganization psychosis" and presents with a constellation of symptoms that include hallucinations and/or delusions; extreme thought disorganization, cognitive confusion, and dissociation; severe insomnia; agitation and restlessness; increased irritability, and aggressiveness. Dissociation causes a disruption in conscious thought. Because psychosis creates a break with reality-testing, it disables logical and rational thought. It causes such disorganization of the mind that it strips the individual of any capacity to make an informed decision or form any rational intention. Consequently, what appears to make sense to the individual who is psychotic would never make sense to the outside observer or even to the individual with postpartum psychosis once they have received appropriate treatment as is the case with Kristy Felkins.

Docket No. 57, p. 2.  Dr. Barnes traced how Ms. Felkins' thoughts during the winter of spring of

2016 matched this pattern of scattered, confused thinking.  Docket No. 57, pp. 2-3.

### 2. Offense Conduct

Suffering from psychosis and fearing for her children, Ms. Felkins made a terrible decision. In February of 2016, she created an account on the website Besa Mafia, a website that purported to offer to carry out a variety of illegal services in exchange for cryptocurrency, but which in fact, "was actually a scam website that took users' money but never carried out the offered services."  Docket No. CR 35, p. 1.  In March of 2016, Ms. Felkins paid Besa Mafia approximately $5,000.00 worth of Bitcoin for a hitman to kill her ex-husband.  Docket No. 35, p. 2.  By April of 2016, Ms. Felkins realized that Besa Mafia would likely not carry out the murder, and she stopped communicating with Besa Mafia or sending the website money.  Docket No. 35, pp. 2-3.  No one from Besa Mafia ever contacted or harmed Ms. Felkins' ex-husband.  Docket No. 35, p. 3.

### 3. Ms. Felkins' Life After Offense

By the summer of 2016, Ms. Felkins recovered from her post-partum psychosis and went forward with her life.  In 2018 she married her partner, Matthew Bushnell, and the family moved to Nevada in 2019.  PSR ¶ 55.  Ms. Felkins lived with her family on a large property where they keep horses, ducks, and pigs.  PSR ¶ 56.  Mr. Bushnell worked as a long-haul truck driver.  PSR ¶ 57.  Ms. Felkins worked on the farm and was involved in her church and community.  She created a program for at-risk teen girls involving horse riding and horsemanship.  PSR ¶ 57.  Ms. Felkins' older children from her first marriage chose to live with Ms. Felkins.  PSR Attachment, Docket No. 50-3, pp. 10-14.  Ms. Felkins' also cared for her two young sons.   PSR Attachment, Docket No. 50-3, p. 18.  In short, Ms. Felkins lived a law-abiding, pro-social life.

### 4. Arrest and Indictment

When Ms. Felkins was arrested in 2020 for the offense, she immediately admitted her conduct.  PSR ¶ 11.  Before sentencing she explained to the United States Probation Office that:

> At the time I committed this crime, I was suffering from postpartum depression, wich *[sic]* due to moving, I was no longer receiving treatment for and had stopped

3

> medication without medical supervision. I also believe I was experiencing PTSD triggers, but at the time lacked the understanding of their effects and how to manage them. I was in such a dark place at this time of my life, it was hard for me to completely comprehend what motivated me. I was struggling with not seeing my older children more regularly.

PSR ¶ 21.

On September 24, 2020, the government filed a single-count indictment charging Ms. Felkins with a violation of 18 U.S.C. § 1958, which prohibits the use of interstate commerce facilities in the commission of murder-for-hire.  Docket No. 8.

### 5.  Pretrial Supervision

After Ms. Felkins' arrest and before her sentencing she lived at her home in Nevada.  She was supervised by Pretrial Services in the District of Nevada and was fully compliant with her conditions.  PSR ¶ 3.  She attended outpatient mental health treatment for post-traumatic stress disorder.  *Id*.  She had computer monitoring conditions and there were no violations.  *Id*.  Her therapist, Licensed Clinical Social Worker Jessica Homer, wrote that during her time on pretrial supervision, Ms. Felkins

> addressed her unhealthy core beliefs and behavioral patterns that arose from the physical and sexual abuse she endured as a child and adult.  Ms. Felkins has been a diligent and active participant in the therapy process, demonstrates consistent application of therapeutic concepts in her daily life, and has proven herself to be a concerned and attentive parent to her children.

PSR ¶ 66.  Ms. Homer also stated Ms. Felkins "appears to be open and honest in session."  *Id*. Treatment reports submitted to Pretrial Services confirmed that Ms. Felkins attended counseling and was "highly committed to treatment and demonstrates positive parenting skills. [Felkins] demonstrates increased emotional intelligence . . . [and] is seeking support for her children as well."  *Id*.

### B.  Guilty Plea and Sentencing

On March 17, 2022, Ms. Felkins entered guilty plea without a plea agreement in district court.  Docket No. 32.  In the factual basis supporting her plea, Ms. Felkins admitted her offense conduct.  On July 20, 2023, this Court imposed a prison sentence of 60 months, to be followed

by a supervised release term of three years.  Docket No. 58, 59.

### C.  Conditions at FCI Dublin During Ms. Felkins' Service of Her Sentence.

Ms. Felkins began serving her prison term on September 29, 2023, at FCI Dublin.

Conditions at FCI Dublin were toxic, abusive, and dysfunctional.  District Judge Yvonne

Gonzalez Rogers, who presides over a class action regarding the treatment of prisoners at FCI

Dublin,[1] has written a letter addressed to all judges who sentenced the women who were

imprisoned at FCI Dublin.  Exh. I, p 1.  The letter provides a "brief summary of the events at FCI

Dublin which [sentencing judges] may wish to consider to the extent applicable to the particular

case of any compassionate release applications [a sentencing judge] receive from class

members."  Exh. I, p. 1.  Judge Gonzalez Rogers describes the fact that multiple FCI Dublin

correctional officers have been convicted for criminal sexual acts and there are likely a dozen

more who remain under investigation.  Exh. I, p. 1.  Judge Gonzalez Rogers further describes her

findings after a January, 2024, unannounced inspection of the prison:

> [The prisoners] had limited to no access to constitutionally adequate medical and
> mental health care, programming, and timely administrative relief. Thus, **the time
> at FCI Dublin was likely "harder time" than other institutions.** Programming
> was effectively non-existent. To accommodate staff, the "day" began at 6:00 a.m.
> and ended at 2:00 p.m. After that, they were in lock down but could not
> congregate for any reason including prayer groups or counseling. . . . FCI Dublin
> " . . . deter[red] inmates from filing administrative grievances by threatening
> [prisoners] with citations on their record, the loss of good time credits and better
> paying jobs, and placement in the SHU [Special Housing Unit] for doing so.

