**To: United States District Court Sentencing Judge**
**Re: Compassionate Release Applications from the AICs Previously Incarcerated at FCI Dublin**

This Court currently presides over a class action for injunctive relief brought on behalf of adults in custody ("AICs") formerly incarcerated at Federal Correctional Institution ("FCI"), Dublin and the satellite camp.

While the Bureau of Prisons ("BOP") has elected to close FCI Dublin, and, thus, its population has been dispersed throughout the country, members of the class remain under the protection of this Court pursuant to a preliminary injunction issued on March 15, 2024.[1] This document provides a brief summary of the events at FCI Dublin which you may wish to consider to the extent applicable to the particular case of any compassionate release applications you receive from class members.

In short, I have sentenced six FCI Dublin correctional officers for criminal sexual abuse and criminal sexual contact, two after jury verdicts. One remains under indictment and, I believe, over a dozen others remain under investigation. In January 2024, I presided over a week-long evidentiary hearing with respect to a civil suit and conducted an unannounced, nine-hour site visit preliminarily finding that the AIC population at FCI Dublin had limited to no access to constitutionally adequate medical and mental health care, programming, and timely administrative relief. Thus, the time at FCI Dublin was likely "harder time" than other institutions. Programming was effectively non-existent. To accommodate staff, the "day" began at 6:00 a.m. and ended at 2:00 p.m. After that, they were in lock down but could not congregate for any reason including prayer groups or counseling. In a 45-page preliminary injunction order, I noted that FCI Dublin "…deter[red] inmates from filing administrative grievances by threatening [the AICs] with citations on their record, the loss of good time credits and better paying jobs, and placement in the SHU [Special Housing Unit] for doing so."[2]

For a period, some AICs were placed in the SHU for reporting the criminal misconduct of correctional officers for weeks at a time. The BOP was fully aware of the issue with two internal assessments. Yet, it "proceeded sluggishly with intentional disregard" and the decision to repeatedly install "BOP leadership who fail to grasp and address the situation strains credulity."[3]

By way of further background, the situation began to unravel in June of 2021 when a whistleblower complaint sparked a Department of Justice ("DOJ") investigation and an officer was criminally charged. This investigation led to the above-referenced sentences. Many AICs have been the subject of staff sexual abuse, harassment, and retaliation by staff seeking to cover up their own misconduct. Remarkably, despite all the criminal activity, BOP provided the victims with little, to no, mental health counseling.

The DOJ's investigation is ongoing. About a month prior to its closure, the FBI executed a search warrant at the facility and walked off, again, the warden and other senior leadership officers.

No AICs remain in FCI Dublin as of May 1, 2024. I anticipate that, after reaching their new destinations, some may submit requests for compassionate release to their sentencing judges, asking for leniency given the abuses they may have endured. The information herein is provided in the event that you find it useful to your decision-making process. Feel free to contact me should you have any questions.

Yvonne Gonzalez Rogers
United States District Court Judge for the Northern District of California

---

[1] *See California Coal. for Women Prisoners v. United States,* No. 4:23-CV-4155-YGR, 2024 WL 1290766 (N.D. Cal. Mar. 15, 2024).
[2] *Id.* at 43.
[3] *Id.* at 1.

**Exhibit I, p. 1**

# First Report of the Special Master Pursuant to the Court's Order of March 26, 2024

## U.S Bureau of Prisons
## Federal Correctional Institution, Dublin

### Submitted by

### Wendy Still
### Special Master

U.S. District Court
Northern District Court of California

June 5, 2024

# TABLE OF CONTENTS

**Special Master & Team Members** .................................................................................................. 3

**Executive Summary** ............................................................................................................................ 4
    Background ..................................................................................................................................... 4
    Findings ............................................................................................................................................ 5
    Conclusion ..................................................................................................................................... 13

**Federal Correction Institution - Dublin** ........................................................................................ 14
    Facility Profile ............................................................................................................................... 14

**Operations** ........................................................................................................................................ 28

**Staffing in the Bureau of Prisons** .................................................................................................. 34

