

# Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca

★ ★ ★

EVALUATION AND INSPECTIONS DIVISION

23-068

MAY 2023

# Executive Summary



**The DOJ OIG's Inspections Program**

Between Monday, January 30, and Saturday, February 4, 2023, the Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an unannounced, on-site inspection of Federal Correctional Institution (FCI) Waseca, a low security female institution in southern Minnesota.

This was the first unannounced inspection of a Federal Bureau of Prisons (BOP) institution under the OIG's new on-site inspections program; therefore, we sought to inspect an institution of relative operational simplicity and one that scored as "low risk" on the OIG's prison inspection risk assessment tool. We also were interested in inspecting a facility that housed female inmates, given the significant number of sexual assault and harassment investigations that the OIG has been handling recently. FCI Waseca fit our selection criteria because, in addition to being a female-only institution, it is a standalone facility with relatively small staff and inmate complements. Further, it ranked among the least risky BOP institutions on our risk assessment tool.

Nonetheless, as we detail in the report, despite this low risk profile, we identified many significant issues at FCI Waseca, most of which were consistent with findings in our other recent BOP oversight work and which we have reported on publicly. We do not make recommendations in this report because, in our prior work, we have recommended that the BOP address many of these issues at an enterprise level. Therefore, through our efforts to resolve those recommendations, we will monitor the BOP's efforts to address these issues at all of its institutions, including FCI Waseca.

While our inspection found that FCI Waseca is generally well-run, with dedicated staff and an environment in which both inmates and staff generally reported feeling safe, we also identified areas of concern that highlight institution challenges and potential serious risks. For example, FCI Waseca suffers from a significant shortage of Correctional Officers, despite ongoing recruitment efforts. As a result, in order to staff all scheduled posts to ensure the safety and security of the institution, FCI Waseca leadership frequently needs to require staff from other departments such as Facilities and Education to serve in correctional posts rather than attend to their regular duties. However, doing so exacerbates challenges elsewhere in institution operations and creates a cascading set of consequences.

For example, when the institution's Education Department staff work correctional posts instead of their regular duties, this has left insufficient personnel available to support inmate education and training programming and has caused FCI Waseca to cancel or delay programming. Moreover, wait lists for programs are already long, so additional delays could result in inmates not receiving sufficient programming during their incarceration. This in turn could result in inmates being released without the skills they need to successfully reintegrate into society, thereby increasing the risk of recidivism. This is precisely the issue that the bipartisan First Step Act of 2018 (FSA) was attempting to address.

Similarly, when FCI Waseca's Facilities Department staff work correctional posts instead of their regular duties, the Facilities Department in turn becomes short staffed and must triage only the most pressing issues, as opposed to addressing the full scope of its regular duties. As a result, Facilities Department staff may be delayed in addressing maintenance problems that affect the conditions of confinement for inmates and work conditions for FCI Waseca staff. Further, unaddressed maintenance problems can increase the scope of the original problem, as well as the costs associated with addressing it in the future.

We also found that staff shortages in both FCI Waseca's Health Services and Psychology Services Departments have caused delays in treatment of the physical and mental healthcare needs of inmates. Such delays can potentially create more

**Exhibit J, p. 2**

serious health issues for inmates, create further demands on healthcare staff, and increase the costs of future treatments.  Additionally, we identified serious infrastructure issues, including significant damage to several building roofs that have caused leaks throughout the institution.  Not only do damaged and leaking roofs present an inherent structural danger, but the BOP's failure to fix them has led to damaged medical and dental equipment, required medical and dental offices to be temporarily abandoned, ruined portions of the gymnasium floor, occasionally left certain inmate cells unusable, and created unsanitary food services situations.

## Report Highlights



**Condition of Facilities**

**Serious facilities issues affect the conditions of inmate confinement.**
- Many inmates live in basements.  At the time of our inspection, some inmate beds were in close proximity to pipes that occasionally leak.
- Institution roofs are in disrepair, routinely leak, and need to be replaced.  FCI Waseca estimates replacement costs to be approximately $3.5 million.



**Staffing Shortages**

**Significant staffing shortages have cascading effects on institution operations.**
- Correctional Officer shortages require the institution to:
  - ➢ routinely use overtime, which can negatively affect staff attentiveness and therefore institution safety and security, and
  - ➢ temporarily reassign non-Correctional Officers to Correctional Officer posts, negatively affecting their ability to perform their regular duties (e.g., performing maintenance and teaching inmate programs).
- Health Services and Psychology Services Department vacancies affect the timeliness of inmate care and the availability of certain programs.



**Staff and Inmate Safety**

**Staff and inmates told us that they generally felt safe at the institution; however, we identified substantial concerns with:**
- **Cameras:**  numerous blind spots, poor night vision, poor zoom quality, and an insufficient number of cameras, and
- **Contraband:**  significant challenge limiting the amount of contraband in the institution, specifically drugs (synthetic cannabinoids and illicitly acquired opioid use disorder medication).



**Staff Discipline**

**Institution management and staff were frustrated by the amount of time it takes to close a staff misconduct investigation.**
- As of January 30, 2023, FCI Waseca had 38 open staff misconduct cases.
- Those 38 cases had been open an average of 221 days, with 10 open for at least a year.



**Sexual Misconduct Reporting**

**Staff told us that they do not believe sexual misconduct is widespread at the institution.**
- Inmates demonstrated how they would report sexual misconduct, if needed.
- Despite a general sentiment that the institution is free from widespread sexual misconduct, as of January 30, 2023, five staff-on-inmate sexual misconduct allegations were being investigated.

**First Step Act Programs and Time Credits**

**Inmate programming is in high demand, but there are long participation wait lists.**
- Wait lists for many FSA-related programs contained 300+ names.
- Due to excess demand for programming, inmates can potentially be released without the skills they need to successfully reintegrate into society.
- Staff and inmates expressed confusion with how inmates earn and apply time credits.

**Exhibit J, p. 3**

# Table of Contents

**Introduction** ..................................................................................................................................1

    FCI Waseca ...............................................................................................................................2

    FCI Waseca Staffing Challenges ..............................................................................................3

**Inspection Results** ........................................................................................................................4

    Condition of Facilities.............................................................................................................4

    Safety and Security...............................................................................................................12

    Use of Restrictive Housing ..................................................................................................20

    Staff Discipline .....................................................................................................................22

    Sexual Misconduct Reporting..............................................................................................24

    Medical and Mental Healthcare ...........................................................................................26

    First Step Act Programming and Time Credits .....................................................................30

**Conclusion** .................................................................................................................................33

**Appendix 1:  Purpose, Scope, and Methodology** ......................................................................34

    Standards ..............................................................................................................................34

    Purpose and Scope ...............................................................................................................34

    Inspection Methodology.......................................................................................................34

**Appendix 2:  DOJ OIG Related Work**.........................................................................................36

**Appendix 3:  BOP Policies Cited** ...............................................................................................37

**Appendix 4:  The BOP's Response to the Draft Report**.............................................................38

**Exhibit J, p. 4**

# Introduction

This report details the results of the U.S. Department of Justice (DOJ) Office of the Inspector General's (OIG) first unannounced inspection of a Federal Bureau of Prisons (BOP) prison, Federal Correctional Institution (FCI) Waseca, a low security female institution located in southern Minnesota.  As this was our first unannounced inspection through the OIG's new on-site inspections program, we sought to inspect a BOP institution of relative operational simplicity and one that scored as "low risk" on a prison inspection risk assessment tool that the OIG is developing and piloting internally.  We determined that by doing so we would be able to establish a baseline against which to compare the operations of other BOP institutions and test the scalability of our inspection protocols in advance of inspections of more operationally complex institutions.[1]  FCI Waseca fit our selection criteria because, unlike many BOP institutions, it is a standalone facility with relatively small staff and inmate complements.  Further, it ranked among the least risky BOP institutions in our piloted risk assessment tool.

The OIG conducted its unannounced, on-site inspection of FCI Waseca between Monday, January 30, and Saturday, February 4, 2023.[2]  The OIG team consisted of seven OIG staff members and two medical subject matter experts contracted by the OIG. While on site, we made physical observations; interviewed both staff and inmates; reviewed security camera footage; and collected records related to inmate programming and education, institution staffing levels, conditions of confinement, inmate medical and mental healthcare, and staff and inmate misconduct including sexual misconduct.  We also made follow-up requests of both the institution and the BOP Central Office for additional data, interviews, and



FCI Waseca Main Entrance
Source:  OIG, February 2023

documents, which we used to further inform our inspection (see Appendix 1 for more details on the methodology).  As this was our first unannounced inspection of a BOP facility, we particularly appreciated the full cooperation and assistance that we received from the Warden, the prison staff, and BOP personnel during our on-site visit and in responding to our follow-up requests.

---

[1]  Many BOP institutions have sub-facilities, each of which houses inmates of specific security levels and genders.  These BOP institutions house multiple thousands of inmates.

[2]  Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified the institution at approximately 8 a.m. on January 30, 2023, that it would be initiating an inspection at noon that same day.

**Exhibit J, p. 5**

## FCI Waseca

FCI Waseca is a low security women's prison located in Waseca, Minnesota, approximately 80 miles south of Minneapolis. It was originally built as a university campus and was purchased by the BOP in 1993. In 1995, the BOP opened FCI Waseca as a male institution, and between 2008 and 2009 the BOP converted it to a female institution.

FCI Waseca is a Medical and Mental Health Care Level 2 institution, meaning that it generally has the capabilities and resources to provide care for stable outpatients whose medical and mental health conditions can be monitored and managed through routine appointments.[3] While the vast majority of inmates at FCI Waseca have been classified at Level 1 or 2 Medical and Mental Health Care Levels, at the time of our inspection 13 inmates were classified at either medical or mental healthcare levels beyond the designation for this institution.

As of February 1, 2023, FCI Waseca housed 806 female inmates.[4] This was approximately 13 percent over its rated capacity of 712 inmates. FCI Waseca has five general population housing units. Collectively, these units contain both unlocked dormitory rooms and open concept living spaces that that span the entire floor of a housing unit. Four of these open concept living areas are located in basements. General population housing units have communal bathrooms and shower facilities. FCI Waseca also has a Special Housing Unit (SHU) for inmates that BOP staff has determined need to be separated from the general population. SHU inmates are generally housed two to a cell.[5] SHU cells are locked and contain their own toilets and showers.

