HEATHER E. WILLIAMS, Bar No. #122664
Federal Defender
CAROLYN M. WIGGIN, Bar No. #182732
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
Email: carolyn_wiggin@fd.org

Attorneys for Defendant-Movant
KRISTY LYNN FELKINS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | ) Case No:  2:20-cr-00175-TLN |
| Plaintiff, | ) |
| vs. | ) SECOND MOTION TO REDUCE SENTENCE<br>) PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)<br>) (COMPASSIONATE RELEASE) |
| KRISTY LYNN FELKINS | ) |
| Defendant. | ) |

# Table of Contents

Table of Contents ................................................................................................................. i

I.    Introduction ............................................................................................................... 1

II.   Relevant Facts and Procedural History ...................................................................... 2

A.   Ms. Felkins Largely Positive Character and Behavior Aside from Abberant Offense
     Behavior in the Midst of Post-Partum Psychosis ..................................................... 2

     1.    Ms. Felkins' Life Prior to Offense ................................................................... 2

     2.    Offense Conduct ............................................................................................... 3

     3.    Ms. Felkins' Life After Offense ........................................................................ 3

     4.    Arrest and Indictment ....................................................................................... 4

     5.    Pretrial Supervision .......................................................................................... 4

B.   Guilty Plea and Sentencing ...................................................................................... 5

C.   Caregiving Crisis for Ms. Felkins' Two Youngest Children ..................................... 5

D.   Ms. Felkins' Conduct While Serving Her Prison Term ............................................. 8

E.   Ms. Felkins' Release Plan ........................................................................................ 9

III.  Argument ................................................................................................................ 11

A.   Statutory Framework for Sentence Reduction Authority Under 18 U.S.C.
     § 3582(c)(1)(A)(i) .................................................................................................. 11

B.   Ms. Felkins Has Exhausted Administrative Remedies ............................................ 12

C.   Extraordinary Circumstances Support a Grant of Compassionate Release. ............ 12

     1.    Under U.S.S.G. Section 1B1.13(b)(3) Ms. Felkins' Family Circumstances Are
           and Extraordinary and Compelling Reason Warranting a Grant of Compassionate
           Release. ........................................................................................................... 12

     2.    Ms. Felkins' Rehabilitation in Prison Supports Compassionate Release ......... 15

D.   The 18 U.S.C. Section 3553(a) Factors Support a Grant of Compassionate Release ........... 17

IV.   Conclusion ............................................................................................................. 19

## Table of Authorities

**Federal Cases**

*United States v. Blancas de Hernandez*, 2021 WL 2290778 (S.D. Cal. June 4, 2021) ............... 14

*United States v. Bowers*, No. 2023 WL 5017015 (D. Me. Aug. 7, 2023) .................................... 13

*United States v. Curl*, 2023 WL 6213049 (D. Nev. Sept. 22, 2023) ........................................... 14

*United States v. Elm*, 2024 WL 4026024 (S.D.N.Y. Sept. 3, 2024)............................................ 14

*United States v. Henderson*, 2024 WL 881253 (E.D. Mo. Feb. 23, 2024)................................... 15

*United States v. Jackson*, 2024 WL 4826466 (S.D.N.Y. Nov. 19, 2024)..................................... 14

*United States v. Keller*, 2 F.4th 1278 (9th Cir. 2021) .................................................................. 12

*United States v. May*, 2024 WL 5170002 (N.D. Ohio Dec. 19, 2024) ........................................ 13

*United States v. Morrison*, 501 F. Supp. 3d 957 (D. Nev. 2020).................................................. 14

*United States v. Muniz*, 2024 WL 3488485 (D. Utah July 19, 2024) ........................................... 13

*United States v. Nunez*, 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024)......................................... 13

*United States v. Ortega*, 2021 WL 5038791 (D. Kan. Oct. 29, 2021).......................................... 14

*United States v. Resendiz*, 2023 WL 7309439 (S.D. Cal. Nov. 6, 2023)....................................... 14

*United States v. Smith*, 2024 WL 4556521 (D. Nev. Oct. 22, 2024)............................................. 14

*United States v. Walker*, 2024 WL 580152 (D.N.J. Feb. 13, 2024).............................................. 14

*United States v. Wessels*, No. 2021 WL 5506656 (D. Minn. Nov. 24, 2021) .............................. 14

**Federal Statutes**

18 United States Code Section 3553................................................................................ 11, 17, 18, 19

18 United States Code Section 3582.......................................................................................... 1, 11, 12

**United States Sentencing Guidelines**

United States Sentencing Guidelines Manual Section 1B1.13 ......................................... 1, 12, 15

**<u>Other Authorities</u>**

*AP News, A Nevada woman who hired a hitman using bitcoin to kill her ex-husband gets five years in prison* (July 21, 2024), available at https://apnews.com/article/bitcoin-murder-for-hire-plot-982744db06845b532666db97660ed0b8 ................................................. 18

Ellis K, Munro D and Clarke J, *Endometriosis Is Undervalued: A Call to Action*, FRONT. GLOB. WOMENS HEALTH,  2022 May 10;3:902371. doi: 10.3389/fgwh.2022.902371. PMID: 35620300; PMCID: PMC9127440 ............................................................ 6, 7

Mount Sinai, *Ask the Doc: Do I Need to Be Concerned About Endometriosis?* (April 21, 2023), available at https://health.mountsinai.org/blog/do-i-need-to-be-concerned-about-endometriosis/ ................................................................................ 15

Popper, Nathaniel, *Can You Really Hire a Hitman on the Dark Web?*, INTERNATIONAL NEW YORK TIMES (March 6, 2020) ........................................................................ 17

## I.    Introduction

On November 27, 2024, Ms. Felkins filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  ECF No. 69.  She focused on several circumstances, including:

- The incapacitation of the caregiver of her two youngest children (U.S.S.G. § 1B1.13(b)(3)(A));

- A combination of other circumstances similar in gravity to those listed in U.S.S.G. § 1B1.13(b)(1)-(4), specifically (a) her placement in a prison 1,600 miles away from her family, (b) the harsh and sexually exploitive circumstances at FCI Dublin, where she served part of her prison term; and (c) the lack of programming and physical disrepair at FCI Waseca, where she currently serves her prison term (U.S.S.G. § 1B1.13(b)(5)).