Exh. I, p. 1 (bold added).  Prisoners "were placed in the SHU for reporting the criminal

misconduct of correctional officers for weeks at a time." Exh. I, p. 1.

A Special Master's Report prepared in June of 2024 in the lawsuit further documented

longstanding problems at FCI Dublin.[2]  As stated in the Executive Summary to the report,

---

[1] *California Coalition for Women Prisoners et al v. United States of America Federal Bureau of
Prisons et al*, 4:23-cv-04155-YGR (N.D. Cal.).

[2] Full report available at https://www.documentcloud.org/documents/25030691-fci-dublin-special-master-report.

attached as Exhibit I, pp. 2-13, before it's rushed and chaotic closure in April of 2024, problems at FCI Dublin included a staffing shortage that led to a failure to provide rehabilitative programs (Exh. I, pp. 7, 11-12), failure to provide timely access to medical care (Exh. I, pp. 7-8), a broken administrative remedy process (Exh, I, pp. 8-10), and a disciplinary process that resulted in prisoners being punished in violation of BOP official policy and due process requirements (Exh. I, p. 10).  As stated by the Special Master, "[i]t is unconscionable that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin for such an extended period of time without correction."

### D.  Closure of FCI Dublin and Ms. Felkins' Transfer to FCI Waseca

On April 15, 2024, ten days after a federal judge appointed a special master to oversee FCI Dublin,[3] the Federal Bureau of Prisons made a surprise announcement that it would shut down FCI Dublin.[4]  By May 1, 2024, all women in the prison, including Ms. Felkins, had been transferred out of FCI Dublin.  Ms. Felkins is now incarcerated at FCI Waseca in Minnesota.

### 1.  Overcrowding, Disrepair, and Lack of Programming at FCI Waseca

FCI Waseca is overcrowded and suffering from its own problems.  FCI Waseca is designed to hold 712 prisoners.[5]  As of November 21, 2024, it held 756 prisoners.[6]  In May of 2023, the Department of Justice's Office of the Inspector General conducted an inspection of FCI Waseca. Exhibit J.  It found that many prisoners live in basements, some sleeping in beds close to pipes

---

[3] *California Coalition for Women Prisoners et al v. United States of America Feder.al Bureau of Prisons et al*, Case No. 4:23-cv-04155-YGR (N.D. Cal.), Docket No. 248.

[4] Fernandez, Lisa, *FCI Dublin cleared out; no women left in prison*, Fox 2 KTVU (May 1, 2024), available at https://www.ktvu.com/news/fci-dublin-cleared-out-no-women-left-in-prison.

[5] PREA Facility Audit Report for FCI Waseca, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.bop.gov/locations/institutions/was/was_prea.pdf?v=1.0.2.

[6] Federal Bureau of Prisons Population Statistics for FCI Waseca, available at https://www.bop.gov/about/statistics/population_statistics.jsp#:~:text=158%2C005%20 Total%20Federal%20Inmates&text=Last%20Updated%20November%2021%2C%202024 (accessed November 27, 2024).

that occasionally leak.  Exh. J, p 3.  In addition, the prison's rooves are in disrepair, routinely

leak, and need to be replaced.  *Id.*  FCI Waseca also suffers from a staffing shortage, with only

75% of its total positions filled, and only 67% of correctional officer positions filled.  Exh. J, p.

7.  As a result, staff from the Facilities and Education departments are frequently used in

correctional posts, meaning repairs, as well as education and training programs, are delayed or

cancelled.  Exh. J, p. 2.  Prisoners want to enroll in rehabilitative programs, but waitlists for

many programs are long, containing 300 + names.  Exh. J, p. 3.  Furthermore, FCI Wasecas's

ability to provide psychology and substance use programs has been severely curtailed by staff

vacancies.  Exh. J, p. 32.  Programs such as FCI Waseca's Resolve Program, a therapy program

designed to address trauma-related mental health needs, is simply not running as there is no

coordinator for the program on staff.  Exh. J, p. 33.

The problems at FCI Waseca have had a direct, negative impact on Ms. Felkins'

rehabilitation.  For example, in Ms. Felkins' October 25, 2024, Individual Needs Plan- Program

Review, BOP staff note "[s]ince the previous review, Felkins has not enrolled in the National

Parenting Program as recommended."  Exh. C, p. 8.  However, it is plain that Ms. Felkins made a

formal request to be added to this program in May of 2024.  Exh. C, p. 9.  The BOP has simply

not been able to find room for her in the program.  While the BOP recommends this program for

Ms. Felkins, there is no indication the BOP will be able to find space for her in this program.

Ms. Felkins has essentially been limited to taking Adult Continuing Education ("ACE") classes

(Exh. C, p. 7).  These classes offer instruction in interesting topics, but they are not the Evidence-

Based Recidivism Reduction programs that Congress prompted the BOP to offer prisoners

through the First Step Act of 2018.

### 2.  Impact of Transfer to FCI Waseca on Ms. Felkins and Her Family

Ms. Felkins' transfer to FCI Waseca in Minnesota has put her much farther away from her

family than she was.  Ms. Felkins' immediate family includes her husband, two teenagers, an 8-

year-old, and an 18-month-old toddler.  Exh. D, p. 1.  When Ms. Felkins was incarcerated at FCI

Dublin, the family could drive 285 miles so her children could see her approximately once per

month.  Now that she has been transferred to FCI Waseca, she is **1,671** miles away from her family.  Ms. Felkins' family is not wealthy and cannot afford to fly and visit her.  Exh. D, p. 1.

Family members describe the devastating consequences of Ms. Felkins imprisonment, and now transfer to a prison more than 1,600 miles from home, has had on the family.  As put by Christina Bushnell, Mr. Bushnell's sister, "[n]ow that [Ms. Felkins is] in Minnesota, the family is destroyed."  Exh. D, p. 8.  The children's grandmother, Yvonne Bennet also observes that the lack of visitation brought upon by Ms. Felkins' transfer to FCI Waseca is traumatizing to eight-year-old G and is hampering two-year-old E's ability to stay connected to his mother.  Exh. D, p. 10.  Ms. Felkins grandmother, Karan Jo White, similarly observes that Ms. Felkins' "incarceration has been a tremendous hardship on the family.  Her unexpected transfer to Minnesota has been very traumatic as her family cannot afford the travel expenses to visit her."  Exh. D, p. 11.