**Health Care** ....................................................................................................................................... 40
    Medical ........................................................................................................................................... 40
    Mental Health ............................................................................................................................... 45
    Medication Assisted Treatment .............................................................................................. 47

**Administrative Remedy Process** .................................................................................................. 63

**Inmate Disciplinary Program** ......................................................................................................... 72

**Casework** ............................................................................................................................................ 77

**Compassionate Release** ................................................................................................................. 79

**Programs** ............................................................................................................................................ 81

**Prison Rape Elimination Act** .......................................................................................................... 88

**Federal Correctional Institution-Dublin Closure Issues – Property** .................................... 98

**Glossary of Acronyms** ................................................................................................................... 101

**Attachments** .................................................................................................................................... 102

# Special Master & Team Members

| Wendy Still | Special Master |
|---|---|
| Dr. Margarita Pereyda | Medical Expert |
| Dr. Julie Hersk | Medical Expert |
| Dawn Davison | Conditions and Operations Expert |
| Jackie Clark | Nurse Consultant |
| Barbara Owen | Data and Research Expert |
| Sara Malone | Special Assistant |

documents related to operations, casework, medical and mental health, the administrative remedy and disciplinary processes, PREA, policies and procedures related to operations, etc.

- **April 15, 2024:** The Federal Bureau of Prisons (BOP) announced plans to close the facility and transfer the 605[1] female AICs to other locations throughout the country, spanning from the west to the east coast. The BOP had previously advised the Court it was considering closing the facility, and if it occurred, for security reasons, it would have to be conducted quickly. Upon becoming aware of the closure, the Court intervened to ensure proper attention to the needs of the AICs (e.g., medical, mental health, casework, etc.), and to direct and oversee the transfer of the AICs. The Special Master, who was on-site at the time, communicated a variety of concerns, to include the medical clearance process for the AICs being prepared for transport and the eligibility of such individuals for community placements (e.g., home confinement, halfway homes) or release and unaddressed compassionate release/reduction in sentence (RIS) requests. As a result, the Court ordered all transport of the AICs halted and an accounting of the casework for all 605 women held at the main lockup and its adjacent minimum-security camp. In response, Special Master Still's duties were modified to include a targeted review of casework to ensure inmates were being transferred to the correct location, whether at another BOP facility, home confinement, halfway house or recommended for a compassionate release. The AICs who had been moved onto the bus on April 15, 2024 were eventually returned to their housing unit after remaining on the loaded bus for approximately four hours.. Additionally, other buses which had been called to the facility were not loaded.

- **April 16, 2024:** The first group of AICs were cleared by the Special Master and transfers to other BOP facilities, located throughout the nation, began. In preparation for and during transportation to other facilities additional issues began to arise. The court subsequently ordered BOP to create a Master Tracking Roster for FCI-Dublin Closure Issues related to each AIC to ensure issues were tracked and resolution subsequently occurred. The tracking categories include destination facility and date of arrival, compassionate release, medical and mental health alerts and victim advocacy services related to PREA, Medication Assisted Treatment alerts, transportation issues, property issues, and disciplinary and related credit issues. The court also ordered all staff must wear their name identification tags as many who had reported from other facilities did not wear any name identification as required by BOP policy, document shredding cease and an accounting of all shredding documentation be provided to the court. The court additionally ordered that the Special Master be provided electronic access to BOP data system to enable the updating of the Master Tracking Roster and ensure resolution of issues occur.

- **May 1, 2024:** After proper clearance and approval from the Special Master, the last group of AICs were transferred to community facilities.

---

[1] The number of AICs varied during the period of April 8 to May 1, 2024, due to daily admissions, releases and transfers. Many of the statistics contained in the report vary due to the population fluctuations and MAP data.

# Executive Summary

This is the first report of the Special Master pursuant to the Court's order of March 26, 2024 in the matter of California Coalition for Women Prisoners, et al., v. United States of America Bureau of Prisons, et al., Case No.: 4:23-cv-4155-YGR. It contains both the Special Master's findings and recommendations. The language in this section is offered to put into context the basis of this report, provide a timeline and to summarize findings.