FCI Waseca offers inmates a variety of programming, including both residential and nonresidential drug treatment programs, as well as First Step Act-required Evidence-Based Recidivism Reduction programming and Productive Activities. The institution also offers vocational apprenticeships, as well as

### FCI Waseca:  Institution Profile


**Location**
Waseca, MN


**Population**
Female Inmates
Rated Capacity:  712
Actual Headcount:  806
*~113% Capacity*


**Security Level**
Low


**Housing Units**
5 General Population Units
1 SHU


**Medical Care Level**
2 of 4


**Mental Healthcare Level**
2 of 4


**Staff**
Total Positions:  255
On Board:  191
*64 Vacancies*

As of February 1, 2023
Source:  FCI Waseca documentation

---

[3] The BOP classifies inmates at a Level 1, 2, 3, or 4 for medical care purposes, with Level 1 inmates requiring the least amount of medical care. The BOP uses a similar classification for inmate mental healthcare.

[4] A small portion of FCI Waseca inmates do not identify with the gender assigned to them at birth.

[5] FCI Waseca staff told us that they double cell inmates whenever possible but noted that there are certain times they cannot do so, such as when there is an odd number of inmates assigned to the SHU.

Exhibit J, p. 6

employment for over 200 inmates at an on-site textile factory operated by UNICOR, a government-owned manufacturing corporation that employs BOP inmates.

## FCI Waseca Staffing Challenges

At the time of our inspection, FCI Waseca was struggling to maintain a staffing complement consistent with the BOP's determination of the needs of the institution.  Overall, FCI Waseca had only 75 percent (191 of 255) of its total positions filled as of January 2023. Staffing shortages have been particularly acute within the Correctional Services Department, which is composed primarily of Correctional Officer positions. Correctional Officers are vital to the safety and security of the institution, as they are responsible for providing round-the-clock supervision of inmates.  Specifically, FCI Waseca had only 67 percent of its Correctional Services positions filled at the time of our inspection (see Figure 1).



**Figure 1**

**FCI Waseca Staffing Level Overview**

Source:  FCI Waseca staffing data, as of January 2023

Moreover, we found that staffing challenges at FCI Waseca were not limited to Correctional Services positions.  For example, consistent with the overall vacancy rate for the institution, both the Health Services and Psychology Services Departments were staffed at 75 percent or less, including vacancies for medical provider positions.  The impact of these staffing shortages is exacerbated by the fact that, as described above, the facility was 13 percent over capacity at the time of our visit.  Throughout the report, we describe how current and longstanding staffing issues have contributed to operational challenges in many of FCI Waseca's mission areas.

**Exhibit J, p. 7**

# Inspection Results

## Condition of Facilities

During our inspection, we observed that most parts of the institution were clean and temperatures in inmate housing units were comfortable and in compliance with BOP policy on temperature ranges, despite below-zero outside temperatures throughout the week of our inspection.[6]

However, we identified serious facility infrastructure issues that negatively affect the conditions of confinement for inmates and the work conditions for staff.  While institution management and nonmanagement staff stated that the Facilities Department was responsive to routine maintenance requests, our interviews and on-site observations identified long-standing, significant infrastructure needs that remain unaddressed by the BOP.  Specifically, as the photographs below demonstrate, we found that some FCI Waseca inmates lived in basements, with beds positioned in close proximity to pipes that occasionally leak.  Further, roofs covering the food service area, health services area, recreation area, and Special Housing Unit (SHU) routinely leak and need to be replaced.  At the time of our inspection, FCI Waseca estimated the cost of roof repairs to exceed $3 million.

### Conditions in Inmate Housing Units

Inmates at FCI Waseca live in five general population housing units.[7]  These housing units contain a collective 12 floors of inmate housing.  Eight of those floors are above ground, while four are basements.  In six of the above-ground housing floors, inmates live four to a room.  Rooms on these floors contain two bunk beds and do not have lockable doors.  Inmates on these housing floors share communal bathroom and shower facilites.  The images below show the typical housing arrangement in these above-ground housing floors.

---

[6]  BOP policy provides that:  "Temperature set points will be targeted to 76 degrees Fahrenheit in the cooling season and 68 degrees Fahrenheit in the heating season.  All spaces will be maintained as close to the targeted set point as possible."  See Appendix 3 (Facilities Operations Manual).

[7]  In addition to the five general population housing units, FCI Waseca also has a SHU for inmates who must be separated from the general population.

Exhibit J, p. 8

 

*Left,* Hallway of Above-Ground Housing Floor, *Right,* Typical Inmate Room in the Above-Ground Housing Floor

Source:  OIG, February 2023 (Inmates Blurred in Left Image)

In the remaining two above-ground housing floors and four basement housing floors, inmates live in open-concept floor plans and share communal bathrooms and shower facilites.  The images below show the typical housing arrangements in the basement housing floors.

 

Inmate Housing in an FCI Waseca Basement Housing Floor

Source:  OIG, February 2023 (Inmates Blurred in Left Image and Product Names Blurred in Right Image)

Exhibit J, p. 9

As can be seen in the images above and below, we observed that the basement housing floors contain exposed pipes, pipes that have been patched or wrapped in plastic, and pipes that have suffered from what appeared to be long-term damage.  We also found that inmates with top bunks slept in very close proximity to exposed pipes and could hit their heads on the pipes if they sat up in bed.  Inmates told us that these pipes regularly leak on their beds.  While we did not observe pipes actively leaking during our inspection, the patches and plastic covering of pipes evidenced prior leaks.  Although we did not independently determine the purpose or contents of all the exposed pipes during our inspection, we questioned Facilities Department staff about this issue.  These staff explained that pipes that move water off and away from the roofs of housing buildings pass through basements and, during periods of significant rainfall or snow melt, these water pipes may experience strain that creates leaks.  Facilities Department staff also explained that shower water may leak from floors above ground level and create leaks in the basement.  The pictures below show the proximity of certain beds to exposed pipes, the plastic wrapping around pipes, and the condition of those pipes.



Condition of Pipes and Their Proximity to Inmate Beds in a Basement Housing Floor

Source:  OIG, February 2023 (Left Image) and January 2023 (Right Image) (Product Names Blurred in Both Images)

**Exhibit J, p. 10**

  

*Left and Center,* Bolt Attached to Overhead Pipe Close to an Inmate Bed, *Right,* Inmate-Fashioned Protective Covering on the Bolt

Source:  OIG, January 2023 (Product Names Blurred in Left Image)



Pipe Uncovered in a Basement Housing Floor.  To better assess the pipe's condition, the OIG cut open the plastic sheeting that had been covering the pipe.

Source:  OIG, January 2023

**Exhibit J, p. 11**

While onsite, FCI Waseca's Warden told us that he was aware of the conditions in the basement housing floors but did not have an alternative housing solution due to the size of the existing inmate population (as explained in the Introduction, FCI Waseca is currently about 13 percent over its rated capacity).  Following our visit, we spoke with the BOP's North Central Regional Director, who had become aware of concerns we expressed to institution management about the basement housing floors.  He told us that, in the short term, there is a plan for FCI Waseca to potentially remove top bunks from its basement housing floors in order to improve the conditions of confinement.  After receiving a draft of this report, FCI Waseca management did in fact relocate inmates from top bunks in close proximity to pipes to other areas of the institution.  According to FCI Waseca management, they do not intend to assign inmates to those bunks in the future.  Further, the Regional Director said that, in the long term, the BOP plans to conduct a national bed-space audit, which will allow it to better allocate the inmate population throughout its institutions and, as a result, ensure that inmates do not have to live in conditions comparable to those with beds in close proximity to pipes.

## Unaddressed Roof Repairs

According to Facilities Department staff, FCI Waseca needs to replace the flat roofs that shelter its food services area, health services area, recreation area, and SHU.  They explained that these roofs regularly leak and prevent the institution from effectively using these areas.  Institution staff attribute roof failures to the weather in Minnesota, which can vacillate between extremely cold winter temperatures and hot summer temperatures, causing roof materials to expand and contract.  Significant snow accumulation also places the flat roofs under stress.  The pictures below show examples of water damage in the food services area caused by water penetrating the damaged roof.



*Left,* Food Service Area Ceiling Panels Warped Due to Water Damage, Riveted Together to Maintain Overhead Cover. *Right,* Water Damage Rendered This Section of the Food Service Area Unusable.

Source:  OIG, January 2023

**Exhibit J, p. 12**

FCI Waseca estimates the cost of necessary roof repairs to be $3.5 million. Below, we summarize the Facilities Department's assessment of current and potential future effects of these unaddressed repairs.

| Current and Potential Future Effects of Unaddressed Roof Repairs at FCI Waseca | |
|---|---|
|  **Health Services Area** | **Current Effects**<br>• Leaks have caused damage to medical and dental treatment equipment.<br>• Leaks have caused medical and dental offices to be temporarily vacated.<br><br>**Potential Future Effects**<br>• The institution believes that, if repairs are not made soon, future repairs will be more costly and invasive, potentially affecting FCI Waseca's ability to provide medical and dental care in the area while extensive repairs are being completed. |
| **Food Services and Dining Areas** | **Current Effects**<br>• Leaks have caused issues with food preparation and sanitation.<br>• Multiple recurring leaks in the dining area have interrupted meal service.<br><br>**Potential Future Effects**<br>• The institution believes that, if needed repairs to the roof in the food services area remain unaddressed, the roof may not be able to hold the added weight of rainwater and snow in coming years, which could cause it to collapse. |
|  **Special Housing Unit** | **Current Effect**<br>• Leaks in the SHU have rendered inmate cells unusable at times.<br><br>**Potential Future Effects**<br>• The institution believes that, if repairs are not made soon, future repairs will be more costly and invasive, potentially affecting FCI Waseca's ability to house inmates in the SHU. |
| **Recreation Area** | **Current Effect**<br>• Leaks caused damage to portions of the gymnasium floor that needed to be remediated.<br><br>**Potential Future Effect**<br>• The institution believes that, if needed recreation area roof repairs remain unaddressed, the roof may not be able to hold the added weight of rainwater and snow in coming years, which would cause it to collapse. |

Source: FCI Waseca Facilities Department roof repair project funding requests

To receive funding for any repair project that is estimated to cost over $10,000, a BOP institution must request funding from its regional office.[8] We found that since 2019 FCI Waseca has been requesting at least

---

[8] For projects estimated to cost less than $300,000, the regional office creates a priority list of regional projects and allocates funds based on that list. For projects estimated to cost over $300,000, the regional office creates a priority list of regional projects and submits that list to the BOP's Central Office. The Central Office then creates a national priority list and allocates funds based on that list. For a description of the BOP's approval process for minor and major repairs, see Appendix 3 (Facilities Operations Manual).