On February 7, 2025, this Court denied Ms. Felkins' motion for compassionate release. ECF No. 77.  This Court found that with respect to Ms. Felkins' claim that the caregiver of her children, her sister-in-law Christina Bushnell, was incapacitated, Ms. Felkins "has not provided sufficient evidence establishing extraordinary and compelling reasons that warrant her release." ECF No. 77, p. 4:17-18.  Furthermore, it found that "Defendant's mere statement, without more, that her husband and father of the minor children, cannot serve as the primary caregiver because he works six days a week as a truck driver and is often out of town, is unsupported by any competent evidence."  ECF No. 77, p. 4:23-26.  This Court rejected Ms. Felkins' other possible bases for compassionate release ECF No. 77, pp. 5-6.

Ms. Felkins now brings this second motion for compassionate release.  She focuses only on the incapacitation of the caregiver of her minor children because this Court found that the evidence she submitted on that point was insufficient.  In this second motion, Ms. Felkins submits additional evidence to support her claim.

1

## II.    Relevant Facts and Procedural History.

### A.  Ms. Felkins Largely Positive Character and Behavior Aside from Aberrant Offense Behavior in the Midst of Post-Partum Psychosis.

#### 1.  Ms. Felkins' Life Prior to Offense

For almost the entirety of Ms. Felkins' life, she has acted as a kind, responsible person.  She grew up in Humboldt County, California, where she worked hard on her family's farm and cared for her younger siblings.  PSR ¶ 49.  Tragically, she was molested by a relative for several years but was too afraid to tell anyone when it was happening.  PSR ¶ 51.  Despite these difficulties, she became involved in her community, playing basketball, taking dance lessons, and serving as an active member of Humboldt County 4H.  PSR ¶ 52.  She showed horses and swine, took part in community services, participated in parliamentary pro, was a junior leader for veterinary science, and held office of county treasurer and secretary. PSR ¶ 52.  She also worked and served as an AVID tutor for children in elementary school.  PSR ¶ 52.  Ms. Felkins' maternal grandmother had horses, and through her exposure to those horses Ms. Felkins developed a passion for riding, showing, and caring for horses.  PSR ¶ 52.

Ms. Felkins married her first husband as a young woman and the couple had two children.  PSR ¶ 53.  The marriage was troubled and in November, 2014, Ms. Felkins and her first husband separated.  Ms. Felkins moved from their home in North Carolina to Oregon, and the two children stayed with their father in North Carolina.  In October of 2015, Ms. Felkins, who was living in Oregon with her new partner (and current husband) Matthew Bushnell, gave birth to her third child.  Within a month of that birth, medical staff reported Ms. Felkins was depressed and suffering from a "low mood."  PSR ¶ 62.  In November of 2015, Ms. Felkins' doctor prescribed anti-depressants, and he increased the prescriptions in December, 2015, because Ms. Felkins was still feeling depressed much of the time.  PSR ¶¶ 62-63.

In early 2016, Ms. Felkins, her partner, and their new baby, G., moved from Oregon to California.  PSR ¶¶ 55-56, 64.  Ms. Felkins' insurance lapsed, so she did not see a doctor and get her prescriptions refilled.  PSR ¶ 64.  Ms. Felkins' post-partum mental health issues became worse.  Psychotherapist Diana Barnes, who has 30 years of experience in treating women with

2

pregnancy and postpartum-related mood disorders, has concluded that in early 2016, Ms. Felkins

began to suffer from "[a] more serious perinatal mood disorder [than postpartum depression],

namely, a bipolar episode with psychotic features, commonly understood as postpartum

psychosis." ECF No. 57, p. 2.  Dr. Barnes explained that:

> Postpartum psychosis is often described as a "cognitive disorganization
> psychosis" and presents with a constellation of symptoms that include
> hallucinations and/or delusions; extreme thought disorganization, cognitive
> confusion, and dissociation; severe insomnia; agitation and restlessness; increased
> irritability, and aggressiveness. Dissociation causes a disruption in conscious
> thought. Because psychosis creates a break with reality-testing, it disables logical
> and rational thought. It causes such disorganization of the mind that it strips the
> individual of any capacity to make an informed decision or form any rational
> intention. Consequently, what appears to make sense to the individual who is
> psychotic would never make sense to the outside observer or even to the
> individual with postpartum psychosis once they have received appropriate
> treatment as is the case with Kristy Felkins.

ECF No. 57, p. 2.  Dr. Barnes traced how Ms. Felkins' thoughts during the winter of spring of

2016 matched this pattern of scattered, confused thinking.  ECF No. 57, pp. 2-3.

## 2. Offense Conduct

Suffering from psychosis and fearing for her children, Ms. Felkins made a terrible decision.

In February of 2016, she created an account on the website Besa Mafia, a website that purported

to offer to carry out a variety of illegal services in exchange for cryptocurrency, but which in

fact, "was actually a scam website that took users' money but never carried out the offered

services."  ECF No. CR 35, p. 1.  In March of 2016, Ms. Felkins paid Besa Mafia approximately

$5,000.00 worth of Bitcoin for a hitman to kill her ex-husband.  ECF No. 35, p. 2.  By April of

2016, Ms. Felkins realized that Besa Mafia would likely not carry out the murder, and she

stopped communicating with Besa Mafia or sending the website money.  ECF No. 35, pp. 2-3.