Ms. Felkins' husband Matthew Bushnell works six days per week to support the family.  Exh. D, p. 1.  He explains that all four children have been "profoundly affected by Kristy's absence."  Exh. D, p. 1.  The couple's eight-year-old son G. has "frequent nightmares about his fear of his mother never returning home," and their toddler is suffering from an inability to bond with his mother.  Exh. D, p. 1.  Kristy's oldest daughter Emerald has suffered mental anguish since Ms. Felkins began her incarceration.  Exh. D, p. 3.  She has dropped out of school and reports that her eight-year-old brother G. has been traumatized and "screamed every night and every day because he didn't have the comfort of his own mom."  Exh D, p. 3.  Her teenage brother has fallen into a deep depression.  Exh. D, p. 3.  Mr. Bushnell's aunt Mary has also observed that Mr. Bushnell and the children "are struggling emotionally and mentally with her absence, and they are not coping well with the separation."  Exh. D, p. 5.

### E.  Caregiving Crisis for Ms. Felkins' Two Youngest Children

While relatives try to provide the care and consistent support the younger children need, there is no relative who can fill the void left by Ms. Felkins.  Mr. Bushnell's mother, Yvonne Bennett, is facing her own medical issues (Exh. D, p 1).  Ms. Felkins' mother, Jeanie Eldridge, is caring for the six-year-old son of Ms. Felkins' younger sister, who died in 2023.  Ms. Eldridge

also cares for her father-in-law.  Exh. D, p. 4.

Mr. Bushnell's sister Christina Bushnell is providing care to Ms. Felkins' two youngest children, but Ms. Bushnell has her own health concerns that require immediate treatment.  Exh. D, pp. 1, 5-8.  Christina Bushnell needs medical treatment, specifically surgery that will require recovery time.  Exh. D, p. 7; Exh. M (filed under seal).  Ms. Bushnell describes this condition, endometriosis, in her letter (Exh. D), and it is noted in her medical records (Exh. M).  The condition has already required multiple surgeries and can leave her "doubled over and incapacitated due to the severe pain."  Exh. D, p. 7.  She has been delaying her next surgery but is not sure how long she can continue caring for the children with medical problems that will get worse if not taken care of.  Exh. D, p. 7.  In addition, Christina Bushnell has assisted her mother Yvonne Bennett, who has health issues and also needs medical treatment, but this care cannot continue while she is in Nevada caring for E. and G.  Exh. D, pp. 7-8.  Ms. Bennett, a bay area teacher close to retirement, has a severely herniated disc and needs surgery, but she will not have the support she needs to undergo and recover from surgery while her daughter, Christina Bushnell, is in Nevada caring for E. and G.  Exh. D, p. 10.

For her own health, Christina Bushnell should get surgery now.  If her condition worsens, she may have no choice but to get immediate surgery.  She states:

> I don't know if I will be able to keep taking care of the children especially if I keep having all these medical problems which are going to continue to get worse if not taken care of.  There is no other adult to take my place as the children's caregiver.

Exh. D, p. 7.

### F.  Ms. Felkins' Conduct While Serving Her Prison Term

Ms. Felkins has been in BOP custody for over a year.  During that time she has taken numerous classes, both from among those offered by the BOP and by outside providers.  She has completed BOP classes involving topics such as history, geography, and Spanish.  Exh. C, p. 3.  She has also taken courses in crafts such as knitting and cross-stitching.  Exh. C, p. 3.  In addition, on October 27, 2024, Ms. Felkins was awarded a Certificate of Completion for completing 100 hours in the Waseca Walkers program.  Exh. F, p. 1.  The certificate recognized

her "dedication, hard work, and achievement."  Exh. F, p. 1.

Most importantly, Ms. Felkins has undergone BOP training to become a tutor.  Exh. C, p. 3. On July 19, 2024, the BOP awarded her a Certificate of Achievement for completing the Education Tutor Training ACE class.  Exh. F, p. 2.  Ms. Felkins has steadily worked as a tutor during her time within the BOP, regularly being rated as "outstanding" at her job.  Exh. C, pp. 4-6.  Her fellow prisoners have observed that she works patiently and persistently in assisting others in obtaining the GED.  Exhibit K, pp. 1-2, 4, 6-8.  She has impressed those who have come to know her in prison as a caring, honest, person who is dedicated to helping others.  Exh. K, pp. 1-8.

In addition to taking BOP courses and working as a tutor, Ms. Felkins has furthered her growth and skills through outside providers while she has served her sentence.  In order to improve her job skills, Ms. Felkins has taken courses to train as a paralegal through Blackstone Career Institute.  Exh. G, pp. 8-15.  She has completed sections in Contracts, Torts, Criminal Law, Real Property, Civil Actions, and Criminal Procedure, regularly receiving high marks on her tests.  Exh. G, p. 13.  In order to deepen her spiritual life, Ms. Felkins has taken courses from the Global University's School for Evangelism and Discipleship.  She has completed courses covering "Who Jesus Is," "Your New Life," and "The Great Questions of Life."  Exh. G, pp. 1, 16.  Ms. Felkins has also taken courses through the International Christian College and Seminary.  Exh. G, pp. 2-7.  Ms. Felkins has earned straight As in her courses, and her instructor has been impressed by her thoughtful analysis and reflection and her ability to apply religious and ethical writings to her own life.  *Id*.  Finally, Ms. Felkins has successfully completed courses through Crossroads Prison Ministries.  Exh. G, pp. 17-18.

Ms. Felkins has fully paid her special assessment.  Exh. C, p. 8.  She has had no disciplinary write ups in prison. Exh. C, p. 7.  She is deemed by the BOP to have a minimal risk level. Exh. C, p. 11.  She has continually accrued First Step Act Earned Time Credits while in BOP custody. Exh. C, p. 12.

### G.  Ms. Felkins' Health Issues

Ms. Felkins suffers from asthma.  Exh. B, p. 1.  Ms. Felkins was diagnosed with asthma at

age 5.  She also has high blood pressure and suffers from chronic back pain, dizziness, migraines, and heart palpitations. Exh. L, pp. 1-2. Ms. Felkins blood pressure continues to be elevated as she serves her sentence.  Exh. B, p. 2 (showing blood pressure reading of 121/83, which is deemed to be "Stage 1 hypertension.").[7]  Ms. Felkins' family has a history of serious heart conditions.  Her maternal grandfather passed at 42 from heart failure, her mother has a serious heart attack at 45, her youngest sister recently passed at 31 years old from an aortic aneurism, her two aunts have high blood pressure, and her father and paternal grandfather both have high blood pressure.  As Ms. Felkins has a family history of serious heart conditions and is now showing symptoms of possible heart conditions developing, she will benefit from preventative treatment upon release.  Exh. L, pp. 1-2.