## Background

The primary objective of every detention facility is to deter and rehabilitate those incarcerated within its walls, while maintaining a safe and secure environment for inmates, staff and visitors. Effectively managing inmate and staff behavior is critical to achieving this goal. However, without adequate levels of staff, supervision, programs, services and effective processes, inmates are at an increased risk of violence, sexual predatory threats, undetected suicide attempts, and of having access to contraband (e.g., weapons, illicit substances) that is more easily introduced into the facility. Overall, the provision of programs and services, mandated by the United States (U.S.) Constitution, federal statutes and regulations, suffers as the facility struggles to meet the basic needs of the inmates. It is apparent that the Federal Correctional Institution FCI-Dublin fell far short of effectively meeting these mandated expectations. For purposes of this report, the incarcerated individuals at FCI-Dublin shall be referred to as Adults in Custody (AIC).

The following timeline depicts the events that took place after Federal Court Judge Gonzalez Rogers recognized the need to utilize her authority to intercede in order to safeguard the AICs at FCI-Dublin.

- **March 15, 2024:** The U.S. District Court (Court), Northern District of California, granted a motion to certify a class of prisoners at FCI-Dublin in response to ongoing constitutional violations related to the conviction and sentencing of five prison officials for criminal sexual abuse and sexual contact.
- **March 26, 2024:** The Court appointed Special Master Wendy Still to ensure compliance with orders from the Court related to the ongoing retaliation and continued violation of the constitutional rights of the AICs.
- **April 5, 2024:** The Court met with Federal Board of Prisons (BOP) Assistant Regional Director, Western Region and Acting Warden Nancy McKinney, Acting Executive Assistant and Camp Administrator Greg Chaffee, Special Master Still, union representatives for the correctional officers, and counsel to review the plan for assessing the issues at the facility in light of the preliminary injunction order.
- **April 8, 2024:** Special Master Still and her team of experts reported to FCI-Dubin to begin their compliance work. In response, Special Master Still and her team spent over three weeks onsite meeting with FCI-Dublin Executives and other staff that could assist in obtaining a deeper understanding of operations, conditions and activities at the facility. They also spent significant time interviewing facility personnel and AICs, and reviewing

## Staffing

**Finding:** Staffing vacancies led to system failures in almost every area within FCI-Dublin. This facility had the second highest vacancy rate in the Western Region; 51% specifically when factoring in the 27 staff on administrative leave.

**Finding:** Staff augmentation (redirection) resulted in program closures and the inability of AICs to access rehabilitative programming and to earn FSA and GTC credits.

**Finding:** The Court ordered that the BOP shall provide the Court and the Special Master a monthly staffing report for each BOP facility to which FCI-Dublin class members were transferred. The staffing report shall include the number of budgeted, authorized positions and associated vacancies detailed by correctional, casework, program, mental health, and medical classifications.

- The first report shall include staffing and vacancies as of January 1, 2024.
- The staffing report shall also include staffing augmentations for such facilities.

**Finding:** Monthly monitoring of the *Position Output Export Report* and the *Staffing Report* for all institutions where class members are housed should be reported to the Court, counsel and Special Master to determine progress on recruitment efforts and filling of vacancies to ensure the minimum amount of overtime and augmentation is utilized.

## Health Care

**Finding:** Patients at FCI-Dublin were not provided timely access to care. This includes lack of timely access to all components of health care (e.g., medical, mental, dental, vision, diagnostic, and specialty services). In many cases, this population of patients had not been provided care and treatment for their serious health conditions. This resulted in delays in diagnosis and treatment, preventable pain and suffering, and demonstrable harm to patients.

**Finding:** At FCI-Dublin, there was a lack of adequate nursing and medical provider evaluation and oversight. Record reviews indicate that in many cases, nurses and providers did not perform an adequate history of the patient's complaint or perform adequate physical examinations, even when the patients presented with symptoms of serious medical conditions. This brings into question the existing policy and procedure used for credentialing and privileging of medical providers, and the ongoing performance evaluation, peer review process, and competency auditing of nursing personnel.