**Exhibit J, p. 13**

part of the $3.5 million estimated as necessary for roof repairs.[9]  However, it had not received any funding to begin these roof repairs as of March 2023.  As detailed in a recent OIG report on the BOP's efforts to maintain and construct institutions, we found that the BOP does not have a well-defined infrastructure strategy and lacks the funding to address what the BOP estimates to be a nearly $2 billion unresolved institution repair project backlog.[10]  As a result, the BOP has been unable to fund many repair projects, like the FCI Waseca roof repair project, at institutions throughout the country.

With regard to the unaddressed roof repair project at FCI Waseca, the North Central Regional Director acknowledged the need for the repairs but told us that there were more serious facilities issues at other institutions in the North Central Region.  He further stated that, given the limited amount of funding available to him, he could not prioritize FCI Waseca's roof repairs over certain other repairs at other institutions.

### Other Facilities Issues Observed

During our inspection, we observed four other significant facilities issues.

First, during the week of our visit, FCI Waseca's external electrical service was interrupted during the early morning hours of February 3.  Following the interruption of service, one of the institution's emergency generators did not turn on and as a result FCI Waseca experienced a partial power outage that rendered systems providing heat and overhead lighting to inmate housing units inoperable between approximately 4 and 5 a.m.  Nevertheless, FCI Waseca temperature sensors (which were unaffected by the power outage) recorded that temperatures inside inmate housing units remained within the BOP acceptable range during the outage, despite contemporaneous outdoor temperatures registering minus 15 degrees Fahrenheit.  Facilities Department staff and FCI Waseca's Warden told us that they reported to the institution during the outage, took manual temperature readings, and similarly found the manual readings to indicate that temperatures in housing units remained within the BOP acceptable range.  Facilities Department staff also explained that, because the housing buildings are made of brick reinforced with concrete, they retain heat well.  Facilities Department staff attributed the generator failure to a communication issue between the

---

[9]  Additionally, FCI Waseca has requested, and has not yet been approved to receive, approximately $232,000 to fund additional projects to replace an uninterrupted power supply system that supports the institution's communications equipment, to replace exterior doors that have deteriorated, and to repair interior institution roads and the food services dock.  We also note that between January 2022 and January 2023 FCI Waseca completed two major repair projects to upgrade perimeter detection and to replace an emergency propane supply station.  The cumulative cost of these projects was nearly $500,000.  As of February 2023, FCI Waseca was conducting three repair projects to replace the institution's water softener, to upgrade exterior lighting, and to replace a dust collector in a vocational education woodworking shop.  The cumulative cost of these projects was over $450,000.

[10]  See Appendix 2, Item I.

**Exhibit J, p. 14**



Makeshift Sump Pump in Evidence Room
Source: OIG, February 2023

Deterioration of an External Walkway
Source: OIG, February 2023

generator and the institution's electrical system. They told us that they were actively addressing the issue with the generator's manufacturer. According to documentation provided by the BOP, FCI Waseca has not experienced a similar power outage in the past 12 months.

Second, we found that that, similar to basement inmate housing floors, the institution's evidence room, which is also located in a basement, experiences leaks. Institution staff attributed the cause of those leaks to groundwater seepage through the basement's walls, as well as roof issues. In 2017, as a result of these leaks, the evidence room flooded and staff and inmate misconduct case evidence was damaged. To address these leaks and prevent future damage to evidence, evidence lockers were placed on lifts, above the ground, and a makeshift sump pump was installed to remove water that enters the space (see image). FCI Waseca is not currently requesting funds from the North Central Regional Office to address the underlying causes of flooding in the evidence room building.

Third, similar to the cause of roof failures, exterior walkways between institution buildings have deteriorated over time due to the extended effects of weather. Health Services Department staff told us that that cracks and heaves in walkways make it difficult for inmates with mobility issues to safely navigate the institution. Further, they expressed concerns for their own safety as they regularly have to transport medical carts throughout the institution and fear that they may lose control of the carts while traversing the uneven pavement. Facilities Department staff were aware of this problem and told us that they will make repairs as weather permits.

Fourth, due to the shortage of correctional staff at FCI Waseca, Facilities Department staff are required to cover unfilled Correctional Officer posts instead of performing their regular duties. This practice is known as augmentation, and we discuss it in greater detail in the next section of the report. We reviewed FCI Waseca augmentation data and found that staff from the Facilities Department were the staff most likely to fill correctional posts via augmentation between January 2022 and January 2023, working a total of more than 2,200 augmentation hours. This corresponds to more than one full-time equivalent position. A senior member of the Facilities Department told us that because of augmentation the

**Exhibit J, p. 15**

Facilities Department can only "put out fires." Specifically, he said that augmentation interferes with his department's ability to perform preventive maintenance and complete administrative work documenting repairs completed.

## Safety and Security

During our inspection interviews, staff and inmates told us that they generally felt safe at the institution. The sentiments inmates expressed to us were consistent with those collected by the BOP, which found through polling FCI Waseca inmates in January 2023 that 86 percent of inmates rated the institution safe. According to our interviews, staff and inmates do not believe that sexual abuse and misconduct are widespread at FCI Waseca, and inmates told us that they are not afraid to report sexual misconduct and that they know how to do so.

While we are pleased to hear from staff and inmates that they generally feel safe at FCI Waseca, we identified serious issues that undermine the institution's safety, many of which are consistent with issues that the OIG has found affecting institutions throughout the BOP:

- First, FCI Waseca has significant Correctional Officer vacancies; to address these vacancies the institution has adopted stopgap measures that have significant negative effects on staff and other aspects of institution operations.

- Second, we found that the institution lacks the number of cameras necessary to sufficiently observe staff and inmate activity and the existing complement of cameras produces low-resolution footage that makes it difficult to monitor and investigate inmate and staff misconduct.

- Third, the institution is struggling to contain the introduction of synthetic cannabinoids (colloquially known as K2 or spice), and illicitly acquired sublingual strips of buprenorphine and naloxone, which, when used appropriately, are prescribed to treat opioid use disorder.

### Staffing of Correctional Officer Positions

Correctional Services Department staff, who are primarily Correctional Officers, are responsible for the daily management and supervision of inmates and the implementation of policies and procedures to maintain a safe and secure environment for inmates and staff. At the time of our inspection, FCI Waseca had significant staffing shortages in the Correctional Services Department, which was staffed at 67 percent, with 36 vacancies. FCI Waseca staff we interviewed described persistent staffing shortages in positions across the institution and in Correctional Officer positions specifically.[11]

Shortages in Correctional Officer positions make it difficult for an institution to provide round-the-clock supervision of inmates. To compensate for vacancies in these critical positions at FCI Waseca, institution management has adopted two stopgap measures used widely across the BOP to maintain coverage of correctional posts: (1) the use of overtime and (2) the temporary assignment of non-Correctional Officer personnel into Correctional Officer positions (a practice known as augmentation). While these measures

---

[11] Prior OIG work has cited staffing shortages as a significant problem for the BOP. See Appendix 2, Item II.

**Exhibit J, p. 16**

have allowed the institution to maintain coverage of Correctional Officer posts, they are imperfect measures to ensure continuity of inmate supervision; they also have compounding and often significant negative effects on other aspects of institution operations, as discussed in greater detail throughout this report.

## Overtime

To counteract ongoing staffing shortages of Correctional Officers and reduce institution reliance on augmentation, FCI Waseca staff routinely work overtime to fill certain Correctional Officer posts, which must be staffed 24 hours a day, 7 days a week.  At FCI Waseca, when relying on overtime to cover Correctional Officer posts, institution management first offers staff the opportunity to take on additional shifts via voluntary overtime.  As a final resort, institution management requires Correctional Officers to cover shifts via mandatory overtime, by requiring them to remain at the institution after completing their original shifts.

We found that ongoing staffing shortages among Correctional Officer positions may result in staff working double shifts, some as long as 16 hours, to cover vacant posts.  We have concerns that, when staff work consecutive shifts or multiple overtime shifts during a week, they may become tired and less observant, which can negatively affect the operation and safety of the institution.  Over the period of approximately 1 year (January 1, 2022–January 14, 2023), we found that Correctional Services staff worked an estimated total of 14,143 voluntary and mandatory overtime hours, which corresponds to approximately 6.8 full-time positions.[12]  The use of overtime to fill staffing gaps also carries financial consequences for the BOP, as personnel working overtime must be compensated over their base salary.  According to FCI Waseca financial management documentation for fiscal year 2023, the institution spent over $335,000 on overtime across all departments during the first quarter alone, which put the institution on pace to far exceed its annual overtime expenditure target of $450,000.

## Augmentation

FCI Waseca relies heavily on staff augmentation—the temporary assignment of non-Correctional Officer personnel from their regular non-correctional duties into Correctional Officer posts—to help compensate for the high vacancy rate among Correctional Officer positions.  According to local practice, non-Correctional Officer staff members can be used for augmentation in Correctional Officer posts only on non-holidays and weekdays, during day shifts (6 a.m. to 4 p.m.).

We found that between January 1, 2022, and January 14, 2023, at least one non-Correctional Officer staff member filled a Correctional Officer position via augmentation on 93 percent of the weekdays in that year. Additionally, we found that 83 different non-Correctional Officer staff members worked at least one augmentation shift, for a cumulative total of approximately 10,000 hours, which is equivalent to nearly five full-time positions.  As described above, for the year we examined, when supplemented through augmentation, Correctional Officer posts were filled most commonly with personnel from the Facilities Department.  This was followed by personnel from FCI Waseca's Unit Team and Education Department, which are together responsible for duties that include managing inmate programming, planning for inmate releases, and facilitating and teaching educational programs.  Based on our analysis, each of these three

---

[12]  In December 2020, the OIG reported that BOP employees worked over 6.7 million overtime hours, the equivalent of more than 3,000 full-time positions, at a cost of over $300 million, during fiscal year 2019.  See Appendix 2, Item III.