No one from Besa Mafia ever contacted or harmed Ms. Felkins' ex-husband.  ECF No. 35, p. 3.

## 3. Ms. Felkins' Life After Offense

By the summer of 2016, Ms. Felkins recovered from her post-partum psychosis and went

forward with her life.  In 2018 she married her partner, Matthew Bushnell, and the family moved

to Nevada in 2019.  PSR ¶ 55.  Ms. Felkins lived with her family on a large property where they keep horses, ducks, and pigs.  PSR ¶ 56.  Ms. Felkins worked on the farm and was involved in her church and community.  She created a program for at-risk teen girls involving horse riding and horsemanship.  PSR ¶ 57.  Ms. Felkins' older children from her first marriage chose to live with Ms. Felkins.  PSR Attachment, ECF No. 50-3, pp. 10-14.  Ms. Felkins' also cared for her two young sons.   PSR Attachment, ECF No. 50-3, p. 18.  In short, Ms. Felkins lived a law-abiding, pro-social life.

### 4.  Arrest and Indictment

When Ms. Felkins was arrested in 2020 for the offense, she immediately admitted her conduct.  PSR ¶ 11.  Before sentencing she explained to the United States Probation Office that:

> At the time I committed this crime, I was suffering from postpartum depression, wich *[sic]* due to moving, I was no longer receiving treatment for and had stopped medication without medical supervision. I also believe I was experiencing PTSD triggers, but at the time lacked the understanding of their effects and how to manage them. I was in such a dark place at this time of my life, it was hard for me to completely comprehend what motivated me. I was struggling with not seeing my older children more regularly.

PSR ¶ 21.

On September 24, 2020, the government filed a single-count indictment charging Ms. Felkins with a violation of 18 U.S.C. § 1958, which prohibits the use of interstate commerce facilities in the commission of murder-for-hire.  ECF No. 8.

### 5.  Pretrial Supervision

After Ms. Felkins' arrest and before her sentencing she lived at her home in Nevada.  She was supervised by Pretrial Services in the District of Nevada and was fully compliant with her conditions.  PSR ¶ 3.  She attended outpatient mental health treatment for post-traumatic stress disorder.  *Id*.  She had computer monitoring conditions and there were no violations.  *Id*.  Her therapist, Licensed Clinical Social Worker Jessica Homer, wrote that during her time on pretrial supervision, Ms. Felkins

> addressed her unhealthy core beliefs and behavioral patterns that arose from the physical and sexual abuse she endured as a child and adult.  Ms. Felkins has been

a diligent and active participant in the therapy process, demonstrates consistent application of therapeutic concepts in her daily life, and has proven herself to be a concerned and attentive parent to her children.

PSR ¶ 66. Ms. Homer also stated Ms. Felkins "appears to be open and honest in session." *Id.* Treatment reports submitted to Pretrial Services confirmed that Ms. Felkins attended counseling and was "highly committed to treatment and demonstrates positive parenting skills. [Felkins] demonstrates increased emotional intelligence . . . [and] is seeking support for her children as well." *Id.*

### B. Guilty Plea and Sentencing

On March 17, 2022, Ms. Felkins entered guilty plea without a plea agreement in district court. ECF No. 32. In the factual basis supporting her plea, Ms. Felkins admitted her offense conduct. On July 20, 2023, this Court imposed a prison sentence of 60 months, to be followed by a supervised release term of three years. ECF No. 58, 59.

### C. Caregiving Crisis for Ms. Felkins' Two Youngest Children

Ms. Felkins is now serving her prison term. Both Ms. Felkins' older teen children and her son G., who is nine, and E., who is two, have been left to cope with life while she is incarcerated. While relatives try to provide the care and consistent support for Ms. Felkins' children, there is no relative who can fill the void left by Ms. Felkins, particularly for Ms. Felkins' two youngest sons, G. and E.

Mr. Bushnell, Ms. Felkins' husband and the father of G. and E., does his best but he must work very long hours to support the family. Mr. Bushnell is employed by Tungsten Engineering Contractors in the position of a Truck Driver and Union Operator. Exhibit A, p. 1. He plays an essential role in the company's operations, with primary responsibilities including transporting critical equipment job sites and collaborating directly with field crews on out-of-town projects. The company is headquartered in Washoe Valley, Nevada, but many of its projects are situated at least two hours from this location. Exh. A. p. 1. To fulfill his job duties, Mr. Bushnell travel extensively and work unconventional and fluctuating hours. Exh. A, p. 1. As put by the president of Tungsten:

It is common for Mr. Bushnell to depart early in the afternoon or late evening to

1    ensure timely arrivals, often staying overnight or multiple days on location
2    depending on project duration.  For example, recent projects have included
     extensive overnight work on highway construction projects and infrastructure
3    installations in remote rural areas.

4    Exh. A. p. 1.  Tungsten operations are frequently active during the night because of lower traffic

5    volumes.  Exh, A, p. 1.  This requires Mr. Bushnell to be available to work at night.  Exh, A, p.

6    1.  Even when Mr. Bushnell only has to commute from his home in Fallon, Nevada, to the

7    company headquarters in Washoe Valley, Nevada, his roundtrip travel is three hours.  Exhibit B,

8    p. 1.

9        Mr. Bushnell cannot simply quit his job to care full time for his two young sons.  The

10   family's monthly expenses are more than $6,500.  Exhibit B, pp. 1-8.  Even with Mr. Bushnell's

11   income, the family sometimes has to borrow money to stay afloat.  Exh. B, p. 2.  Mr. Bushnell

12   cannot simply hire a babysitter or find a daycare to provide all of the care his young sons need

13   both because of his irregular and long work hours, and because the family cannot add that

14   significant expense (see Exh. B, p. 6) to their already stretched budget.  Exh. B, p. 1.