### H.  Ms. Felkins' Release Plan

Ms. Felkins has a strong release plan.  She will live at her home in Fallon, Nevada, with her husband and two youngest children.  Exhibit L, p. 1.  Ms. Felkins will not only be the primary caregiver to her two young sons, she will also maintain close relationships with her older two children.  *Id*.  Ms. Felkins' family strongly believes her children are suffering without her presence and will greatly benefit by her return to the family.  See Exh. D.  Ms. Felkins' return as the primary caregiver of her two young sons will also allow Christina Bushnell to be relieved of caretaking duties and undergo much-needed medical treatment.

Community members look forward to Ms. Felkins' return as well.  Mary Olshefski writes that Ms. Felkins has played a positive role in her family's life by teaching her granddaughter how to horseback ride and work with animals.  Exh. E, p. 1.  Ms. Olshefski's granddaughter similarly writes that Ms. Felkins was her guide and mentor and taught with "exceptional kindness, expertise, and understanding."  Exh. E, p. 2.

Upon release, Ms. Felkins will be added to her husband's health insurance and will be able to obtain treatment for physical and mental health issues.  Exh. L, p. 2.  Ms. Felkins' former

---

[7] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982.

therapist, Jessica Homer, has agreed to take Ms. Felkins back on as a patient to resume the therapeutic work she took on before entering the BOP.  Exhibit H, p. 1.  Ms. Homer believes Ms. Felkins can benefit from future therapy, and in future counseling can work on topics such as communication, healthy boundaries, healing from the impacts of incarceration, and re-adjusting to the community.  Exh. H, p. 1.

While Ms. Felkins' primary work upon release will be dedicated to caring for her children, if she has offers of employment if she has an opportunity to work.  Ms. Felkins has been offered several job opportunities upon release.  She has been offered a job at Tungsten Engineering Contractors.  Exhibit E, pp. 4-5.  The president and CEO of Tungsten Engineering has written a letter to the Court explaining that despite Ms. Felkins' offense "we firmly believe in Ms. Felkins' potential for rehabilitation and reintegration into society."  Exh. E, p. 4.  Tungsten Engineering is "dedicated to providing individuals like Ms. Felkins with a supportive environment wherein they can rebuild their lives and contribute positively to our organization.  Exh. E, p. 4.  Ms. Felkins has also been offered employment by His Inspiration Christian Books & Gifts.  Exh. E, p. 3.  The store's owner has known Ms. Felkins for over five years and believes she has been rehabilitated and deserves an opportunity.  Exh. E, p. 3.

Ms. Felkins will also have the ongoing support of the Federal Defenders Social Work Team as she reenters the community.  Exh. L, p. 4.

Finally, Ms. Felkins will be on supervised release upon her release.  She had no violations while she was on pretrial release and actively participated in programming.  PSR ¶ 3. Ms. Felkins also agrees that if the Court reduces her sentence to time-served the Court may decide it is appropriate to enhance her punishment by adding a condition of home confinement to her term of supervised release.

III.    **Argument**

  **A.  Statutory Framework for Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A)(i)**

  The compassionate release statute grants courts authority to reduce a term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(C)(1)(A)(i). Section 3582(C)(1)(A)(i) provides:

  (1) in any case--

  (A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the   unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--**

  (i) **extraordinary and compelling reasons warrant such a reduction;** . . . ***** **and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]**

18 U.S.C. § 3582(c)(1)(A)(i) (bold added).  Thus, in order to reduce a sentence, the statute requires theCcourt to 1) find extraordinary and compelling reasons for the reduction, 2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and 3) ensure any reduction is consistent with applicable policy statements.

  Under the U.S. Sentencing Guidelines, the following list of circumstances qualify as an "extraordinary and compelling reason" to warrant early release: (1) the defendant's medical circumstances; (2) the defendant's age; (3) the defendant's family circumstances; (4) whether the defendant was a victim of abuse while serving his term of imprisonment; (5) "other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described above warrant compassionate release"; and (6) "a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive)" if certain other conditions are met. U.S. Sent'g Guidelines Manual § 1B1.13(b).

**B.  Ms. Felkins Has Exhausted Administrative Remedies**

A district court may consider a motion for compassionate release brought by an inmate only if "the inmate has requested that the BOP make such a motion and either (a) the inmate has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the [inmate]'s behalf, or (b) 30 days have elapsed since the warden of the [inmate]'s facility received a compassionate-release request from the inmate." *United States v. Keller*, 2 F.4th 1278, 1281 (9th Cir. 2021) (quotation marks and citation omitted, alterations in original); *see also* 18 U.S.C. § 3582(c)(1)(A).  Ms. Felkins has exhausted her administrative remedies.  Exhibit A.

**C.  Extraordinary Circumstances Support a Grant of Compassionate Release.**

**1.  Under U.S.S.G. Section 1B1.13(b)(3) Ms. Felkins' Family Circumstances Are and Extraordinary and Compelling Reason Warranting a Grant of Compassionate Release.**

U.S.S.G. § 1B1.13(b)(3) provides that a defendant's family circumstances are an extraordinary and compelling reason that can support a grant of compassionate release when there is:

The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

U.S.S.G. § 1B1.13(b)(3)(A).  It further provides:

The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual.

U.S.S.G. § 1B1.13(b)(3)(D).

Under U.S.S.G. § 1B1.13(b)(3)(A) or § 1B1.13(b)(3)(D), an extraordinary and compelling reason exists in Ms. Felkins' case because the person who is caring for her children in her absence has a serious health issue and needs to get surgery.  She is incapacitated and should be relieved of her caretaking duties so she can get needed surgery.  Exh. D, p. 7; Exh. M.

1   Mr. Bushnell cannot serve as the primary caretaker for the two youngest children in the family

2   because he works six days a week as a truck driver.  Exh. D, p. 1.  Somebody needs to earn

3   money to support the family, and he is doing so.  No other family member is in a position to

4   become the caretaker to the young children.  Exh. D, p. 7.