**Finding:** During the review of health records, the medical experts found significant problems with the management of chronic disease patients related to the timeliness and/or quality of care patients are receiving.

**Finding:** Existing programs were not leveraged, as evidenced by the inconsistent assignment to a Chronic Care Clinic (CCC) for many patients with a chronic problem or with a condition that required close follow up. The CCC appears to be how BOP clinicians are alerted to follow up on chronic conditions like diabetes, asthma, and rheumatologic diseases.

**Finding:** A review of specialty care medical records identified serious deficiencies existed in the timeliness and/or quality of care provided to patients. Many issues were related to the provider's failure to monitor and implement the specialty consultants' recommendations in a timely manner.

**Finding:** A process for managing work-related injuries for inmates was not evident. Several cases of accidents leading to significant morbidity were identified by the SMT and evaluated. FCI-Dublin did not follow-up to appropriately address the injury and the issue was not documented.

**Finding:** The BOP has acceptable guidelines for preventive care.  FCI-Dublin providers appear to have clear guidelines, in particular, for screening for infectious diseases like Tuberculosis, Hepatitis C, HIV, and Sexually Transmitted Illnesses, along with routine primary care screening for anemia, thyroid illness and diabetes. Unfortunately, test results were not consistently followed up and or documented putting the health and safety of AICs and staff at risk.

## Administrative Remedy Process

**Finding:** The primary outcome of "closed/explanation" and the boiler-plate, non-substantive responses to Administrative Remedies indicate that AICs are given very little information about their claims. These canned responses reflect a dismissive and non-problem-solving philosophy of the Administrative Remedy process. The files made available to the Special Master's Team (SMT) did not contain any information about the  investigation of the Administrative Remedy complaint.

**Finding:** The AICs were not able to readily obtain the BP-9 forms, Administrative Remedy Request form.  To obtain any of the forms necessary to file a remedy at any level, the AIC had to request the form from staff and justify the need for the form which had a chilling effect on the process as AICs were fearful of retaliation.  The forms were not available in Spanish or other languages, and translation and confidential interpretation services were not readily available.

**Finding:** The Administrative Remedy Program Statement was outdated and did not mirror the facility's procedure.  The informal level was oftentimes bypassed. The Administrative Remedy process should not bypass the informal level, absent exigent circumstances. These exceptions should have been delineated in an updated Program Statement.

**Finding:**  When an AIC wrote an Administrative  Remedy request, they would enter the date they submitted the form in the space provided.  A review of the dates written on the form by the AIC's, compared to the date received and entered into Sentry, by either the clerk or

counselor, sometimes reflected a 30-day difference. The program statement defines that a request or appeal, if accepted, is considered filed on the date it is logged into the Administrative Remedy Index. In many cases, there were significant time-frame discrepancies between the date the AIC signed the form and when it was entered as received.

**Finding:** A quality control process should have been implemented to ensure Administrative Remedy timeframes are followed, along with a remedy in circumstances in which timelines are violated, except in exigent circumstances. The actual process should have been reflected in the Program Statement.

**Finding:** A review of the Administrative Remedies determined the majority were denied arbitrarily in that it did not appear that a thorough review was conducted to determine the validity of the complaint. The canned language was repetitive among many of the responses and not tailored to each appeal.

**Finding:** Many of the Administrative Remedy packages were incomplete. If an AIC submitted exhibits, they were not attached to the BP-9, Administrative Remedy Request form, making an audit difficult as a result of missing documentation. The Program Statement mandates that all the supporting documents shall be kept in the Warden's Administrative Remedy File along with all supporting material. A review of these files determined this does not occur.

**Finding:** If an appeal was s rejected and the reason was correctable, the notice of rejection is supposed to inform the AIC of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal. FCI left the time of extension granted up to a staff member rather than providing a specified completion time is subjective and a flaw in due process.

**Finding:** Administrative Remedy Procedures under PREA fall very short of the National PREA Standard 115.52. The Standard states that Administrative Remedies regarding allegations of sexual abuse may be filed at any time, yet a review Administrative Remedies indicated they were rejected based on missed time constraints. That is in direct conflict with the PREA standard.