**Exhibit J, p. 17**

departments lost at least one staff member to augmentation duties in correctional posts for more than half the total weekdays in the year we examined (see Figure 2).

**Figure 2**

**Top 3 Departments Supplying Staff for Augmentation in Correctional Posts:
Percentage of Weekdays Each Department Lost at Least One Staff Member to Augmentation**



Source: OIG analysis of FCI Waseca staff augmentation data, January 1, 2022–January 14, 2023

We found that augmentation has ripple effects impeding operations across the institution. For example, as described above, a senior member of the Facilities Department told us that augmentation interferes with his department's ability to perform preventive maintenance and complete administrative work documenting facility repairs completed. Further, a Unit Team staff member (who, among other duties, works to identify inmates' individual programming needs and prepare them for reentry) told us that, given how frequently she has had to serve in Correctional Officer posts, it has been difficult to give her full attention to all of the inmates in her caseload, which approaches 150 inmates. Finally, Education Department staff told us that inmate programs may be delayed or canceled because course instructors are pulled away from their normal duties and a supervisor estimated that, due to augmentation, inmates enrolled in the institution's General Educational Development (GED) high school equivalency program receive only 3 to 5 hours of instruction per week, short of the 7.5 hours required by BOP policy.[13]

In addition, when institutions such as FCI Waseca adopt augmentation, or have to mandate overtime to fill crucial Correctional Officer posts, this can result in a variety of negative effects for institution staff, including

---

[13]  See Appendix 3 (Literacy Program (GED Standard)).

**Exhibit J, p. 18**

low morale and failure to perform assigned shifts.  We were told that the staff generally prefer to perform the duties for which they were hired and stopgap strategies such as augmentation negatively affect their morale.  Further, staff who are unwilling to work Correctional Officer shifts assigned through augmentation or overtime may abuse sick leave or take an absence without leave.  This can perpetuate a vicious cycle of understaffing:  staff absences create additional gaps for an already understaffed institution, which in turn increases the likelihood that the institution will have to use additional augmentation or mandatory overtime to cover correctional posts.

**Recruitment, Retention, and Associated Challenges**

To help address the institution's safety concerns associated with Correctional Officer staffing, FCI Waseca management implemented recruitment, hiring, and retention initiatives that have included:

- hosting job fairs at the institution and participating at statewide recruiting events,

- a 10 percent retention incentive for Correctional Officers,

- a 10 percent recruitment bonus for all new staff, and

- paid moving expenses for existing BOP staff working at other institutions to relocate and work at FCI Waseca.

The institution had also sought approval from the BOP's Central Office for increases to Correctional Officer retention incentives, from 10 percent to 25 percent, as well as a 10 percent pay increase for all other staff.  As of March 2023, FCI Waseca was awaiting a decision from the Central Office on these proposals.

Despite these efforts, FCI Waseca management reported difficulties in finding talented people who want to work in the institution, due in part to the rural location of the institution and lack of competitive staff salaries for new recruits.  Management explained that the rural location may not be a desirable location for potential applicants and that the commute to the institution from larger metropolitan areas in the state—such as Rochester, Minneapolis, and St. Paul—is over an hour.

**Exhibit J, p. 19**

Another barrier to recruiting new applicants, we were told, is the lack of competitive salary and low locality pay.  According to FCI Waseca staff, local businesses and the nearby state prison offer higher starting salaries than the average starting salary for Correctional Officers at FCI Waseca.

Additionally, institution management suggested that the lack of locality pay for staff at FCI Waseca hinders its ability to match competitor salaries.[14]  As shown in Figure 3, FCI Waseca is located just outside the boundary of the Minneapolis-St. Paul, Minnesota–Wisconsin locality pay area, where federal employees receive locality pay that supplements their base salaries.  As a result, the salary for a General Schedule Level 8, Step 1 Correctional Officer is $4,682 less than it would be if FCI Waseca were located approximately 11 miles to the north, within the bounds of the Minneapolis-St. Paul, Minnesota-Wisconsin locality pay area.

**Figure 3**

**FCI Waseca Is Situated Outside the Minneapolis-St. Paul Locality Pay Area**



- Minneapolis-St. Paul, MN-WI locality pay area
- Waseca County
- Minneapolis
- FCI Waseca

Source:  OIG visualization based on U.S. Office of Personnel Management locality pay areas

| Staffing Challenges at FCI Waseca | | |
| --- | --- | --- |
| **Lack of Applicants** | **Location & Locality Pay** | **Competition** |
| • Qualified applicants have not applied to repeated vacancy announcements. | • Outside locality pay area with higher salaries<br>• Location in a rural community<br>• Longer than 1-hour commute from several large metropolitan areas | • Unable to match competitor salaries |

Source: FCI Waseca documentation, interviews with staff, and OIG analysis

---

[14]  Locality pay supplements a federal employee's base salary and is calculated from the cost of living in a specific area. As a result, federal employees with duty stations in locality pay areas receive higher overall salaries compared to federal employees with duty stations outside of locality pay areas, which includes Waseca, Minnesota.

**Exhibit J, p. 20**

## Security Cameras

As described in the Introduction to this report, FCI Waseca was converted to a prison after having been designed and built as a university.  As a result, compared to facilities designed as prisons, this institution has many blind spots and areas where inmates or staff could remain beyond lines of sight.  Although security cameras can serve as a force multiplier for visual coverage in a BOP institution, according to FCI Waseca management and staff, FCI Waseca lacks the number of cameras necessary to sufficiently observe staff and inmate activity.  We confirmed in our walkthrough that blind spots exist throughout the institution.  Staff we interviewed told us that they would prefer to have more cameras so they can more closely monitor inmate activity and increase the overall level of safety.

During our on-site review of security camera footage available from the existing complement of cameras, we found the video quality to be of low resolution, consistent with complaints we heard from institution management.  We also found that the cameras had poor night vision and poor zoom quality.  According to members of FCI Waseca's Special Investigative Services (SIS) staff, who investigate inmate incidents and staff misconduct, it is difficult to fully investigate alleged behavior that is not captured by cameras, as well as activity that is captured by cameras that produce low resolution footage.

The OIG has long identified insufficient camera coverage and low video resolution as a challenge, both for the BOP throughout its institutions and for the OIG in its own investigative capacity.  In a 2016 report, we found that "deficiencies within the BOP's security camera system have affected the OIG's ability to secure prosecutions of staff and inmates in BOP contraband introduction cases, and these same problems adversely impact the availability of critical evidence to support administrative or disciplinary action against staff and inmates." [15]  In response to our June 2016 findings and recommendations, the BOP completed a multiyear update to cameras at 45 institutions; however, serious issues with the BOP's security camera systems remained unresolved.  Specifically, as we reported in October 2021, 86 percent of the BOP's cameras were still using analog or old technology, resulting in poor-quality video, limited areas of coverage, limited ability to zoom and search recorded video, and restricted video storage periods. [16]  Given the persistence of BOP camera issues, in December 2022 Congress passed and the President signed the Prison Camera Reform Act, which requires the BOP to develop  plan to evaluate and reform its security camera capabilities. [17]

As of the time of our inspection, FCI Waseca did not have an upgraded camera system.  According to FCI Waseca management, the institution is slated to receive and then install fiber optic cable that will serve as the foundation for the new camera system in and around October 2023.  After installation of the fiber optic cable, FCI Waseca will receive and install new high-resolution cameras, as well as additional supporting camera system infrastructure.  As of April 2023, FCI Waseca management was uncertain about when the new camera system will be fully operational.  While the institution is awaiting equipment, the Warden plans

---

[15]  See Appendix 2, Item IV.

[16]  See Appendix 2, Item V.

[17]  The Prison Camera Reform Act became law in December 2022.  Under the law, among other things, the BOP is required to submit to Congress a plan to "evaluate the security camera, land-mobile radio, and public address systems." Prison Camera Reform Act of 2021, Pub. L. No. 117-321, 136 Stat. 4430 (2022), www.congress.gov/117/plaws/publ321/PLAW-117publ321.pdf (accessed May 8, 2023).

**Exhibit J, p. 21**

to have a committee determine where the institution could install additional cameras to improve visibility in existing blind spots.

| FCI Waseca Security Camera System | | |
|---|---|---|
| **Existing Cameras** | **Limitations** | **Security Implications** |
| • 162 analog cameras | • Poor night vision<br>• Poor zoom quality<br>• Blind spots due to insufficient number of cameras at the institution | • Inmates and staff are aware of blind spots, making it more likely that they can commit misconduct in those areas.<br>• Poor-quality camera footage makes it difficult to investigate misconduct. |

Source: FCI Waseca documentation, OIG observations, and interviews with staff and inmates

## Contraband

FCI Waseca management told us that they did not believe BOP staff were introducing contraband into the institution and they did not believe that there were large volumes of common prison contraband such as cellular telephones or inmate-fashioned weapons in the institution.  However, they told us that there was an inmate drug problem at FCI Waseca, particularly with synthetic cannabinoids and illicitly acquired buprenorphine and naloxone.  When we asked about potential sources of this contraband, institution staff told us that drugs enter through the mail (letters and books sent to inmates) and, to a lesser extent, during in-person visitation.  These drugs are difficult to detect and can be easily concealed in mail and books:  synthetic cannabinoids can be sprayed onto paper, while buprenorphine and naloxone can be transmitted via small dissolvable strips that, for example, easily fit behind a stamp or in the binding of a book (see the text box for more information about these drugs).

Consistent with BOP policy, FCI Waseca staff screen all non-legal mail by opening it, touching it to detect obvious lumps, and scanning suspected drug-laden paper with a light bar that can indicate whether a piece of piece of has been saturated with a fluid.[18]
However, according to mailroom personnel, mailroom staff cannot detect all drugs contained in mail for

> **Synthetic Cannabinoids and Compounded Buprenorphine/Naloxone**
>
> **Synthetic Cannabinoids** (colloquially known as K2 or spice) do not have a medical purpose.  They are a category of synthetic drugs that mimic THC, the main ingredient in marijuana.  The exact ingredients and strength of these drugs are almost impossible for the user to know and can cause severe side effects, such as panic attacks, hallucinations, increased blood pressure and heart rate, and even death.  Typically, synthetic cannabinoids are sprayed onto plant matter and smoked.
>
> **Buprenorphine and Naloxone** are opioids that can be compounded together and ingested orally through pills or dissolvable strips.  When used appropriately, they can help treat opioid use disorder by helping patients manage withdrawal symptoms and reduce cravings.  Though the high is less intense than the high from opioids, "the medication can still produce a euphoric effect, as it still acts on the same opioid receptors in the brain and creates a flood of dopamine in the brain."
>
> Source:  American Addiction Centers and Prison Journalism Project

---

[18]  According to BOP policy, legal mail can be opened only by institution staff, and staff must do so in the inmate's presence.  See Appendix 3 (Mail Management Manual).