15       Mr. Bushnell's sister, Christina Bushnell, has moved into the family home in Fallon, Nevada,

16   and is helping to care for the two young Bushnell boys.  Ms. Bushnell, however, has health

17   issues that result in excruciating pain, making it difficult for her to care for the boys.  Exhibit C

18   (filed under seal).  Ms. Bushnell has numerous physical ailments, including endometriosis and

19   chronic pain.  Exh. C, pp. 1-3.  Endometriosis is a chronic disease that "causes tissue from the

20   uterus to migrate and implant in other regions of the body (8, 9). This tissue interacts with the

21   body's endocrine, musculoskeletal, vascular, reproductive, and nervous systems (10) causing

22   numerous painful symptoms and physiological changes."  Ellis K, Munro D and Clarke J,

23   *Endometriosis Is Undervalued: A Call to Action*, FRONT. GLOB. WOMENS HEALTH,  2022 May

24   10;3:902371. doi: 10.3389/fgwh.2022.902371. PMID: 35620300; PMCID: PMC9127440.

25   (internal footnotes omitted).[1]  Endometriosis

26       causes a wide range of symptoms, including chronic pelvic pain, dysmenorrhea

27   _____

28
     [1] Available at https://www.frontiersin.org/journals/global-womens-
     health/articles/10.3389/fgwh.2022.902371/full (last accessed April 1, 2025).

                                6

(menstrual pain), dyspareunia (painful sex), dysuria (painful urination), dyschezia (painful defecation) metrorrhagia (mid-cycle bleeding), diarrhea, constipation, infertility, and myofascial pain, among others.  Furthermore, the gastrointestinal symptoms of endometriosis patients are more severe than those of controls, which often results in both coexistence and misdiagnosis of irritable bowel syndrome. As the disease progresses, patients risk developing adhesions, fibrous scar tissue bands that can abnormally bind pelvic and abdominal organs.  Endometriosis is the most frequent cause of adhesions in women and common areas for endometriosis adhesions include the anterior abdominal wall, bladder, and uterus. Adhesions can cause anatomical distortion, which can hinder fertility, cause rectal constriction, and be a cause of dyspareunia.  In a 2019 study, the presence of endometriosis-associated adhesions was shown to significantly negatively impact quality of life.

The cumulative effect of these chronic pain symptoms is a substantial burden on sufferers and 70% of patients live with unresolved pain (2), with impacts to all aspects of their quality of life.

*Id*. (internal citations omitted).

Ms. Bushnell suffers from many of the symptoms described above.  As her treating physician explains, Ms. Bushnell's "[c]urrent paint limits her physical activity including lifting/ pushing/ pulling." Exh. C, p. 1.  In a letter to the Court, Ms. Bushnell describes the fact that her endometriosis is severe, exacerbated by numerous abdominal surgeries she has undergone since her teen years.  Exh. D, p. 1.  The endometriosis has attached itself to her ovaries an intestine. Exh. D, p. 1.  Like many other women suffering from endometriosis, Ms. Bushnell now menstruates/bleeds multiple times per month (metrorrhagia).  Exh. D, p. 1.  Ms. Bushnell is now menstruating for the majority of the month, and, as she describes,

[t]his alone is draining and taxing. The pain is so bad I must use 2-3 heating pads just to ease the discomfort.  One on my back, one on my lower stomach and at times one between my legs, because...well...there just isn't anywhere this pain doesn't reach.  I also rely on pain meds to help manage my discomfort. On the days when I am not suffering due to extreme menstruation or constipation, I am simply tolerating a lesser amount of pain.

Exh. D., p. 1.

The chronic pain and other symptoms Ms. Bushnell suffers make it difficult for her to care for the two young Bushnell boys, G. (age 9), and E. (age 2).  Some days she cannot get G. to school on time or at all.  Exh. D, p. 1.  She has difficulty buying groceries and preparing meals for the boys.  *Id*.  There are days she tries to care for them while flat on her back and crying in

pain from her endometriosis and Complex Regional Pain Syndrome. *Id.*

In acting as caregiver to G. and E., Ms. Bushnell has also made her health worse by delaying needed treatment. Ms. Bushnell is a patient of Kaiser Permanente, and Kaiser does not offer health plans to Nevada residents. In June of 2024, both of Ms. Bushnell's Kaiser doctors in California discussed the possibility of surgery to assist in treating Ms. Bushnell's endometriosis. Exh. C, pp. 4-5. Ms. Bushnell reports that the surgeon who was going to perform this surgery "has now backed a way from my very complicated case, as another year of bypass scar tissue and Endometriosis attachment has resulted." Exh. D, p. 2. In addition, because she cannot leave Nevada while she is caring for G. and E. she cannot get the physical therapy for chronic pelvic pain that her doctor recommends. Exh. D, p. 2.

Without treatment, Ms. Bushnell's endometriosis and associated pain will only get worse, and she may lose her ability to have children. Exh. D, p. 2. Understanbly the disease and the implications of delaying treatment are also affecting Ms. Bushnell's mental health. Exh. D, p. 2. Ms. Bushnell's "health and mental state are in serious jeopardy." Exhibit I, p. 4. Both Ms. Felkins and Ms. Bushnell ask this Court to show mercy on both Ms. Felkins, the Felkins family, and Ms. Bushnell by allowing Ms. Felkins to return home and care for G. and E., and thereby allowing Ms. Bushnell to return to California to receive the medical care she needs. Exh. D, p. 2; Exh. I p. 4.