5          Many federal courts have granted relief when the caretaker of a defendant's minor or

6   disabled child has become incapacitated, just as Christina Bushnell is now incapacitated by pain

7   arising out of her medical condition and her need to have surgery done as soon as possible.   In

8   *United States v. Nunez*, 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024), the court granted

9   compassionate release where the mother of Mr. Nunez's son had breast cancer and her treatment

10  at times causes severe and debilitating side- effects that made it impossible for her to properly

11  care for their child.  In *United States v. Muniz*, the Court granted compassionate release where

12  the defendant's mother, who was caring for her five and twelve-year-old children, had a stroke

13  that caused "immense difficulty parenting Defendant's three children."  *United States v. Muniz*,

14  2024 WL 3488485, at *2 (D. Utah July 19, 2024).  The Court recognized that the defendant's

15  father could not take over daytime caretaking responsibilities because "he works to support the

16  family."  *Id.*[8]  In *United States v. Bowers*, No. 2023 WL 5017015 (D. Me. Aug. 7, 2023), the

---

[8] Additional cases in which courts have granted compassionate release on the ground that the caretaker of a defendant's minor children has become incapacitated, requiring the defendant to return home and assume caretaking responsibilities, are too numerous to list in total but include:

- *United States v. Smith*, 2024 WL 4556521, at *6 (D. Nev. Oct. 22, 2024) ("because I find that Z's caregiver is incapacitated [by substance abuse and mental health issues], Smith has provided the court with an extraordinary and compelling reason for a sentence reduction");
- *United States v. Elm*, 2024 WL 4026024 (S.D.N.Y. Sept. 3, 2024) (granting compassionate release on ground that defendant is needed to care for son);
- *United States v. Walker*, 2024 WL 580152, at *4 (D.N.J. Feb. 13, 2024) (granting compassionate release where "Walker has demonstrated that extraordinary and compelling reasons exist due to the incapacitation of her mother, the caregiver of Walker's minor children.");
- *United States v. Resendiz*, 2023 WL 7309439, at *2 (S.D. Cal. Nov. 6, 2023) (where defendant's wife was caregiver for couple's two minor children and suddenly had to dedicate time to medical needs of one of the children, court granted compassionate release on ground that "[a]lthough Defendant's wife is not truly incapacitated, she is unable to take care of two of her children while she commutes back and forth to the hospital caring for her sick two-year-old. She is likely to continue to be unavailable on

Court granted compassionate release where the defendant's minor child was experiencing mental health struggles due to his father's incarceration and the child's mother was unable to properly care for the child.

Ms. Felkins' children are facing a caregiving crisis.  The youngest two children need daytime care.  Mr. Bushnell is the family's primary financial provider and as a truck driver he works six days per week and is often out of town.  Exh. D, p. 1.  Both Mr. Bushnell's mother and Ms. Felkins' mother suffer from health issues and responsibilities to others that prevent them from moving to the Bushnell-Felkins home to care for the young children.  Exh. D, pp. 1, 4, 5, 10.  That has left Mr. Bushnell's sister, Christina Bushnell, to try to become the primary caregiver for the two young children.  In December of 2023, when it became apparent that Ms. Felkins' oldest daughter—a teenager herself—could not physical and emotionally take on the care of her young siblings while dealing with her own trauma at having her mother sent to prison and trying to start college, Ms. Bushnell dropped her life in California to become an emergency caregiver to Ms. Felkins' two youngest children.  Exh. D, p. 7.  In doing this, she put off extensive medical procedures and tests she should be getting to deal with a serious, chronic

---

and off over the next year, and the grandparents, who are currently caring for the two children, are unable to continue to do so.");

- *United States v. Curl*, 2023 WL 6213049, at *3 (D. Nev. Sept. 22, 2023) (granting compassionate release where defendant's mother was guardian of his three minor children and "medical and mobility needs severely and increasingly limit her capacity to care for them.");

- *United States v. Wessels*, No. 2021 WL 5506656, at *1 (D. Minn. Nov. 24, 2021) (granting compassionate release where defendant's parents cared for minor children and they suffered from medical issues that limited their ability to care for children);.

- *United States v. Ortega*, 2021 WL 5038791, at *3 (D. Kan. Oct. 29, 2021) (granting compassionate release where defendant's parents cared for her minor son and her father passed away and mother suffered from heart attack that impairs here ability to provide care);

- *United States v. Blancas de Hernandez*, 2021 WL 2290778, at *4 (S.D. Cal. June 4, 2021) (granting compassionate release where defendant's mother was primary caregiver to child and suffered from poor health, a language barrier, and limited mobility);

- *United States v. Morrison*, 501 F. Supp. 3d 957, 959 (D. Nev. 2020) (granting compassionate release because the current caregiver of the defendant's children, the defendant's 60-year-old mother, "ha[d] spinal stenosis and degenerative disc disease and [was] ... limited in her physical ability to take care of them").

medical issue. Exh. D, p. 7. Now, as she tries to care for the children, she is doubled over in pain at least three times per month. Exh. D, p. 7. She needs to undergo surgery, and her recovery will take 6-8 weeks. Exh. D, p. 7; Exh. M, pp. 1-2.

Ms. Bushnell certainly should get treatment for her endometriosis as soon as possible; Ms. Bushnell is in pain should be addressing her medical issues and scheduling surgeries with her doctors in California. "If left untreated, endometriosis sometimes can be a progressive condition that can lead to mechanical obstruction of the various areas in the reproductive tract, causing chronic pain as well as infertility. Sometimes there is a slight association with an increased risk for certain types of gynecologic cancers."[9] In addition, at any time Ms. Bushnell's condition could become so debilitating that she has to suddenly leave the family and get treatment, which would leave the younger children with no day-to-day caregiver.

Ms. Bushnell's incapacitation is an extraordinary circumstance that warrants a grant of compassionate release.

**2. Under U.S.S.G. Section 1B1.13(b)(5), Both the Harm Caused to Ms. Felkins and Her Family By Her Placement in a Prison More Than 1600 Miles from Her Family, and the Harsh Conditions of Her Prison Term, Are Grave Circumstances that Warrant a Grant of Compassionate Release.**

Under U.S.S.G. § 1B1.13(b)(5), an extraordinary and compelling reason to support compassionate release exists when

> The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

---

[9] Mount Sinai, *Ask the Doc: Do I Need to Be Concerned About Endometriosis?* (April 21, 2023), available at https://health.mountsinai.org/blog/do-i-need-to-be-concerned-about-endometriosis/ (last accessed November 25, 2024).

17

Mr. Felkins' case involves several circumstances that are similar in gravity to those listed in U.S.S.G. § 1B1.13 (b)(1)-(4). These include her transfer to a prison that is too far away to allow for family visits and the exceedingly difficult term of imprisonment she has faced.

### a. Ms. Felkins' Transfer to FCI Waseca, a Prison More Than 1,600 Miles from Her Family, Prevents Family Visits that Are Critical to Both Ms. Felkins and Her Family.