**Finding:** There was no bridge between an Administrative Remedy and PREA protocols. If an AIC submitted an allegation of PREA via a Remedy it was answered, yet not forwarded to the PREA Compliance Manager (PCM). The Warden's responses to the PREA Administrative Remedies all stated the AIC's allegations will be reviewed and referred for further investigation as deemed appropriate, yet the AICs were never interviewed regarding their allegations. This is alarming especially in light of the sexual abuse that had occurred at this facility. This process gap endangered the sexual safety of AICs.

**Finding:** The Administrative Remedy review indicates that medical concerns were the most common reason for filing. However, many appear to have remained unaddressed for months or never.

**Finding:** A review of BOP-wide data indicates that less than 2% of Administrative Remedies were granted. FCI-Dublin's grant rate was slightly lower. While fully recognizing that some appeals are indeed frivolous or a misuse of the process, it is difficult to justify such a small grant or relief rate.

## Inmate Disciplinary Program

**Finding:** Staffing vacancies led to system failures in almost every area, to include disciplinaries. Staff augmentation led to unnecessary disciplinary hearing extensions, lack of timeliness of conclusion of the hearing process, and led to errors in and incomplete staff work.

**Finding:** Due process violations occurred at every level of the disciplinary process at FCI-Dublin. Based on The SMT's review of prior disciplinary actions and concerns identified a request was made to review 10 disciplinary cases with the Western Region Discipline Administrator. The inmate disciplinaries were found to be inconsistent with BOP policy and many contained due process violations. The issues ranged from incorrect charges to excessive sanctions without sufficient justifications. The Western Region Discipline Administrator then consulted with the Chief Discipline Administrator and a decision was made to expunge all 10 disciplinaries reviewed.[2] Additionally, a decision was made to review all the UDC and DHO hearings from January 23, 2024, to present for due process violations.

**Finding:** AIC class members' classification level, FSA and GTCs could be impacted by the due process violations contained in disciplinary actions taken at FCI-Dublin. Further review and expungement of class member credit losses may need to be applied in cases in which due violations occurred.

## Casework

**Finding:** FCI-Dublin failed to comply with BOP Program Statement 5321.09 requirements related to the timeframe in which Team Meetings and classification reviews must be held. Additionally, AIC case records contained errors that impacted time credits, earning status, community eligibility, and release dates.

**Finding:** To ensure the accuracy of an AIC's time credits and eligibility, follow-up casework should be conducted and a classification review for any AIC who had a disciplinary expunged as a result of the Regional Hearing Administrator's audit.

---

[2] Disciplinaries, involving the 10 cases that were expunged, are confidential and will be provided to the court and counsel under separate cover.

**Finding:** The court ordered that AIC casework had to updated before an AIC could be transferred. BOP had to establish a Classification and Record Strike Team to update and correct AIC casework prior to any transfer occurring. Their reviews identified AIC classification levels that should have been reduced, community referral packages that had not been completed, FSA and GTC credits that needed to be updated that impacted eligible release dates, and other casework deficiencies that existed.

**Finding:** FCI-Dublin AIC case files were not maintained in compliance with BOP policy.

## Compassionate Release

**Finding:** FCI-Dublin's prior Administrations were in violation of BOP Program Statement 5050.50 related to the processing of Compassionate Release/RIS requests in that there was no sense of urgency and the unreliability of processing these requests. The requests were oftentimes received and ignored.

**Finding:** FCI-Dublin failed to track and report accurate information on Compassionate Release/RIS requests as mandated by their internal Program Statement. This resulted in inaccurate information being reported by the Director of the Bureau of Prisons, under 18 U.S.C. § 3582 (d)(3) to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives in the annual Compassionate Relate/RIS report.

**Finding:** The Office of the General Counsel should, in a timely manner, process outstanding pending Compassionate Release/RIS requests submitted by AICs previously housed at FCI-Dublin.