**Exhibit J, p. 22**

reasons that include the volume of incoming mail, the limited number of staff who work in the mailroom, and the novel ways synthetic cannabinoids and buprenorphine and naloxone strips can be concealed.

BOP staff at other, higher security, male institutions photocopy all non-legal mail, with inmates receiving only a photocopy, to help prevent drugs from making their way to inmates.  At FCI Waseca, staff photocopy only mail containing cardstock (the type of paper believed to be most likely saturated with drugs).  FCI Waseca's Warden acknowledged the potential benefits of photocopying all mail but was also hesitant to pursue this contraband interdiction approach, as he was concerned with the psychological effects it could have on FCI Waseca inmates.  For example, he was concerned that the female inmates at FCI Waseca could become distressed if they were allowed to receive only black and white photocopies of photos of their children. Another obstacle to photocopying all non-legal mail is the staffing that would be necessary if the institution decided that such an interdiction effort was necessary.  Supervisory personnel estimated that two additional staff members would be needed to photocopy the volume of non-legal mail arriving at FCI Waseca.

To help prevent the introduction of drug-laden books, other, higher security, male BOP institutions allow inmates to receive books shipped by verified publishers only.  At FCI Waseca, inmates can receive books from anyone who sends them.  The Warden told us that he requested from the North Central Regional Office the authority to limit the source of shipped books to verified publishers but this request was denied. The Warden also told us that he established an advisory committee to consider potential solutions to the institution's contraband issues.

## Inmate and Staff Searches

In addition to searching non-legal inmate mail, FCI Waseca conducts:

- routine searches of *inmates* entering the institution,
- random searches of *inmates* and their living areas,
- routine screening of *staff* entering the facility, and
- random searches of *inmate visitor* vehicles.

According to FCI Waseca management, mass searches of inmate living spaces are conducted on a quarterly basis.  A supervisory Correctional Officer told us that, during a December 2022 mass search, staff seized drugs.[19]

The supervisory Correctional Officer also told us that staff were being screened according to the BOP staff search policy when entering the institution.[20]  We identified no evidence to indicate that FCI Waseca was out of compliance with this policy.  While at FCI Waseca we also observed that, consistent with BOP policy, the institution followed the procedures below.

---

[19]  For policy governing inmate searches, see Appendix 3 (Searches of Housing Units, Inmates, and Inmate Work Areas).

[20]  The BOP's policy governing staff searches, see Appendix 3 (Staff Entrance and Search Procedures).  The BOP does not make this policy publicly available.

| Staff Search Procedures at FCI Waseca | | |
|---|---|---|
| **Circumstance** | | **Procedure** |
| When staff entered the institution… | ⟫ | All staff walked through a metal detector and all staff belongings were x-rayed. |
| If a walkthrough metal detector repeatedly indicated presence of metal on staff… | ⟫ | Staff were separately scanned with a handheld metal detector before being allowed to enter the institution. |
| If a staff member had to exit and reenter the institution throughout the day… | ⟫ | Procedures above were repeated. |

Source:  OIG observations

We also observed that FCI Waseca had a second staff member assist with staff screening when a large number of staff entered the institution during a shift change.

## Use of Restrictive Housing

As of February 2, 2023, 50 FCI Waseca inmates were housed in the institution's Special Housing Unit (SHU).[21] SHU inmates are subject to significant restrictions compared to inmates in the general population.

Specifically, they are confined to a locked cell with an opportunity for 5 hours of outdoor recreation per week.  Despite opportunities for outdoor recreation, our review of BOP records found that many SHU inmates declined their opportunities during the week of January 15, 2023.  We note that outdoor temperatures during this week reached lows of minus 16 degrees Fahrenheit.  Through our review of BOP records, we found that SHU inmates at FCI Waseca are generally housed two to a cell in cells that contain their own toilets and showers.  FCI Waseca staff told us that they double-cell inmates whenever possible but noted that there are certain times they cannot do so, such as when there are an odd number of inmates assigned to the SHU.  In such situations, the Warden must approve any decision to single-cell an inmate. These photos below show a vacant SHU cell and the SHU's outdoor recreation area.

Inmates are generally housed in the SHU if they:

- are suspected of having committed serious misconduct and are awaiting the completion of an investigation and disciplinary hearing,

---

[21]  For BOP policy on restrictive housing, see Appendix 3 (Special Housing Units).

**Exhibit J, p. 24**

- are serving a disciplinary sanction after having been found to have committed misconduct at the completion of an investigation and disciplinary hearing,

- have been assessed by staff to pose a safety risk to the institution and are awaiting transfer to another institution (certain inmates in this status may have already completed their disciplinary sanction), or

- need to be separated from another inmate or staff member for their own safety.



Vacant SHU Cell, Pictured Without Mattresses That Would Be Furnished When the Cell Was Occupied

Source:  OIG, January 2023

FCI Waseca's leadership gathers each week to review and share information about SHU inmates.  During a meeting we attended, FCI Waseca staff discussed the mental and physical health of each inmate in the SHU, as well as how long each inmate had been housed in the SHU and the reason for their continued SHU housing.  According to FCI Waseca's Warden, these meetings allow different department leaders to communicate and ensure that inmates remain safe while housed in the SHU and that they do not remain in the SHU for extended periods of time.  The Warden told us that the North Central Regional Director has prioritized reducing extended SHU stays, especially when inmates have completed their sanctions and are awaiting transfer to another institution.  The Warden believes that, through both his and the Regional Director's oversight, FCI Waseca has reduced the amount of time that inmates remain in the SHU.



SHU Recreation Area

Source:  OIG, January 2023

Of the 50 FCI Waseca inmates housed in the SHU as of February 2, we found that no inmate had been housed in the SHU for more than 80 days.  The majority of inmates had been housed in the SHU for fewer than 40 days.  See Figure 4 below for more detail.

**Figure 4**

**Duration of Stay for FCI Waseca Inmates Housed in the SHU**



Source:  FCI Waseca inmate SHU records as of February 2, 2023

Based on our review of SHU placement records, we found that six of the eight FCI Waseca inmates who had been housed in the SHU beyond 61 days were still serving a disciplinary sanction.  The remaining two inmates were no longer serving a disciplinary sanction but were awaiting transfer to another institution, as it was determined that they would continue to be disruptive if they remained in FCI Waseca's general population.

## Staff Discipline

Institution management complained about the amount of time it takes to close a staff administrative misconduct investigation and expressed the belief that the BOP's staff discipline process is ineffective at enforcing standards of conduct.  This is a common refrain we have heard from institution and BOP leadership in recent years.  In a May 2023 OIG report on the BOP's strategies to identify, communicate, and remedy operational issues, we reported that former BOP leadership told the OIG that the BOP's employee discipline process was "horrible" and that "it takes too long to get anything done."[22]

---

[22]  See Appendix 2, Item VI.

**Exhibit J, p. 26**

As of January 30, 2023, FCI Waseca had 38 ongoing staff misconduct cases. Of those cases, 27 were still being investigated. In the remaining 11 cases, the underlying misconduct had been substantiated but the cases were pending a disciplinary sanction decision. As of January 30, the average time that the 38 misconduct cases had remained open was 221 days, with 9 open for longer than a year and 1 open for longer than 2 years.

Depending on the severity of staff misconduct and the potential risk that a staff member may pose to the institution, the Warden may elect to remove a staff member from regular duty pending the outcome of a misconduct investigation. At FCI Waseca, as of January 30, four staff members had been removed from regular duty pending the outcome of their misconduct investigations.[23] These staff members were assigned to duties, such as monitoring inmate telephone calls or performing other administrative duties outside the secure perimeter of the institution, that did not involve direct contact with inmates.

Delays in the administrative discipline process that caused staff to be removed from regular duty further exacerbate FCI Waseca's existing staff shortages. Therefore, it is vital that FCI Waseca and the BOP complete staff misconduct investigations as promptly as possible, so that:

- if the investigation results in exoneration, the staff member can return to regular duty;

- if the investigation results in sanction, the staff member, when appropriate, can return to regular duty after fulfilling the terms of their sanction; or

- if the investigation results in termination, the institution can quickly backfill the vacated position with a new staff member.

Institution management acknowledged that there can be investigative delays for staff misconduct cases and told us that the institution has only one staff member, a SIS Lieutenant, assigned to work staff misconduct cases full time.[24] FCI's Waseca Warden told us he believed that, in the future, the institution would be able to conduct staff misconduct investigations more quickly, as the institution had recently selected a Special Investigative Agent, a position that would supplement the work of FCI Waseca's SIS Lieutenant. In a written response to this report, the BOP told us that a Special Investigative Agent reported to duty at FCI Waseca as of April 23, 2023.

---

[23]  One additional FCI Waseca staff member transferred to another institution while on administrative duty as a result of a misconduct allegation. As of March 2023, that investigation into the staff member's alleged misconduct was still ongoing and the staff member remained on administrative duty at the new institution.

[24]  At FCI Waseca, Associate Wardens have assisted in conducting staff misconduct investigations. Additionally, some FCI Waseca staff misconduct cases are investigated by BOP Central Office investigators within the BOP's Office of Internal Affairs.