### D. Ms. Felkins' Conduct While Serving Her Prison Term

During Ms. Felkins' service of her prison term she has taken numerous classes, both from among those offered by the BOP and by outside providers. She has completed BOP classes involving topics such as history, geography, and Spanish. Exhibit E, p. 3. She has also taken courses in crafts such as knitting and cross-stitching. Exh. E, p. 3. In addition, on October 27, 2024, Ms. Felkins was awarded a Certificate of Completion for completing 100 hours in the Waseca Walkers program. Exh. F, p. 1. The certificate recognized her "dedication, hard work, and achievement." Exh. F, p. 1.

Most importantly, Ms. Felkins has undergone BOP training to become a tutor. Exh. E, p. 3. On July 19, 2024, the BOP awarded her a Certificate of Achievement for completing the

8

Education Tutor Training ACE class.  Exh. F, p. 2.  Ms. Felkins has steadily worked as a tutor during her time within the BOP, regularly being rated as "outstanding" at her job.  Exh. E, pp. 4-6.  Her fellow prisoners have observed that she works patiently and persistently in assisting others in obtaining the GED.  Exhibit K, pp. 1-2, 4, 6-8.  She has impressed those who have come to know her in prison as a caring, honest, person who is dedicated to helping others.  Exh. K, pp. 1-8.

In addition to taking BOP courses and working as a tutor, Ms. Felkins has furthered her growth and skills through outside providers while she has served her sentence.  In order to improve her job skills, Ms. Felkins has taken courses to train as a paralegal through Blackstone Career Institute.  Exh. G, pp. 8-15.  She has completed sections in Contracts, Torts, Criminal Law, Real Property, Civil Actions, and Criminal Procedure, regularly receiving high marks on her tests.  Exh. G, p. 13.  In order to deepen her spiritual life, Ms. Felkins has taken courses from the Global University's School for Evangelism and Discipleship.  She has completed courses covering "Who Jesus Is," "Your New Life," and "The Great Questions of Life."  Exh. G, pp. 1, 16.  Ms. Felkins has also taken courses through the International Christian College and Seminary.  Exh. G, pp. 2-7.  Ms. Felkins has earned straight As in her courses, and her instructor has been impressed by her thoughtful analysis and reflection and her ability to apply religious and ethical writings to her own life.  *Id*.  Finally, Ms. Felkins has successfully completed courses through Crossroads Prison Ministries.  Exh. G, pp. 17-18.

Ms. Felkins has fully paid her special assessment.  Exh. E, p. 8.  She has had no disciplinary write ups in prison. Exh. E, p. 7.  She is deemed by the BOP to have a minimal risk level. Exh. E, p. 11.  She has continually accrued First Step Act Earned Time Credits while in BOP custody. Exh. E, p. 12.

### E.  Ms. Felkins' Release Plan

Ms. Felkins has a strong release plan.  She will live at her home in Fallon, Nevada, with her husband and two youngest children.  Exhibit L, p. 1.  Ms. Felkins' return as the primary caregiver of her two young sons will allow Christina Bushnell to be relieved of caretaking duties and undergo much-needed medical treatment.

Community members look forward to Ms. Felkins' return as well. Mary Olshefski writes that Ms. Felkins has played a positive role in her family's life by teaching her granddaughter how to horseback ride and work with animals. Exh. J, p. 1. Ms. Olshefski's granddaughter similarly writes that Ms. Felkins was her guide and mentor and taught with "exceptional kindness, expertise, and understanding." Exh. J, p. 2.

Upon release, Ms. Felkins will be added to her husband's health insurance and will be able to obtain treatment for physical and mental health issues. Exh. L, p. 2. Ms. Felkins' former therapist, Jessica Homer, has agreed to take Ms. Felkins back on as a patient to resume the therapeutic work she took on before entering the BOP. Exhibit H, p. 1. Ms. Homer believes Ms. Felkins can benefit from future therapy, and in future counseling can work on topics such as communication, healthy boundaries, healing from the impacts of incarceration, and re-adjusting to the community. Exh. H, p. 1.

While Ms. Felkins' primary work upon release will be dedicated to caring for her children, if she has offers of employment if she has an opportunity to work. Ms. Felkins has been offered several job opportunities upon release. She has been offered a job at Tungsten Engineering Contractors. Exhibit J, pp. 4-5. The president and CEO of Tungsten Engineering has written a letter to the Court explaining that despite Ms. Felkins' offense "we firmly believe in Ms. Felkins' potential for rehabilitation and reintegration into society." Exh. J, p. 4. Tungsten Engineering is "dedicated to providing individuals like Ms. Felkins with a supportive environment wherein they can rebuild their lives and contribute positively to our organization. Exh. J, p. 4. Ms. Felkins has also been offered employment by His Inspiration Christian Books & Gifts. Exh. J, p. 3. The store's owner has known Ms. Felkins for over five years and believes she has been rehabilitated and deserves an opportunity. Exh. J, p. 3.

Ms. Felkins will also have the ongoing support of the Federal Defenders Social Work Team as she reenters the community. Exh. L, p. 4.

Finally, Ms. Felkins will be on supervised release upon her release. She had no violations while she was on pretrial release and actively participated in programming. PSR ¶ 3. Ms. Felkins also agrees that if the Court reduces her sentence to time-served the Court may decide it

is appropriate to enhance her punishment by adding a condition of home confinement to her term of supervised release.

### III.    Argument

#### A.  Statutory Framework for Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A)(i)

The compassionate release statute grants courts authority to reduce a term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(C)(1)(A)(i). Section 3582(C)(1)(A)(i) provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the   unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--**

(i) **extraordinary and compelling reasons warrant such a reduction;** . . . ***** **and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]**

18 U.S.C. § 3582(c)(1)(A)(i) (bold added).  Thus, in order to reduce a sentence, the statute requires the Court to 1) find extraordinary and compelling reasons for the reduction, 2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and 3) ensure any reduction is consistent with applicable policy statements.