When sentencing Ms. Felkins, this Court recommended she be designated to FCI Dublin or Victorville after defense counsel pointed out that those were the women's prison facilities closest to her family in Fallon, Nevada. Docket No. 65, p. 35. For the first seven months of Ms. Felkins' term of imprisonment, she was at FCI Dublin. Her family could drive to visit her about once per month. Then in April of 2024, FCI Dublin was abruptly shut down.[10] The transfer of Ms. Felkins and 600 other female prisoners from FCI Dublin to prisons across the country occurred with no warning and was itself painful. As Judge Gonzalez Rogers noted of the events, ". . . BOP's operational plan for [the] closure of FCI Dublin was ill-conceived and, like Swiss cheese, full of holes." *California Coal. For Women Prisoners v. United States*, 4:23-cv-04155-YGR, Dkt. 300, at 1. Ms. Felkins was transferred to FCI Waseca, which is a 1,671-mile drive from Fallon, Nevada. Ms. Felkins' family, which is not wealthy, cannot afford to visit Ms. Felkins at FCI Waseca.

This Court's effort to have Ms. Felkins' sentenced as close to her family as possible was wise. Social science research shows a strong positive association between a prisoner's family contact and outcomes including in-prison behavior,[11] measures of health, and reconviction after release.[12] Studies have shown that for imprisoned mothers, fewer face-to-face visits with

---

[10] Fernandez, Lisa, *Feds Closed A Prison Notorious For Abuse. Things Only Got Worse.*, ROLLING STONE (June 5, 2024).

[11] Siennick, S. E., Mears, D. P., & Bales, W. D. (2013). *Here and gone: Anticipation and separation effects of prison visits on inmate infractions*. Journal of Research in Crime and Delinquency, 50(3), 417–444. https://doi.org/10.1177/0022427812449470.

[12] *See, e.g.*, Minnesota Department of Corrections, *The effects of Prison Visitation on Offender Recidivism*, (November, 2011), available at  https://mn.gov/doc/assets/11-

children are correlated to an increase in depression.[13]  As one summary of academic literature

regarding parents in prison states:

> There is a plethora of evidence that visits by families during incarceration are beneficial for parents and their children.  Specifically among mothers . . . a combination of generous visitation policies and proximity of the prison to the homes of home caregivers promoted mothers' who are incarcerated feelings of attachment to their children.  Consistent parent-child contact throughout periods of incarceration is a predictor for reunification upon release.  Additionally, there is evidence that family visits during incarceration reduce the likelihood of recidivism upon release, again highlighting the benefit of parents remaining connected with their children.  Similarly, ***there is considerable evidence that children benefit from remaining in contact with their parents during a period of lengthy incarceration.*** . . . [C]hildren who remain in contact with their incarcerated parent(s) have shown improvement in academic performance.  Additionally, ***children who have no contact with their parents often report feelings of isolation and alienation***, whereas those who remain in contact show lower levels of anxiety.

Dargis M, Mitchell-Somoza A., *Challenges Associated with Parenting While Incarcerated: A Review*. Int J Environ Res Public Health. 2021 Sep 21;18(18):9927. doi: 10.3390/ijerph18189927. PMID: 34574849; PMCID: PMC8469117 (internal citations omitted) (emphasis added).  For these reasons "facilitating family visits and providing services to help families navigate the complexities of incarceration are important policy considerations for correctional facilities and community agencies." *Id*.

Congress recognized the importance of family visitation to imprisoned parents and their children in passage of the First Step Act of 2018.  Prior to the First Step Act, the BOP had essentially unlimited discretion to decide which prison to send people to for service of their sentence.  The First Step Act worked to address family separation caused by imprisonment.by providing that subject to some constraints, the BOP shall "place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence."  18 U.S.C. § 3621(b).

---

11MNPrisonVisitationStudy_tcm1089-272781.pdf (last accessed November 25, 2024).

[13] Poehlmann, J., *Incarcerated Mothers' Contact With Children, Perceived Family Relationships, and Depressive Symptoms. Journal of Family Psychology*, 19(3), 350–357 (2005). https://doi.org/10.1037/0893-3200.19.3.350.

Through no fault of her own or her family's, Ms. Felkins has been placed in a prison that is more than 1,600 miles from her home. This move is certainly not consistent with this Court's efforts to rehabilitate Ms. Felkins and to minimize, to the extent possible, the harm Ms. Felkins' incarceration will have upon her children. As this Court stated at Ms. Felkins' sentencing hearing, Ms. Felkins' children "have been exposed to things that are hurting them" and "in a perfect world" they will be able to "have a relationship with both their mother and their father." Docket No. 65, pp. 29-30. The children's current inability to visit their mother is extremely difficult. As Mr. Bushnell writes: "Our family once found solace in the rare moments of togetherness during visits with Kristy, but the distance imposed by her transfer to Waseca has shattered that fragile threat of hope." Exh. D, p. 1. The family's eight-year-old son G. has frequent nightmares about his fear of his mother never returning and their toddler son E. is unable to bond with her. Exh. D, p. 1. Ms. Felkins' daughter Emerald has experienced "excruciating pain" and "mental anguish" since her mother has been imprisoned, and she has watched her teenage brother fall into a deep depression. Exh. D, p. 3. The ability to visit Ms. Felkins would not alleviate all of the pain these children feel, but it would provide some relief to the sadness and anxiety her absence has caused in their lives.

### b. Ms. Felkins Has Served an Exceedingly Difficult Prison Term

Ms. Felkins began her prison term at FCI Dublin. In the last few years, it has come to light that FCI Dublin fostered systemic sexual abuse of prisoners by BOP employees. In 2022, an Associated Press investigation revealed "a permissive and toxic culture" at FCI Dublin that "enabled years of sexual misconduct by predatory employees" as well as "cover-ups" that enabled the abuse to continue.[14] Employees of FCI Dublin even called the institution "the rape club." *Id*. To date, seven former FCI Dublin correctional officers have been found guilty or

---

[14] Balsamo, Michael & Michael R. Sisak, *AP Investigation: Women's Prison Fostered Culture of Abuse, Associated Press* (Feb. 6, 2022, 9:40 AM),, available at https://apnews.com/article/coronavirus-pandemic-health-california-united-states-prisons-00a711766f5f3d2bd3fe6402af1e0ff8 (last accessed November 25, 2024).

pleaded guilty to sexual misconduct against prisoners, and at least one more former officer is currently facing charges.[15]  It is likely over a dozen other officers are under investigation.  Exh. I, p. 1.