## Programs

**Finding:** It was challenging to determine what programs were actually available at the facility. Different staff had different answers, and there was not a single repository in which all of the program data could be retrieved.

**Finding:** A review of program availability based on the data that was provided reflects there were serious programming issues faced by the AICs at FCI-Dublin. Waiting lists were extensive and some of the AICs interviewed stated they had been on waiting lists for well over a year. AICs with shorter sentences were prioritized, and AICs with both short and long terms could not access many of the needed programs for rehabilitative and credit earning purposes.

**Finding:** The SMT was able to determine rather quickly while onsite that staffing shortages had severely impacted programs taking place. If staff were augmented, they were not placed in program positions as custody positions were the priority. The facility reassigned teachers to augment custody positions, thereby requiring the closure of educational and

rehabilitative classes.

**Finding:** No clear data (MAP and Climate) was used for program planning.

## Prison Rape Elimination Act (PREA)

**Finding:** FCI-Dublin did not have a standardized PREA protocol in place, to include forms, that would be kept in a PREA file in the PREA Compliance Manager's Office. Additionally, the facility did not have a PREA checklist in each file to enable necessary elements to be easily identified if missing or upon completion.

**Finding:** There was no mechanism in place to ensure PREA Administrative Remedies that were granted were sent to the PREA Compliance Manager for appropriate follow-up. This follow-up may include interviewing the AIC and/or sending the AIC's case file to the OIA/OIG for investigation. It would also entail the creation of a new PREA file if one did not already exist.

**Finding:** The existing PREA Administrative Remedy list did not contain a comprehensive listing of all cases and/or they were not monitored to ensure proper follow-up.

## FCI-Dublin Closure Issues - Property

**Finding:** The closure was unnecessarily rushed. Methodical, planned, thoughtful practices could not be carried out, leading to mass chaos. Communication from leadership changed daily leading to even more confusion.

**Finding:** Staff temporarily transferred from other facilities to FCI-Dublin, to expedite and assist existing staff who had not been previously made aware of the impending closure, added to the chaotic environment, trauma and stress.

**Finding:** AIC Property processing from the beginning to the end of the closure process was chaotic and created anxiety for both the AICs and staff.

**Finding:** Many of the staff who were brought in from men's facilities to assist in packing property had never worked with women or transgender AICs, and had no idea how to communicate or deescalate the emotional responses the AICs had during the chaotic closure process associated with their property.

**Finding:** There were attitude conflicts between some of the staff BOP brought in from other facilities and FCI-Dublin staff that made the closure even more difficult and traumatic for both staff and AICs.

# Conclusion

Judge Gonzalez Rogers took historic judicial action when she appointed a Special Master with an initial mission to oversee FCI-Dublin and to ensure the correction of the *"dyfunctional mess"* that she identified existed at FCI-Dublin.  Upon the BOP's notification on April 15, 2024 of its immediate intent to close this facility, the Special Master's mission quickly changed to on behalf of the court ensure the safe transfer of the AICs occurred. In response, specific action was taken by the Court,  that required prior to the transfer of any AIC, specific  issues were identified and tracked for resolution.

The Master Tracking Roster for FCI-Dublin Closure Issues that was ordered by the courtwas developed by BOP to enable the Special Master to capture, and follow up on issues related to destination facility and date of arrival, compassionate release, medical and mental health alerts including victim advocacy services related to PREA, Medication Assisted Treatment alerts, transportation issues, property issues, and disciplinary and related credit issue. The tracking roster will be used to provide the Court and counsel with regular updates on the resolution of oustanding issues related to the AICs that were transferred from FCI-Dublin due to the closure of the facility.

In addition to the dysfunction noted by the Court, the SMT found numerous operational, policy and constitutional violations as outlined in the body of this report. This included the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied in multiple audits and investigations. Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs at great risk for many years.  It is unconscionable that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin for such an extended period of time without correction.

This Special Master continues to have concerns that the mistreatment, neglect and abuse the AICs received at FCI-Dublin not be repeated at the facilities where these individuals are being transferred to as many of the conditions that existed at this facility appear to be longstanding and systemic in nature.