**Exhibit J, p. 27**

## Sexual Misconduct Reporting

Many FCI Waseca staff told us that they do not believe that sexual misconduct is widespread at the institution.[25] Both staff and inmates we interviewed also expressed the belief that inmates would feel comfortable reporting report sexual misconduct, if necessary, and that they know how to do so.[26] Inmates can report sexual misconduct in a variety of ways, including directly to institution staff and to the OIG through the inmate computer system, TRULINCS.[27] Inmates can also report sexual misconduct through telephones that connect to a third party sexual abuse support center. During our on-site inspection, we asked inmates to show us how they would report sexual misconduct in TRULINCS and they were able to do so. However, inmate computers are in public spaces (see the image below), which may create a challenge for an inmate concerned about staff or other inmates observing a report made via these computers. One inmate told us that, while she would feel comfortable reporting sexual misconduct via computer, she would probably wait to do so when no one else



*Left,* Inmate Computers in a Housing unit, *Right,* Sexual Abuse Reporting Information

Source: OIG, February 2023 (Left Image) and January 2023 (Right Image) (Bulletin Board Blurred in Right Image)

was nearby. We also directly observed throughout the institution the presence of sexual abuse support center telephones and educational posters with information about how to report sexual abuse.

---

[25] For the purposes of this report, we use the term "sexual misconduct" to encompass all forms of sexual misconduct, including harassment and assault.

[26] The BOP has policy in place to ensure that sexual abuse is detected, reported, and investigated. See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

[27] Inmates may also report sexual misconduct by writing directly to the OIG. The BOP also reports all allegations of staff misconduct, including sexual misconduct, to the OIG.

**Exhibit J, p. 28**

Based on our review of sexual misconduct reporting data, as well as staff and inmate misconduct data, we found that between January 2022 and January 2023:

- Six FCI Waseca *staff members* had been alleged to have committed an act of *staff-on-inmate* sexual misconduct.  As of January 2023, five of the six staff-on-inmate allegations were being investigated by the BOP and the sixth allegation was determined to be unsubstantiated following an investigation.

- Three FCI Waseca *inmates* had been alleged to have committed an act of *inmate-on-inmate* sexual misconduct.  As of January 2023, one of the three inmate-on-inmate sexual misconduct allegations had been substantiated and the remaining two were not substantiated as a result of BOP investigations.

We report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations, especially those for which the underlying investigation has yet to be concluded, should not be used, alone, to assess the pervasiveness of sexual misconduct or lack thereof at an institution.  To this point, FCI Waseca's Warden told us that the existence of allegations can indicate that an institution has developed a healthy culture in which inmates feel comfortable reporting allegations of sexual misconduct.  Given the seriousness of sexual misconduct allegations, they are all investigated by either Special Agents in the BOP's Central Office-based Office of Internal Affairs or by the OIG.[28]

FCI Waseca staff also told us of some unintended consequences related to sexual misconduct reporting that had been negatively affecting institution safety and security.  Specifically, we learned that, despite receiving routine training on how to announce themselves prior to entering inmate living areas, some male staff are hesitant or unwilling to monitor inmate activity in communal bathrooms because they fear that inmates may report a baseless sexual misconduct allegation against them.[29]  FCI Waseca staff told us that inmates are aware of this and, as a result, regularly use and exchange drugs, fight, or engage in sexual activity in bathrooms because they believe that they are unlikely to be monitored there.  Further, a supervisory Correctional Officer told us that they had reviewed an inmate email that stated that death by suicide would be easy for an inmate to complete in FCI Waseca bathrooms because staff do not monitor those areas.  In addition, staff told us that they know of other staff who are hesitant or unwilling to physically restrain a

---

[28]  The OIG investigates the most serious, and often most complex, allegations of BOP employee misconduct, including allegations of criminal misconduct.

[29]  BOP policy explains that monitoring inmates to prevent and deter the movement of contraband is an example of an official duty that may require a Correctional Officer to monitor inmate activities in bathrooms.  The relevant program statement further states that sexual harassment includes voyeurism, meaning the invasion of an inmate's privacy "by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions."  See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

**Exhibit J, p. 29**

female inmate at FCI Waseca when circumstances warrant it because they fear that the inmate will allege that the physical restraint amounted to sexual assault.[30]

## Medical and Mental Healthcare

We found that FCI Waseca appeared to be able to address the most critical and time-sensitive medical and mental healthcare needs of inmates.  However, the institution faces several challenges in the effective and timely provision of healthcare to inmates, particularly for less urgent and more routine issues.  We found that, like the challenges this institution is experiencing in other operational areas, many of these issues stem from chronic and persistent understaffing, especially in clinical positions.  As detailed below, our inspection found that:

- FCI Waseca houses inmates whose assessed medical and mental health needs exceed the core capabilities of the institution;

- inmates experience significant delays in receiving nonemergency care, due to both institution Health Services Department staff vacancies and constraints involving the surrounding community of medical providers;

- staff vacancies in the Psychology Services Department limit FCI Waseca's ability to provide psychology services and substance use programs, with primarily "crisis focused" services provided instead; and

- many inmates decline to take prescribed psychiatric medication, and the institution is limited in its ability to address this issue.

### Alignment of Institution Capabilities with Inmate Needs

FCI Waseca is a Medical Care and Mental Health Care Level 2 institution, meaning that it generally has the capabilities and resources to provide care for stable outpatients whose health conditions can be monitored and managed through routine appointments.  Health Services Department staff we interviewed at FCI Waseca reported experiencing an increase in the number of inmates with more complex medical care needs that they believe would be better managed by a Medical Care Level 3 institution.  At the time of our inspection, there were 11 inmates classified at Medical Care Level 3 at FCI Waseca and 2 inmates classified at Mental Health Care Level 3.  This presents a challenge for FCI Waseca, as inmates designated at Care Level 3 have complex, usually chronic, medical or mental health conditions and generally require frequent clinical contact to maintain control of their conditions or to prevent hospitalization.

In attempt to better align inmates on the FCI Waseca roster with BOP institution capabilities, FCI Waseca has submitted requests to transfer inmates to other institutions that may be more appropriate for inmates'

---

[30]  BOP policy defines sexual abuse as including "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of another person, excluding contact incidental to a physical altercation."  See Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

assigned care levels in accordance with the BOP's standard medical transfer process. However, Health Services Department staff told us that the only medical center in the BOP established for female inmates, Federal Medical Center Carswell, has not had the space to accept the transfers. In the interim, this means that, despite already limited health services staffing resources, FCI Waseca must manage higher complexity and more resource-intensive inmate medical care than it may be equipped to manage.

## Health Services Staffing and Appointments

While we were told that FCI Waseca is able to sufficiently address the urgent and emergency care needs of inmates, as well as routine activities such as triaging inmate requests for care (sick call) and medication distribution (pill line), the institution faces several challenges in the provision of health services to inmates, many of which stem from concerning vacancy rates in both Health Services Department positions and Correctional Officer positions. As noted in the Introduction, as of January 2023, the Health Services Department was 75 percent staffed.[31] Specifically, at the time of our inspection, the Health Services Department had five vacancies, four of which had been open for over a year, including a Midlevel Practitioner position, whose role is to assess, diagnose, and treat medical conditions under the license of the physician. See Table 1. Staff mentioned that it can be hard to recruit medical staff to FCI Waseca because of competition with a nearby hospital system.

**Table 1**

**Health Services Vacancies**

| Vacancy | Time Unfilled |
|---|---|
| Psychiatrist | 1 year, 1 month |
| Midlevel Practitioner | 3 years, 7 months |
| Registered Nurse | 1 year, 3 months |
| Registered Nurse | 1 year, 2 months |
| Social Worker | 4 months |

[a] In a written response to this report, the BOP told us that the Social Worker position will be filled in May 2023 and that FCI Waseca has awarded contracts for two nursing positions.

Source: FCI Waseca staffing data as of January 2023

Health Services Department staff we interviewed described low staffing levels as a strain on staff, who often put in extra work to ensure that they can fulfill their responsibilities. Based on the data available for certain Health Services Department positions, we estimate that between January 2022 and January 2023 staff in this department worked a minimum of 1,365 overtime hours, although this total is likely higher, as it does not capture extra hours worked by two clinical personnel in positions ineligible for overtime pay.

At FCI Waseca, we found that there are only two providers on staff to conduct nonemergency appointments with inmates on site. Although the institution has received some support via telehealth providers at other BOP institutions, as well as the BOP's Central Office and regional offices, this has not been sufficient to fully compensate for the vacancies in health services staffing at FCI Waseca. FCI Waseca's Health Services Administrator estimated that the wait time for nonemergency follow-up appointments can be as long as a month to a month and a half, and FCI Waseca can typically schedule only one to two outside medical trips per day. At the time of our inspection, Health Services Department staff reported that they were working

---

[31] The OIG has previously reported how staff shortages among healthcare professionals can negatively affect the provision of healthcare at BOP institutions. See Appendix 2, Item VII.

**Exhibit J, p. 31**

through a backlog of outside medical consultations after delays due to the coronavirus disease 2019 pandemic and estimated that there were about 175 consultations pending scheduling.

We also found that scheduling constraints of outside medical providers, as well as shortages among Correctional Officers, contribute to delays in nonemergency appointments for inmates.  For example, FCI Waseca staff told us that outside medical providers have limited appointment availability and, as a result, it can be difficult to promptly schedule an inmate visit.  Further, the ability to transport inmates to outside medical appointments is dependent on the availability of FCI Waseca Correctional Officers and shortages in Correctional Officer staffing limit the number of outside medical trips FCI Waseca can support.  This is because it is routinely Correctional Officers who must be available to escort inmates to each outside medical appointment and FCI Waseca generally requires two staff members, one of whom must be female, to accompany an inmate on an outside medical trip.

An additional factor that may contribute to nonemergency wait times is that FCI Waseca houses inmates at care levels above those for which the institution is rated.  According to a staff member, inmates at these higher care levels tend to have more urgent needs for outside medical consultations, which sometimes requires the institution to cancel less-urgent appointments in favor of the urgent ones, further contributing to delays in outside medical trips.

We are concerned that long wait times for nonemergency appointments may have long-term effects on inmate health and well-being.  We are also concerned that potential staff burnout may result in additional staff departures, and losing additional staff could greatly jeopardize FCI Waseca's ability to deliver medical care, especially given the difficulty in filling vacant positions.

## Psychology and Substance Use Programs

FCI Waseca's ability to provide psychology and substance use programs has been severely curtailed by staff vacancies.  The Chief Psychologist described the psychology and substance use programs as severely short-staffed "for years."  The institution has made moderate progress but still has key vacancies in these program areas.  In January 2022, there were eight vacancies and only one Psychologist on staff.  While FCI Waseca was able to fill four positions in 2022 and increase the number of Psychologists to three, as of January 2023 there were still four staff vacancies despite ongoing recruitment efforts and incentives (see Figure 5).  According to the Chief Psychologist, short staffing means that services are "crisis focused" and staff have to prioritize inmates whose needs are more severe.