Under the U.S. Sentencing Guidelines, the following list of circumstances qualify as an "extraordinary and compelling reason" to warrant early release: (1) the defendant's medical circumstances; (2) the defendant's age; (3) the defendant's family circumstances; (4) whether the defendant was a victim of abuse while serving his term of imprisonment; (5) "other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described above warrant compassionate release"; and (6) "a change in the law (other

than an amendment to the Guidelines Manual that has not been made retroactive)" if certain

other conditions are met. U.S. Sent'g Guidelines Manual § 1B1.13(b).

### B.  Ms. Felkins Has Exhausted Administrative Remedies

A district court may consider a motion for compassionate release brought by an inmate

only if "the inmate has requested that the BOP make such a motion and either (a) the inmate has

fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the

[inmate]'s behalf, or (b) 30 days have elapsed since the warden of the [inmate]'s facility received

a compassionate-release request from the inmate."  *United States v. Keller*, 2 F.4th 1278, 1281

(9th Cir. 2021) (quotation marks and citation omitted, alterations in original); *see also* 18 U.S.C.

§ 3582(c)(1)(A).  Ms. Felkins has exhausted her administrative remedies.  Exhibit M.

### C.  Extraordinary Circumstances Support a Grant of Compassionate Release.

#### 1.  Under U.S.S.G. Section 1B1.13(b)(3) Ms. Felkins' Family Circumstances Are and Extraordinary and Compelling Reason Warranting a Grant of Compassionate Release.

U.S.S.G. § 1B1.13(b)(3) provides that a defendant's family circumstances are an

extraordinary and compelling reason that can support a grant of compassionate release when

there is:

> The death or incapacitation of the caregiver of the defendant's minor child or the
> defendant's child who is 18 years of age or older and incapable of self-care
> because of a mental or physical disability or a medical condition.

U.S.S.G. § 1B1.13(b)(3)(A).

Under U.S.S.G. § 1B1.13(b)(3)(A) an extraordinary and compelling reason exists in Ms.

Felkins' case because the person who is caring for her children in her absence, Christina

Bushnell, has a serious health issue that severely interferes with her ability to care for others and

to obtain the treatment she needs.  Ms. Bushnell is incapacitated and should be relieved of her

caretaking duties so she can get needed surgery.  Exh. C; Exh. D.  M.  Mr. Bushnell cannot serve

as the primary caretaker for the two youngest children in the family because he works long and

1    irregular hours, including overnights, for his company.  Exh. A; Exh. B.  Somebody needs to

2    earn money to support the family, and he is doing so.

3            Many federal courts have granted relief when the caretaker of a defendant's minor or

4    disabled child has become incapacitated, just as Christina Bushnell is now incapacitated by pain

5    arising out of her medical condition.  In *United States v. May*, 2024 WL 5170002, at *4 (N.D.

6    Ohio Dec. 19, 2024), the Court noted that federal courts "have found that a caretaker's inability

7    to support themselves can qualify as incapacitation if their inability diminishes their availability

8    to provide for minor children."  Courts also consider "the best interests of the children, and the

9    suitability of the minor child's caregiver."  *Id*. at * 5.  In *May* the Court granted compassionate

10   release after Ms. May had served about six months of her 24-month sentence due to the fact that

11   Ms. May's incarceration left her 21-year-old daughter as the caregiver for eight children, an

12   overwhelming task.  As put by the Court:

13           The choice of leaving May in prison for the next sixteen months or reducing her
             sentence to allow her an earlier start to making a home for her children, ideally
14           before the beginning of the next school year, is not a difficult choice. In the
             opinion of the undersigned, it is the only right-thinking one.
15

16   *May*, 2024 WL 5170002, at *6.

17           In *United States v. Nunez*, 2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024), the court granted

18   compassionate release where the mother of Mr. Nunez's son had breast cancer and her treatment

19   at times causes severe and debilitating side- effects that made it impossible for her to properly

20   care for their child.  In *United States v. Muniz*, the Court granted compassionate release where

21   the defendant's mother, who was caring for her five and twelve-year-old children, had a stroke

22   that caused "immense difficulty parenting Defendant's three children."  *United States v. Muniz*,

23   2024 WL 3488485, at *2 (D. Utah July 19, 2024).  The Court recognized that the defendant's

24   father could not take over daytime caretaking responsibilities because "he works to support the

25   family."  *Id*.[2]  In *United States v. Bowers*, No. 2023 WL 5017015 (D. Me. Aug. 7, 2023), the

26   _____

27   [2] Additional cases in which courts have granted compassionate release on the ground that the
     caretaker of a defendant's minor children has become incapacitated, requiring the defendant to
28   return home and assume caretaking responsibilities, are too numerous to list in total but include:

Court granted compassionate release where the defendant's minor child was experiencing mental

health struggles due to his father's incarceration and the child's mother was unable to properly

care for the child.