This widespread and longstanding sexual abuse of prisoners at FCI Dublin did not happen in vacuum but instead occurred in the context of a dysfunctional prison setting in which prisoners knew that their basic needs might not be met.  A surprise visit to FCI Dublin in January, 2024,—during the time that Ms. Felkins was at FCI Dublin—revealed that prisoners there had "limited to no access to constitutionally adequate medical and mental health care, programming, and timely administrative relief."  Exh. I, p. 1.  "Programming was effectively non-existent.  To accommodate staff, the "day" began at 6:00 a.m. and ended at 2:00 p.m. After that, they were in lock down but could not congregate for any reason including prayer groups or counseling.  *Id*.  Staff threatened to take punish prisoners if they filed administrative grievances.  *Id*.  Some prisoners were placed in the SHU for reporting criminal conduct.  *Id*.  Despite the abusive environment at the prison, prisoners were provided with little, to no, mental health counseling.  *Id*.  See also Exh. I pp. 7, 11-12 (discussing FCI Dublin's failure to provide rehabilitative programming); Exh. I pp. 7-8 (discussing FCI Dublin's failure to provide timely medical care); Exh. I, pp. 8-10 (discussing FCI Dublin's broken administrative remedy program); and Exh I, p. 10 (discussing FCI Dublin's failure to follow BOP policy and dur process in its disciplinary process).  As Judge Gonzalez Rogers has concluded, "the time at FCI Dublin was likely 'harder time' than other institutions."  Exh. I, p. 1.

When FCI Dublin was abruptly closed, Ms. Felkins was transferred to FCI Waseca.  FCI Waseca too suffers from numerous problems, including overcrowding, housing of prisoners in basements and near leaky pipes (Exh. J, p 3); leaky, broken rooves (*Id*.); and a substantial staffing shortage (Exh. J, p. 7).  The staffing shortage means that BOP employees who were hired to keep up facilities and provide education are instead used as correctional officers,

---

[15] Fernandez, Lisa, *Prison officer nicknamed 'Dirty Dick' charged with more sex crimes*, KTVU FOX 2 (July 29, 2024), available at https://www.ktvu.com/news/prison-officer-nicknamed-dirty-dick-charged-more-sex-crimes (last accessed November 26, 2024).

meaning repairs, as well as education and training programs, are delayed or cancelled.  Exh. J, p. 2.  Waitlists for rehabilitative programs are long, containing 300 + names.  Exh. J, p. 3. Furthermore, FCI Waseca's ability to provide psychology and substance use programs has been severely curtailed by staff vacancies.  Exh. J, p. 32.  Programs such as FCI Waseca's Resolve Program, a therapy program designed to address trauma-related mental health needs is simply not running as there is no coordinator for the program on staff.  Exh. J, p. 33.  Ms. Felkins has personally suffered from these problems.  She has been directed to enroll in a National Parenting Program (Exh. C, p. 8), but she asked to be placed in that program in May of 2024, almost immediately after her arrival at FCI Waseca (Exh. C, p. 9), and BOP still has not placed her in the program.  In addition, for Ms. Felkins, placement at FCI Waseca, more than 1,600 miles away from her family, has resulted in total loss of family visits and all the hardship to herself and her family that entails, as described in Section III(C)(2)(a) of this motion.

Numerous courts have relied on or taken note of deplorable prison conditions at FCI Dublin in granting compassionate release.  *See*, *e.g.*, *United States v. Russell*, 2024 WL 4851154 (D. Idaho Nov. 21, 2024) (relying in part on defendant's injury at hands of FCI Dublin guard in granting compassionate release); *United States v. McCoy*, 2024 U.S. Dist. LEXIS 136812, *4 (E.D. Cal. Aug. 1, 2024) (relying on defendant's verified allegations of sexual assault at FCI Dublin in granting compassionate release); *Muniz*, 2024 WL 3488485, at *1 (relying in part on fact that defendant reported her medical symptoms to FCI Dublin health staff and her reports were met with indifference in granting compassionate release); *United States v. Morales*, 2024 WL 967658, at *5 (E.D. Cal. Mar. 6, 2024) (relying in part on fact that defendant was sexually assaulted at FCI Dublin in granting compassionate release);  *United States v. Smith*, 2023 WL 5487308 (E.D. Cal. Aug. 24, 2023) (relying in part on "numerous instances of sexual assault and humiliation that [defendant] endured at the hands of prison guards while incarcerated at FCI Dublin" in granting compassionate release); *United States v. Chivira*, 2023 WL 3612389 (S.D. Cal. May 23, 2023) (granting a sentence reduction on the basis of sexual abuse that occurred at FCI Dublin).

Although Ms. Felkins was not personally sexually assaulted at FCI Dublin, she was

incarcerated in an environment where rape, other forms of sexual assault, and sexual harassment and humiliation by correctional officers were prevalent and tolerated.  Prisoner who were direct victims and those who were witnesses were discouraged from complaining by threats of punishment.  This is especially troubling because, as this Court noted at Ms. Felkins' sentencing hearing, Ms. Felkins "has been a victim of abuse as a child, and obviously as we all know, those of us in the system know, that abuse continues on for the rest of her life . . ."  Docket No. 65, p. 30:13-16.  It is hard to imagine a more frightening and damaging place to incarcerate a person who was sexually abused as a child than a prison in which sexual abuse by guards against prisoners is widespread and accepted.  Courts have deemed unusually difficult and chaotic confinement conditions an extraordinary and compelling reason to grant a sentence reduction. *See*, *e.g.*, *Nunez*, 2024 WL 4504493, at *6 (relying in part on harsh, violent and chaotic conditions at MDC Brooklyn in granting compassionate release)

For the reasons stated above, Ms. Felkins' term of imprisonment has been exceptionally difficult and is a further basis for a grant of compassionate release.

### 3.  Ms. Felkins' Rehabilitation in Prison Supports Compassionate Release

The Sentencing Guidelines provide that if a person has shown an "extraordinary circumstance under U.S.S.G. § 1B1.13(a)-(c), then "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  U.S.S.G. § 1B1.13(d).  *United States v. Henderson*, 2024 WL 881253, at *7 (E.D. Mo. Feb. 23, 2024) (while rehabilitation alone cannot support a grant of compassionate release, it can be part of a combination of circumstances that support a grant of compassionate release).

Ms. Felkins has engaged in admirable rehabilitation while in prison.  She has completed BOP classes available to her (Exh. C, p. 3) and been commended for her hard work in the Waseca Walkers program.  Exh. F, p. 1.  She undertook BOP training to serve as a tutor (Exh. F, p. 2) and she has regularly been rated as "outstanding" in her job as a tutor.  Exh. C, pp. 4-6.  Her fellow prisoners have observed that she works patiently and persistently in assisting others in

obtaining the GED.  Exhibit K, pp. 1-2, 4, 6-8.