Psychology staff also reported that vacancies, along with extended staff unavailability, have affected their ability to offer certain programming at FCI Waseca.  For example, FCI Waseca's Residential Drug Treatment Program should have a capacity of 72 inmates but was capped at 48 due to the number of available drug treatment specialists.  In

**Figure 5**

**Psychology and Substance Use Program Staffing Snapshots**



Source:  OIG analysis of FCI Waseca staffing data

**Exhibit J, p. 32**

addition, according to Psychology Services Department staff, FCI Waseca should be offering Steps Toward Awareness, Growth, and Emotional Strength, a residential treatment program for inmates with serious mental illnesses and a primary diagnosis of borderline personality disorder.  However, despite the fact that two treatment specialists have been hired for the program and resources and bedspace are allocated for it, this program is essentially inactive as the institution has been unable to hire a coordinator for the program after 15 consecutive job announcements, as of January 2023.  Similarly, FCI Waseca's Resolve Program, a therapy program designed to address trauma-related mental health needs, is not running, as there is no coordinator for the program on staff.

Additionally, short staffing has affected implementation of FCI Waseca's Medication Assisted Treatment (MAT) Program which, according to the BOP, combines medication and psychosocial services as treatment for opioid use disorder (OUD).  Specifically, the Psychologist position dedicated to facilitating the psychosocial component of the MAT Program has remained unfilled after 14 consecutive job announcements, as of January 2023.  In the interim, these responsibilities have been adopted by another Psychologist on staff, in addition to other responsibilities.  This staff member reported a list of about 200 inmates pending the Psychology Services Department component of MAT Program screening.  At the time of our inspection, there were only 11 inmates enrolled in the MAT Program and were prescribed medication for OUD, 7 of whom arrived at FCI Waseca already taking medication for OUD.  We also learned that coordination issues between departments, exacerbated in part by staff shortages, have caused delays in screening inmates for MAT.  In addition to the screening performed by Psychology Services Department staff, Health Services Department staff must screen inmates to determine whether medication-based treatment for OUD is clinically indicated and initiate these medications in compliance with all regulatory standards.  Staff described conflicting views on whether Psychology Services Department staff must fully document the results of a psychology screening before Health Services Department staff can conduct their screening.

## Distribution of Psychiatric Medication

OIG analysis of FCI Waseca inmate healthcare data found that, in January 2023, 25 percent of all doses of prescribed psychiatric medications were not administered due to inmates not attending scheduled medication administration (pill line).  Seventy-two percent of inmates who were prescribed a psychiatric medication skipped at least one dose, and nearly 10 percent skipped doses daily.  FCI Waseca's Chief Pharmacist estimated that rates of missed psychiatric medication could be even higher, closer to 30–35 percent.  This raises several concerns, including the following:

- **Increased Medical Risk.**  Certain medications require sequentially higher or lower doses.  Skipping doses increases the risk of an inmate receiving an improper dose, which could result in negative outcomes.

- **Staff and Inmate Safety.**  If Correctional Officers are not aware that an inmate has not been taking their psychiatric medications, it could lead to escalation of situations that might otherwise be avoided.

- **Operational Efficiency.**  Pharmacy staff expend time and resources preparing medications that do not get administered.  Missed doses may also result in waste.

**Exhibit J, p. 33**

FCI Waseca's Warden, who receives a weekly report detailing inmates who have missed medications, explained that inmates have the autonomy to choose whether or not they take a medication but ideally inmates who miss doses should be counseled by medical staff and asked whether they want to continue with the prescribed medication.  However, as discussed above, there are long wait times for nonemergency appointments with medical providers, limiting FCI Waseca's ability to address medication no-shows in a timely manner.

## First Step Act Programming and Time Credits

As required by the First Step Act of 2018 (FSA), BOP institutions conduct a needs assessment on all inmates entering their custody to identify specific Evidence-Based Recidivism Reduction (EBRR) programs and Productive Activities (PA) that will best prepare inmates for their reentry into society.[32]  FCI Waseca offers a variety of these and other programs, including educational programming, such as literacy and post-secondary classes; psychology programming, such as trauma and drug treatment programs; recreational and wellness programming; UNICOR employment; and vocational training and apprenticeships.  See photos of some of the programming offered at FCI Waseca below.

Nevertheless, wait lists for several of these programs exceeded 300 names, meaning that over a third of the entire institution population was waiting to participate in these programs at the time of our inspection.  Staff told us about institution plans to expand the range of programming offered.  However, as described above, staff shortages in the Psychology Services Department limit the programing it can offer and augmentation limits the programming the Education Department can offer when its personnel are augmented into Correctional Officer posts.

**Other Challenges That Have Limited Program Offerings**

 Space limitations have limited class sizes and caused challenges in launching a Certified Nursing Assistant program.

 Delays in software installation on new computers have limited the availability of certain typing courses and resumé workshops.

Sources:  Interview with FCI Waseca Education Department staff member and the BOP's response to draft of this report

The FSA sought to incentivize EBRR program and PA participation by providing eligible participating inmates time credits that can be applied toward additional time in prelease custody (i.e., satisfying the end of a court-ordered sentence in a Residential Reentry Center or on home confinement) or on supervised release (i.e., a period of monitoring that occurs after an inmate has satisfied his or her court-ordered sentence).[33]  Under the FSA, an eligible inmate earns time credits for every 30 days of "successful participation" in EBRR programs or PAs that are recommended based on the inmate's individualized needs assessment.[34]  The regulation promulgated by DOJ to implement the FSA, however, defines "successful participation" in a manner that does not actually require eligible

---

[32]  18 U.S.C. § 3632(a).

[33]  18 U.S.C. § 3632(d)(4) provides greater detail about the number of time credits inmates can earn in a 30-day period, as well as a list of offenses that make an inmate ineligible to earn FSA time credits.  18 U.S.C. § 3624(g) provides greater detail about the application of time credits toward time in prerelease placement or supervised release.

[34]  18 U.S.C. §§ 3632 (b) and (d)(4).

**Exhibit J, p. 34**

inmates to participate in individualized EBRR programs or PAs to earn time credits if their institution is unable to offer those EBRR programs or PAs due to "temporary operational or programmatic interruptions."[35]  We were told that the BOP has considered this regulation to cover program interruptions when the demand for programs exceeds an institution's capacity to offer them, which is common at FCI Waseca.



*Top:*  UNICOR Textile Factory Where Approximately 200 FCI Waseca Inmates Work.  Inmate workers can also participate in related apprenticeship programs that train them as pattern makers or sewing machine repairers.

*Bottom:*  A Service Dog in Training in the Prisoners Assisting With Service Dogs (PAWS) Program.  Inmates who participate in the PAWS program raise and train dogs that will assist people with disabilities.  Inmates in the PAWS program may also participate in a related apprenticeship that trains them as animal handlers.



Source:  OIG, February 2023 (Top Image) (Product Names Blurred in Top Image) and January 2023 (Bottom Image)

---

[35]  28 C.F.R. §§ 523.40–523.42.

**Exhibit J, p. 35**

Given that FCI Waseca inmates can earn FSA time credits irrespective of the availability of EBRR programs and PAs, and because demand for programs exceeds FCI Waseca's capacity to offer them, inmates may not have the opportunity to participate in programs designed to address their recidivism risk before they are released.

FCI Waseca staff told us that they first prioritize for program enrollment inmates with upcoming projected release dates and for whom the program would fulfill a need identified on the inmate's individualized needs assessment.  Staff said that they then prioritize for enrollment inmates farther away from their projected release dates and for whom the program would fulfill a need identified on the inmate's individualized needs assessment.  While this approach may mitigate the risk of inmates being released from FCI Waseca without being offered programs aligned with their reentry needs, it also has unintended consequences:  inmates with long sentences and low FSA-identified needs may not be able to participate, for significant periods of their incarceration, in any programs with lengthy wait lists.

Further, based on our interviews with staff at FCI Waseca, we identified a lack of expertise on FSA topics, including the application of the time credits rules.  For example, FCI Waseca staff told us that inmates often sign up for more programming than they need or intend to participate in so they can earn more time credits.  This indicates a misunderstanding on the part of both staff and inmates, as, under the regulations implementing the FSA published in January 2022, time credits are earned per 30-day period of successful participation in programming, not on a per-program basis.  Thus, inmates do not earn more time credits for being on more wait lists; yet, when inmates sign up for more programs than they intend to participate in, FCI Waseca's already lengthy wait lists become even lengthier without benefit.  Further, inmates will remain confused about the application of the FSA and time credits if staff themselves are unclear on the nuances of the law and unable to convey accurate explanations to the inmates as they navigate their sentences.

Finally, as described earlier in this report, one of the departments at FCI Waseca most commonly tapped to cover staffing gaps in Correctional Officer posts via augmentation is the Unit Team, whose responsibilities include routinely meeting with inmates to identify their programming needs and prepare them for reentry.  These reassignments can interfere with the institution's ability to effectively prepare its inmates for reentry into the community upon release.  For example, one Unit Team staff member told us that, due to how frequently she has had to serve in a Correctional Officer post instead of performing her regular duties, it has been difficult to provide full attention to all of the inmates in her caseload of nearly 150 inmates.  When an institution is unable to closely monitor and support inmates' progress in addressing their risk factors and completing rehabilitation programming suited to their needs, inmates may not be learning the skills they need to reenter society, thereby increasing rather than reducing the risk of recidivism.  This is precisely the issue that the bipartisan FSA was attempting to address.

**Exhibit J, p. 36**

# Conclusion

In general, we found that FCI Waseca is well-run and that staff and inmates reported feeling safe there, although we identified areas of concern that highlight challenges and risks for the institution.  For example, we identified serious facilities issues affecting the conditions of confinement for inmates.  Specifically, at the time of our inspection, many inmates were living in basement housing floors and slept in beds positioned near damaged, leaking pipes.  Further, roofs at FCI Waseca routinely leak and the resulting water damage occasionally renders spaces throughout the facility unusable.  According to FCI Waseca Facilities Department documentation, the cost of needed repairs would be over $3 million, and unaddressed repairs could eventually cause further deterioration of the roofs with some at risk of potential collapse.  We also found that the institution suffers from significant staffing shortages, particularly among medical and Correctional Officer positions.  Shortages of Correctional Officers require the institution to routinely use overtime and augmentation of non-Correctional Officer staff to cover Correctional Officer posts.  We found that these strategies have cascading effects throughout the institution, particularly on institution operations including facility maintenance, managing inmate programming, planning for inmate release, and facilitating and teaching educational programs.