---

- *United States v. Jackson*, 2024 WL 4826466, at *4 (S.D.N.Y. Nov. 19, 2024) (granting compassionate release where "Mr. Jackson's partner represents that her health issues are worsening, that these issues pose difficulties in caring for their two children, and that the lack of available alternative caregivers has prevented her from seeking the medical treatment that she needs to improve her condition.");
- *United States v. Smith*, 2024 WL 4556521, at *6 (D. Nev. Oct. 22, 2024) ("because I find that Z's caregiver is incapacitated [by substance abuse and mental health issues], Smith has provided the court with an extraordinary and compelling reason for a sentence reduction");
- *United States v. Elm*, 2024 WL 4026024 (S.D.N.Y. Sept. 3, 2024) (granting compassionate release on ground that defendant is needed to care for son);
- *United States v. Walker*, 2024 WL 580152, at *4 (D.N.J. Feb. 13, 2024) (granting compassionate release where "Walker has demonstrated that extraordinary and compelling reasons exist due to the incapacitation of her mother, the caregiver of Walker's minor children.");
- *United States v. Resendiz*, 2023 WL 7309439, at *2 (S.D. Cal. Nov. 6, 2023) (where defendant's wife was caregiver for couple's two minor children and suddenly had to dedicate time to medical needs of one of the children, court granted compassionate release on ground that "[a]lthough Defendant's wife is not truly incapacitated, she is unable to take care of two of her children while she commutes back and forth to the hospital caring for her sick two-year-old. She is likely to continue to be unavailable on and off over the next year, and the grandparents, who are currently caring for the two children, are unable to continue to do so.");
- *United States v. Curl*, 2023 WL 6213049, at *3 (D. Nev. Sept. 22, 2023) (granting compassionate release where defendant's mother was guardian of his three minor children and "medical and mobility needs severely and increasingly limit her capacity to care for them.");
- *United States v. Wessels*, No. 2021 WL 5506656, at *1 (D. Minn. Nov. 24, 2021) (granting compassionate release where defendant's parents cared for minor children and they suffered from medical issues that limited their ability to care for children);.
- *United States v. Ortega*, 2021 WL 5038791, at *3 (D. Kan. Oct. 29, 2021) (granting compassionate release where defendant's parents cared for her minor son and her father passed away and mother suffered from heart attack that impairs here ability to provide care);
- *United States v. Blancas de Hernandez*, 2021 WL 2290778, at *4 (S.D. Cal. June 4, 2021) (granting compassionate release where defendant's mother was primary caregiver to child and suffered from poor health, a language barrier, and limited mobility);
- *United States v. Morrison*, 501 F. Supp. 3d 957, 959 (D. Nev. 2020) (granting compassionate release because the current caregiver of the defendant's children, the defendant's 60-year-old mother, "ha[d] spinal stenosis and degenerative disc disease and [was] ... limited in her physical ability to take care of them").

Ms. Felkins' children are facing a caregiving crisis.  The youngest two children need daytime care.  Mr. Bushnell is the family's primary financial provider and as a truck driver long and irregular hours, including some overnight hours.  Exh. A; Exh. B.  That has left Mr. Bushnell's sister, Christina Bushnell, to try to become the primary caregiver for the two young children.  Ms. Bushnell, however, is frequently incapacitated by the pain associated with her endometriosis and chronic pain diagnosis.  Exh. D.  She has put off much needed medical care while caring for the children, which has further exacerbated her problems and could threaten her reproductive health.  Exh. D.

Ms. Bushnell certainly should get treatment for her endometriosis as soon as possible; Ms. Bushnell is in pain should be addressing her medical issues with her doctors in California.  "If left untreated, endometriosis sometimes can be a progressive condition that can lead to mechanical obstruction of the various areas in the reproductive tract, causing chronic pain as well as infertility. Sometimes there is a slight association with an increased risk for certain types of gynecologic cancers."[3]  In addition, at any time Ms. Bushnell's condition could become so debilitating that she has to suddenly leave the family and get treatment, which would leave the younger children with no day-to-day caregiver.

Ms. Bushnell's incapacitation is an extraordinary circumstance that warrants a grant of compassionate release.

### 2.  Ms. Felkins' Rehabilitation in Prison Supports Compassionate Release

The Sentencing Guidelines provide that if a person has shown an "extraordinary circumstance under U.S.S.G. § 1B1.13(a)-(c), then "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  U.S.S.G. § 1B1.13(d).  *United States v. Henderson*, 2024 WL 881253, at *7 (E.D. Mo. Feb. 23, 2024) (while

---

[3] Mount Sinai, *Ask the Doc: Do I Need to Be Concerned About Endometriosis?* (April 21, 2023), available at https://health.mountsinai.org/blog/do-i-need-to-be-concerned-about-endometriosis/ (last accessed November 25, 2024).

rehabilitation alone cannot support a grant of compassionate release, it can be part of a combination of circumstances that support a grant of compassionate release).

Ms. Felkins has engaged in admirable rehabilitation while in prison. She has completed BOP classes available to her (Exh. E, p. 3) and been commended for her hard work in the Waseca Walkers program. Exh. F, p. 1. She undertook BOP training to serve as a tutor (Exh. F, p. 2) and she has regularly been rated as "outstanding" in her job as a tutor. Exh. E, pp. 4-6. Her fellow prisoners have observed that she works patiently and persistently in assisting others in obtaining the GED. Exhibit K, pp. 1-2, 4, 6-8.

In addition to taking BOP courses and working as a tutor, Ms. Felkins has increased her skills through classes provided by outside educational organizations. She has trained as a paralegal through Blackstone Career Institute. Exh. G, pp. 8-15. Further, she has deepened her spiritual life through classes in religion and philosophy. Exh. G, pp. 1-7, 16-18. She has earned straight As in her coursework and impressed her teacher with her insights and hard work. Exh. G, pp. 2-7.

Ms. Felkins has fully paid her special assessment. Exh. E, p. 8. Ms. Felkins has had no disciplinary write ups in prison. Exh. E, p. 7. She is deemed by the BOP to have a minimal risk level. Exh. E, p. 11. She has continually accrued First Step Act Earned Time Credits while in BOP custody. Exh. E, p. 12. All of these factors, combined with her positive conduct while under pretrial supervision, weigh in favor of a grant of compassionate release.

As stated by Ms. Felkins, in a letter she wrote the Court on March 25, 2025 (Exh. I), "over the past 18 months, I have learned invaluable lessons about the significance of my role within my family and community. I now fully understand how my actions both good and bad impact the lives of others." Exh. I, p. 1. Ms. Felkins explains

> I have come to understand the importance of reaching out for help. Had I known
> about the support available to me years ago, I do not believe my mental state
> would have deteriorated to the point it did. I now realize that sometimes all we
> need to do is ask for help, and I want to assist others in finding that support, so
> they do not have to endure the mental anguish and consequences that often follow
> from making poor decisions in moments of distress.