In addition to taking BOP courses and working as a tutor, Ms. Felkins has increased her skills through classes provided by outside educational organizations.  She has trained as a paralegal through Blackstone Career Institute.  Exh. G, pp. 8-15.  Further, she has deepened her spiritual life through classes in religion and philosophy.  Exh. G, pp. 1-7, 16-18.   She has earned straight As in her coursework and impressed her teacher with her insights and hard work.  Exh. G, pp. 2-7.

Ms. Felkins has fully paid her special assessment.  Exh. C, p. 8.  Ms. Felkins has had no disciplinary write ups in prison. Exh. C, p. 7.  She is deemed by the BOP to have a minimal risk level.  Exh. C, p. 11.  She has continually accrued First Step Act Earned Time Credits while in BOP custody.  Exh. C, p. 12.  All of these factors, combined with her positive conduct while under pretrial supervision, weigh in favor of a grant of compassionate release.

### D.  The 18 U.S.C. Section 3553(a) Factors Support a Grant of Compassionate Release.

Consideration of the factors set forth in 18 U.S.C. § 3553(a) also supports a grant of compassionate release to Ms. Felkins.

In terms of the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1)), certainly using the internet with the intent to hire a hitman is very serious conduct.  The circumstances of this offense include the fact that Ms. Felkins had lost access to her medical care and was suffering from postpartum psychosis. Docket No. 57, pp. 2-3.  Her conduct was truly aberrational; aside from this incident she has been a caring, responsible person.  Thankfully, like virtually all dark web internet sites promising to send out a hitman for a fee,[16] the one Ms. Felkins contacted was a scam and no one was endangered.

The history and characteristics of Ms. Felkins (18 U.S.C. § 3553(a)(1)) show that aside from this incident, she has been a kind, responsible person.  She was involved with her community

---

[16] Popper, Nathaniel, *Can You Really Hire a Hitman on the Dark Web*?, INTERNATIONAL NEW YORK TIMES (March 6, 2020) ("Experts and law enforcers who have studied these sites — almost all of them on the so-called dark web or dark net — say they are scams. There has not been a known murder attributed to any of them.").

24

through the 4-H and other organizations as a young person, and as an adult she was a dedicated mother who worked on the family farm and helped young people through training with horses. PSR ¶¶ 49-52.  Even now while she is incarcerated, she is kind and generous in sharing her talents, working as a tutor to help others earn their GEDs and supporting her fellow prisoners. Exh. C, pp. 4-6; Exh. K, pp. 1-8.

Moreover, Ms. Felkins' circumstances include the fact that she is a mother to four children. Her older children have experienced depression in her absence.  Exh. D, pp. 1-4.  Ms. Felkins' eight-year-old son G. has "frequent nightmares about his fear of his mother never returning home," and her toddler is suffering from an inability to bond with his mother."  Exh. D, p. 1. Furthermore, Ms. Felkins sister-in-law has uprooted her life to provide childcare to the younger children, but doing so has caused her to stop getting needed medical care.  Exh. D, pp. 5-7; Exh. M.  This not only leaves Ms. Bushnell in extreme pain but increases the risk that her untreated endometriosis could cause permanent damage to her body.  Ms. Felkins' is needed as a caregiver to her children.

In terms of the need for the sentence to adequately punish, deter criminal conduct, and protect the public (18 U.S.C. § 3553(a)(2)), a sentence of time-served to be followed by supervised release with home confinement will adequately serve those purposes.  Ms. Felkins has served approximately 14 months in harsh and dysfunctional prisons.  She has gone through the excruciating pain of being separated from her family, including four children.  She will have a three-year term of supervised release when she is released from prison and the Court can enhance the punitive nature of that supervised release term by adding a condition of home confinement.  Ms. Felkins' arrest, conviction, and sentence have had a deterrent effect.  Her case generated regional and even national news coverage.[17]  The public will not be endangered by a reduction in Ms. Felkins sentence.  Ms. Felkins' offense was truly a one-off fueled by a mental health crisis that is no longer present in her life.  Before the offense, in the four-and-a-half years

---

[17] *See*, *e.g.*, *AP News, A Nevada woman who hired a hitman using bitcoin to kill her ex-husband gets five years in prison* (July 21, 2024), available at https://apnews.com/article/bitcoin-murder-for-hire-plot-982744db06845b532666db97660ed0b8 (last accessed November 26, 2024).

between the offense and her arrest, and ever since her arrest, Ms. Felkins has engaged in no other misconduct but instead has engaged in wholly pro-social conduct.

The need to provide Ms. Felkins with training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D)) weighs heavily in favor of a reduction in sentence. Ms. Felkins made excellent progress with her therapist Jessica Homer while was under pretrial supervision. PSR ¶ 66. Ms. Homer has agreed to take Ms. Felkins back on as a patient when she is released from prison and Ms. Homer believes Ms. Felkins can benefit from future therapy, particularly as she works in the areas of communication, healthy boundaries, healing from the impacts of incarceration, and re-adjusting to the community. Exh. H, p. 1. The BOP has not provided Ms. Felkins with any mental health therapy. This is especially troubling in that Ms. Felkins, a sexual abuse survivor, served time at a BOP facility rife with sexual abuse by guards against prisoners. The BOP has not even managed to place Ms. Felkins in a parenting program it recommends she takes because despite her requests for admission in the program, the program has no space. Exh. C, pp. 8-9.

In terms of the kinds of sentence and sentencing range established for Ms. Felkins' offense and the need to avoid unwarranted sentencing disparities, a reduced sentence would be a sentence below Ms. Felkins' advisory Guidelines range. However, this is true in virtually all compassionate release cases. Through passage of the First Step Act of 2018, Congress showed that it approves of judges granting compassionate release when the circumstances are appropriate. This is such a case. Finally, this case does not involve restitution (18 U.S.C. § 3553(a)(7).

IV.    CONCLUSION

For the foregoing reasons, Kristy Lynn Felkins respectfully requests that the Court grant reduction in sentence to time served to be followed by a term of supervised release that includes a condition of home confinement.

DATED: November 27, 2024                          Respectfully submitted,
                                                  HEATHER E. WILLIAMS
                                                  Federal Defender

                                                  /s/ Carolyn M. Wiggin
                                                  Carolyn M. Wiggin
                                                  Assistant Federal Defender

                                                  Attorneys for Defendant-Movant
                                                  KRISTY LYNN FELKINS