The issues identified during this inspection are not unique to FCI Waseca.  In recent years, the DOJ OIG has cited many of the issues we identified at FCI Waseca as BOP-wide challenges, including its aging infrastructure, staffing issues, insufficient security camera coverage, and difficulties preventing the introduction of contraband.  Further, we have reported on how staff shortages, especially among healthcare professionals, can negatively affect the provision of healthcare at BOP institutions.  In addition, prior OIG work has identified significant enterprise-wide delays in the BOP's staff discipline process and described how those delays make it difficult for the BOP to enforce standards of employee conduct that help to ensure the efficient operations of its institutions.  See Appendix 2 for details on related DOJ OIG work.

Given the OIG's past reporting on these systemic issues and the recommendations we have made to the BOP to address them at an enterprise level, we do not make specific recommendations in this report to address the manifestation of these issues at FCI Waseca.  However, through our efforts to resolve recommendations made in our prior work, we will monitor the BOP's efforts to address these issues at all BOP institutions, including FCI Waseca.  Finally, through our future inspections and BOP oversight work, we intend to assess how other institutions are implementing the FSA and the availability of recidivism reduction programs at those institutions.  With this additional information, we will be better positioned to make recommendations, where appropriate, that will assist the BOP in implementing the law and achieving its primary goal of reducing recidivism among federal offenders.

**Exhibit J, p. 37**

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The DOJ OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (December 2020).

## Purpose and Scope

The OIG has determined that it can enhance the effectiveness of its oversight, and its ability to alert the BOP to concerns, by conducting short notice and unannounced inspections of BOP facilities, as appropriate. Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified FCI Waseca at approximately 8 a.m. on January 30, 2023, that it would be initiating an inspection beginning at noon that same day.  The OIG team, which consisted of seven OIG staff members and two medical subject matter experts contracted by the OIG, conducted the on-site inspection Monday, January 30, through Saturday, February 4.  The focus of our inspection was the state of institution operations at the time of our inspection, although, for certain portions of our analysis, our scope included roughly the 1 year that preceded our inspection, beginning in January 2022.

Since this was our first inspection of a BOP institution as part of our new on-site inspections program, we sought to inspect an institution of relative operational simplicity and one that scored as "low-risk" on the OIG's prison inspection risk assessment tool.  We also were interested in inspecting a facility that housed female inmates, given the significant number of sexual assault and harassment investigations that the OIG has been handling recently.  FCI Waseca fit our selection criteria because, in addition to being a female-only institution, it is a standalone facility with a relatively small staff and inmate complements.  Further, it ranked among the least risky BOP institutions on the risk assessment tool that the OIG is developing and piloting internally.

The scope of this inspection did not include specialized testing of facility plumbing to definitively determine, for example, the contents of certain pipes or the potential presence of mold and other hazardous substances.  In addition, although this report includes information on allegations of sexual misconduct, we report this data for informational and transparency purposes and note that the volume of sexual misconduct investigations (especially those for which the underlying investigation has yet to be concluded) should not be used, alone, to assess the pervasiveness of sexual misconduct, or lack thereof, at an institution.

## Inspection Methodology

To better understand FCI Waseca's operations, we toured the institution, interviewed its inmates and staff, and reviewed its operational records.

### Observations

We toured the interior and exterior of the institution, including general population inmate housing units; the Special Housing Unit (SHU); Health Services Department examination space; the front lobby staff entrance and screening area; Psychology, Education, and Recreation Departments; the mail room; evidence storage

**Exhibit J, p. 38**

area; the UNICOR textile factory; the visitation room; inmate intake and screening areas; Facilities Department areas; the kitchen; and the inmate dining hall.

We also reviewed security camera footage, as well as the functionality of the security camera system. Further, we tested ambient temperatures throughout the institution, as well as the functionality of showers, sinks, and toilets in inmate housing areas.

## Interviews

We conducted 11 on-site interviews with FCI Waseca inmates who were housed in both the general population and SHU, as well as 40 on-site interviews with FCI Waseca staff.  FCI Waseca staff we interviewed includes the Warden; Associate Wardens, one of whom serves as the institution's sexual misconduct reporting coordinator; supervisory and non-supervisory Correctional Officers; healthcare providers; inmate case managers; teachers; food service workers; and staff responsible for institution safety, facilities management, the UNICOR factory, and the inmate trust fund program.  Following our on-site work at FCI Waseca, we also conducted virtual interviews with BOP staff who are posted at BOP duty stations other than FCI Waseca.  From the BOP's North Central Regional Office, we interviewed the North Central Regional Director.  From the BOP's Central Office, we interviewed the Chief of the BOP's Office of Emergency Preparedness, as well as a First Step Act of 2018 (FSA) implementation subject matter expert.  From the Federal Law Enforcement Training Center, we interviewed the Director of the BOP's Staff Training Academy.

## Document Review and Analysis

We reviewed FCI Waseca records related to facilities management, staffing levels, use of overtime and augmentation, use of restrictive housing, provision of inmate healthcare and programming, food service, inmate and staff misconduct, sexual misconduct reporting, and FSA implementation.

## External Subject Matter Experts Assisting the OIG

To assist the OIG in its efforts to assess the provision of healthcare to FCI Waseca inmates, the OIG employed the services of two contract healthcare subject matter experts:  one physician and one registered nurse.

**Exhibit J, p. 39**

# Appendix 2:  DOJ OIG Related Work

I.  For prior OIG reporting on the BOP's **infrastructure management challenges,** see DOJ OIG, *The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions*, Audit Report 23-064 (May 2023) oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

II.  For prior OIG reporting on the BOP's **staffing challenges,** see DOJ OIG, *Department of Justice Top Management and Performance Challenges 2022*, oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2022.

III.  For prior OIG reporting on the BOP's use of **overtime,** see DOJ OIG, *Management Advisory:  Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

IV.  For prior OIG reporting on **contraband introduction** at BOP institutions, as well the insufficiency of BOP **security camera systems,** see DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, Evaluation and Inspections (E&I) Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

V.  For additional prior OIG reporting on the insufficiency of BOP **security camera systems,** see DOJ OIG, *Management Advisory Memorandum:  Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.

VI.  For prior OIG reporting on delays in the BOP's **staff discipline** process, see DOJ OIG, *Limited Scope Review of the Federal Bureau of Prisons' Efforts to Identify, Communicate, and Remedy Operational Issues*, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy.

VII.  For prior OIG reporting on BOP **medical personnel staffing** challenges, see DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

VIII.  The OIG has also posted on its website a compendium of non-investigative reports that highlight the reports listed above, as well as other DOJ OIG reports that detail the **BOP's longstanding challenges**.  See DOJ OIG, "Compendium of Non-Investigative Reports on the Federal Bureau of Prisons," February 16, 2022, oig.justice.gov/news/compendium-non-investigative-reports-federal-bureau-prisons.

**Exhibit J, p. 40**

# Appendix 3:  BOP Policies Cited

| Topic Discussed in Report | Relevant Program Statement | Link (If Public) |
|---|---|---|
| Facility Temperatures and Approvals for Repair Projects | 4200.12<br>**Facilities Operations Manual**<br>July 18, 2017 | www.bop.gov/policy/progstat/4200,12.pdf<br><br>(accessed May 8, 2023) |
| General Education Development (GED) | 5350.28<br>**Literacy Program (GED Standard)**<br>December 1, 2003 | www.bop.gov/policy/progstat/5350_028.pdf<br><br>(accessed May 8, 2023) |
| Mail Management | 5800.16<br>**Mail Management Manual**<br>April 5, 2011 | www.bop.gov/policy/progstat/5800_016.pdf<br><br>(accessed May 8, 2023) |
| Inmate Searches | 5521.06<br>**Searches of Housing Units, Inmates, and Inmate Work Areas**<br>June 4, 2015 | www.bop.gov/policy/progstat/5521_006.pdf<br><br>(accessed May 8, 2023) |
| Staff Searches | 3740.02<br>**Staff Entrance and Search Procedures**<br>March 28, 2016 | Not applicable.  The BOP does not make this policy publicly available. |
| Special Housing Unit | 5270.11<br>**Special Housing Units**<br>November 23, 2016 | www.bop.gov/policy/progstat/5270.11.pdf<br><br>(accessed May 8, 2023) |
| Sexual Abuse | 5324.12<br>**Sexually Abusive Behavior Prevention and Intervention Program**<br>June 4, 2015 | www.bop.gov/policy/progstat/5324_012.pdf<br><br>(accessed May 8, 2023) |

**Exhibit J, p. 41**

# Appendix 4:  The BOP's Response to the Draft Report



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                                *Washington, DC 20534*

May 3, 2023

MEMORANDUM FOR    RENÉ L. ROQUE
                  ASSISTANT INSPECTOR GENERAL
                  EVALUATIONS AND INSPECTIONS

FROM:             Colette S. Peters, Director

SUBJECT:          Response to the Office of Inspector General's (OIG) Draft Report:
                  Inspection of the Federal Bureau of Prisons' Federal Correctional
                  Institution Waseca, Assignment Number A-2023-002

The Bureau of Prisons (BOP) values the opportunity to formally respond to the Office of the Inspector
General's (OIG) above-referenced draft report. As noted by OIG, this report documents its first
unannounced inspection of a BOP facility under OIG's new on-site inspections program. BOP
appreciates the clear communication and professionalism demonstrated by OIG's Evaluations
and Inspections Division during both its fieldwork and the drafting of this report, particularly as
this is a new area of oversight.

No recommendations were issued with this report and OIG indicates, "FCI Waseca is well-run
staff and inmates reported feeling safe." However, BOP has also taken specific steps to address
possible areas of concern such as relocating individuals from top bunks in basement housing to
other areas of the institution. BOP remains committed to addressing any resolved
recommendations from the related products referenced in Appendix 2 and we look forward to
continuing our work with OIG on the new onsite inspections program.

**Exhibit J, p. 42**