Exh. I, p. 3. In prison Ms. Felkins has experienced "positive transformations" that she will

16

1    continue to pursue.  Exh. I, p. 4.

2    **D. The 18 U.S.C. Section 3553(a) Factors Support a Grant of**
3    **Compassionate Release.**

4    Consideration of the factors set forth in 18 U.S.C. § 3553(a) also supports a grant of

5    compassionate release to Ms. Felkins.

6    In terms of the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1)), certainly

7    using the internet with the intent to hire a hitman is very serious conduct.  The circumstances of

8    this offense include the fact that Ms. Felkins had lost access to her medical care and was

9    suffering from postpartum psychosis. ECF No. 57, pp. 2-3.  Her conduct was truly aberrational;

10   aside from this incident she has been a caring, responsible person.  Thankfully, like virtually all

11   dark web internet sites promising to send out a hitman for a fee,[4] the one Ms. Felkins contacted

12   was a scam and no one was endangered.

13   The history and characteristics of Ms. Felkins (18 U.S.C. § 3553(a)(1)) show that aside from

14   this incident, she has been a kind, responsible person.  She was involved with her community

15   through the 4-H and other organizations as a young person, and as an adult she was a dedicated

16   mother who worked on the family farm and helped young people through training with horses.

17   PSR ¶¶ 49-52.  Even now while she is incarcerated, she is kind and generous in sharing her

18   talents, working as a tutor to help others earn their GEDs and supporting her fellow prisoners.

19   Exh. E, pp. 4-6; Exh. K, pp. 1-8.

20   Moreover, Ms. Felkins' circumstances include the fact that she is a mother to four children.

21   Her older children have experienced depression in her absence and her sister-in-law, Christina

22   Bushnell, has uprooted her life to provide childcare to the younger children, but doing so has

23   caused her to stop getting needed medical care.  Exh. C; Exh. D.  This not only leaves Ms.

24   Bushnell in extreme pain but increases the risk that her untreated endometriosis could cause

25   permanent damage to her body.  Ms. Felkins' is needed as a caregiver to her children.

26

27   ───────────────────

28   [4] Popper, Nathaniel, *Can You Really Hire a Hitman on the Dark Web?*, INTERNATIONAL NEW
     YORK TIMES (March 6, 2020) ("Experts and law enforcers who have studied these sites —
     almost all of them on the so-called dark web or dark net — say they are scams. There has not
     been a known murder attributed to any of them.").

17

In terms of the need for the sentence to adequately punish, deter criminal conduct, and protect the public (18 U.S.C. § 3553(a)(2)), a sentence of time-served to be followed by supervised release with home confinement will adequately serve those purposes. Ms. Felkins has served approximately 18 months in harsh and dysfunctional prisons. She has gone through the excruciating pain of being separated from her family, including four children. She will have a three-year term of supervised release when she is released from prison and the Court can enhance the punitive nature of that supervised release term by adding a condition of home confinement. Ms. Felkins' arrest, conviction, and sentence have had a deterrent effect. Her case generated regional and even national news coverage.[5] The public will not be endangered by a reduction in Ms. Felkins sentence. Ms. Felkins' offense was truly a one-off fueled by a mental health crisis that is no longer present in her life. Before the offense, in the four-and-a-half years between the offense and her arrest, and ever since her arrest, Ms. Felkins has engaged in no other misconduct but instead has engaged in wholly pro-social conduct.

The need to provide Ms. Felkins with training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D)) weighs heavily in favor of a reduction in sentence. Ms. Felkins made excellent progress with her therapist Jessica Homer while was under pretrial supervision. PSR ¶ 66. Ms. Homer has agreed to take Ms. Felkins back on as a patient when she is released from prison and Ms. Homer believes Ms. Felkins can benefit from future therapy, particularly as she works in the areas of communication, healthy boundaries, healing from the impacts of incarceration, and re-adjusting to the community. Exh. H, p. 1. The BOP has not provided Ms. Felkins with any mental health therapy. This is especially troubling in that Ms. Felkins, a sexual abuse survivor, served time at a BOP facility rife with sexual abuse by guards against prisoners. The BOP has not even managed to place Ms. Felkins in a parenting program it recommends she takes because despite her requests for admission in the program, the program has no space. Exhibit E, pp. 8-9.

---

[5] *See, e.g.*, *AP News, A Nevada woman who hired a hitman using bitcoin to kill her ex-husband gets five years in prison* (July 21, 2024), available at https://apnews.com/article/bitcoin-murder-for-hire-plot-982744db06845b532666db97660ed0b8 (last accessed November 26, 2024).

In terms of the kinds of sentence and sentencing range established for Ms. Felkins' offense and the need to avoid unwarranted sentencing disparities, a reduced sentence would be a sentence below Ms. Felkins' advisory Guidelines range.  However, this is true in virtually all compassionate release cases.  Through passage of the First Step Act of 2018, Congress showed that it approves of judges granting compassionate release when the circumstances are appropriate.  This is such a case.  Finally, this case does not involve restitution (18 U.S.C. § 3553(a)(7).

## IV.     Conclusion

For the foregoing reasons, Kristy Lynn Felkins respectfully requests that the Court grant reduction in sentence to time served to be followed by a term of supervised release that includes a condition of home confinement.

DATED: April 3, 2025                           Respectfully submitted,
                                               HEATHER E. WILLIAMS
                                               Federal Defender

                                               */s/ Carolyn M. Wiggin*
                                               Carolyn M. Wiggin
                                               Assistant Federal Defender

                                               Attorneys for Defendant-Movant
                                               KRISTY LYNN FELKINS